## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| DIAMOND ELITE COMMUNITY LLC,<br><br>Plaintiff,<br><br>v.<br><br>URBAN BAY FINANCIAL LLC; URBAN BAY HOUSING FUND, LLC d/b/a URBAN BAY FINANCIAL LLC; URBAN BAY TAMPA APTS LLC;  CALEB JOHN WALSH d/b/a URBAN BAY FINANCIAL LLC; BRITTANY INFIELD; JOSHUA MANCE; and JOSEPH HERNANDEZ,<br><br>Defendants. | Case No. _____ |

## <u>COMPLAINT</u>

Plaintiff, Diamond Elite Community LLC ("**Plaintiff**" or "**Diamond**"), files this Complaint against Defendants, Urban Bay Financial LLC ("**Urban Bay Financial**"), Urban Bay Housing Fund LLC ("**Urban Bay Housing Fund**"), Urban Bay Tampa Apts LLC ("**Urban Bay Apts**"), Caleb John Walsh ("**Mr. Walsh**"), Brittany Infield, Joshua Mance, and Joseph Hernandez (collectively, "**Defendants**"), and alleges as follows:

1

## INTRODUCTION

1.    This case arises out fraud committed by a serial fraudster in addition to Defendants' blatant failure to perform in accordance with the terms of a loan commitment to refinance a loan in the amount of approximately $20,000,000, secured by real property in Arizona; thereby causing Plaintiff to lose its property. In sum, knowing full-well Plaintiff was relying exclusively on Defendants to refinance existing secured debt, Defendants promised to fund a loan by a date certain, and indisputably failed to do so – without a valid reason.  As a result of Defendants' blatant failures, Plaintiff lost valuable real property to a trustee sale. As Defendants well-knew at the time they agreed to pay off the existing debt and fund a new loan, the real property securing the loan was (and is) worth far in excess of the existing debt due, in part, to existing utility lines on the property and restrictions on development of surrounding properties.

2.    As Defendants also knew, based on Defendants' contractual promise to provide the loan (and Plaintiff's promise not to seek alternative lenders), Plaintiff paid Defendants a significant loan commitment fee, and also paid the existing lender substantial extension fees in connection with a forbearance agreement to allow Defendants time to close and fund the loan.

3.    Unfortunately, without explanation, Defendants failed to fund the loan prior to the expiration of the forbearance period.

4.      As a direct, foreseeable, and proximate result of Defendants' fraud, wrongdoing, and inaction, Plaintiff lost the property at a trustee sale.  In this action, Plaintiff seeks just compensation for its lost real property and return of all funds paid to Defendants.

## THE PARTIES

5.      Plaintiff, Diamond Elite Community LLC, is an Arizona limited liability company, with its principal place of business in Casa Grande, Arizona. For purposes of diversity jurisdiction, Plaintiff is a domicile of the States of Arizona, Delaware, and New York because its members are citizens of these jurisdictions.

6.      Defendant, Urban Bay Financial LLC, holds itself out as a Florida limited liability company, with its principal place of business in Tampa, Florida; however, there is no public registration of any such entity in Florida. It appears to instead be a Wyoming limited liability company with a principal office in Las Vegas, Nevada. *See* Business Entity Detail – Wyoming Secretary of State, a true and correct copy of which is attached hereto as **Exhibit H** and incorporated herein by reference.  As is set forth in more detail below, this designation seems to be one of form, not substance, as Urban Bay Financial has represented itself as a Florida limited liability company both to Plaintiff and to the public. *See* the "Loan Commitment" a true and correct copy of which is attached hereto as **Exhibit A**

3

and incorporated herein by reference; and Urban Bay Financial's former website a true and correct copy of which is attached hereto as **Exhibit G**. Nonetheless, because Mr. Walsh is Urban Bay Financial's sole member, Urban Bay Financial is domiciled in Florida for diversity purposes.

7.    Defendant, Urban Bay Housing Fund LLC, is a Florida limited liability company, with its principal place of business in Tampa, Florida. For purposes of diversity jurisdiction, Urban Bay Housing is a citizen of Florida because Mr. Walsh, its sole member, is a citizen of that jurisdiction.[1]

8.    Defendant, Urban Bay Tampa Apts LLC, is a Florida limited liability company with a principal address in St. Petersburg, Florida, and a principal place of business in Hillsborough County, Florida. Defendant Caleb Walsh is listed as Urban Bay Apts' Title Manger.[2] *See* Search of Florida's Division of Corporations a true and correct copy of which is attached hereto as **Exhibit L.** Because Mr. Walsh is Urban Bay Apts sole member, it is a citizen of Florida for diversity purposes.

9.    Defendant, Caleb Walsh is a citizen and resident of Hillsborough

---

[1] It appears that on April 30, 2025, Urban Bay Housing Fund filed for voluntary dissolution and is no longer active but instead is in the winding down process. Mr. Walsh is listed as the person appointed to wind up the company's activities and affairs. *See* Exhibit N. Plaintiff may still sue Urban Bay Housing Fund while it is winding down per Fla. Stat. Ann. § 605.0717(1)(b).

[2] It appears that on April 29, 2025, Urban Bay Apts filed for voluntary dissolution and is no longer active but instead is in the winding down process. Mr. Walsh is listed as the person to wind up the company's activities and affairs. Plaintiff may still sue Urban Bay Housing Fund while it is winding down per Fla. Stat. Ann. § 605.0717(1)(b).

4938-2816-9283, v. 6

County, Florida.  Mr. Walsh is listed as the Manager for Urban Bay Financial, Urban Bay Housing Fund, and Urban Bay Apts.

10.    Defendant Brittany Infield is an individual residing in Hillsborough County, Florida. She was employed by Urban Bay during the timeframe of the relevant facts alleged herein.

11.    Defendant Joshua Mance is an individual residing in Hillsborough County Florida. Although no longer employed by Urban Bay, Defendant Mance was employed by Urban Bay during the timeframe of the relevant facts alleged herein.

12.    Defendant Joseph Hernandez is an individual who upon information and belief resides in Tampa, Florida.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1).  There is complete diversity between the Parties, whose citizenship is Arizona, Delaware, and New York on the Plaintiff's side and Florida on the Defendants' side.  The damages caused by Plaintiff exceed $7 million; thus, the amount in controversy is far in excess of $75,000, exclusive of interest and costs.

14.    This Court has personal jurisdiction over each Defendant because they are all domiciled in the state of Florida, and because they consented to

jurisdiction in this forum on page 4 of the Loan Commitment (defined below) (Exhibit A).

15.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, a substantial part of the events or omissions giving rise to the claim occurred in this jurisdiction.  Further, Defendants consented to venue in this Court on page 4 of the Loan Commitment (defined below) (Exhibit A).

## FACTS

### The Property

16.    The real property Plaintiff lost due to Defendants' failure to fund is located at Cottonwood Lane and Peart Road, Casa Grande, Arizona 85122 (the "**Property**").

17.    At all relevant times, the Property was and is of particular and especially unique value because it has pre-existing water, sewer, electrical, and other utility connections, that the State of Arizona is no longer granting for new development in the surrounding area.

### The Loan Commitment

18.    On or about February 22, 2023, Plaintiff and Defendant Urban Bay Financial entered into an agreement entitled "Commitment Letter" (the "**Loan Commitment**").

19.    The Loan Commitment required Urban Bay Financial to fund a

4938-2816-9283, v. 6

"Senior Loan" in the amount of $19,100,000. *See* Exhibit A.

20.     In reasonable reliance on Urban Bay Financial' s unconditional promise to fund a refinance in the Commitment Letter, Plaintiff agreed to exclusivity as follows:

> Unless authorized in writing by Urban Bay . . . [Diamond] shall not (and shall not permit its affiliates or subsidiaries or any of their respective directors, officers, employees, attorneys, or other representatives) to, directly or indirectly, (a) accept any proposal, offer, or commitment from, or enter into any agreement with, any other person or entity to consummate a competing transaction; (b) take any action to solicit, initiate, facilitate, encourage, or consummate a competing transaction; or (c) engage in discussions or negotiations with, or furnish information or access to the Collateral to, any person (other than Urban Baby or its representatives) with respect to a competing transaction. [Diamond] shall cause any discussions or negotiations with any other person or entity regarding a competing transaction to be immediately terminated.

*Id.*

21.     In other words, not only did Urban Bay Financial promise to make a loan to Plaintiff to timely pay off the Existing Debt (defined below), it also handcuffed Plaintiff by insisting Plaintiff cease all other efforts to find funding to avoid losing the valuable Property.

**Plaintiff's Payments to Defendants**

22.     Pursuant to Section 4 of the Loan Commitment, Plaintiff paid Defendants a "Commitment Deposit" in the amount of $95,500.

23.     In addition, Plaintiff had already paid Defendants $68,900 as a good

7

faith deposit under a term sheet ("Term Sheet") dated January 6, 2023. *See* "Term Sheet: a true and correct copy of which is attached hereto as **Exhibit I** and incorporated herein by reference.

24.     In total, Plaintiff has paid, and Defendants have wrongfully retained, a total of $164,400.

25.     Of course, to date, Plaintiff has received absolutely no benefit from these payments while, in contrast, Defendants have been unjustly enriched.

## **The Existing Loan – Plaintiff's Disclosed Reason for the Refinance**

26.     Prior to executing the Loan Commitment, Defendants were well-aware that Plaintiff had a looming due date on a debt owed to Okoa Capital LLC ("**Okoa**") (the "**Existing Debt**").  Indeed, Plaintiff told Defendants that the entire purpose of the loan was to pay off the Existing Debt.

27.     Accordingly, following the effective date of the Loan Commitment, on or about March 2, 2023, Plaintiff entered into a Forbearance Agreement with Okoa (the "**Forbearance Agreement**"), a true and correct copy of which is attached hereto as **Exhibit B** and incorporated herein by reference.

28.     To obtain forbearance from Okoa, Plaintiff was forced to pay extension fees of $105,300 to extend the forbearance period through April 17, 2023, which would allow sufficient time for Plaintiff to fund the new loan by the outside date of March 31, 2023. *See* Paragraph 6 of Exhibit B.

29.    Specifically, pursuant to the Forbearance Agreement, on or before April 17, 2023, Plaintiff was required to pay Okoa a final balloon payment for all outstanding principal and unpaid interest – which, as of the end of March 2023, equaled nearly $6,000,000.

30.    Because of the exclusivity provision in the Loan Commitment, Plaintiff was precluded from obtaining alternative financing and justifiably relied on Defendants' obligation to timely fund the loan.

31.    As a direct and proximate result of Defendants' failure to timely fund the loan, Plaintiff defaulted on the Forbearance Agreement and lost the Property to a trustee sale.

**Plaintiffs Warn Defendants of the Dire Consequences of Failing to Fund**

32.    Plaintiff made multiple demands that Defendants fund the loan, but Defendants responded with nonsensible excuses. Defendants continued to lead Plaintiff on with no intention of ever funding the loan.

33.    On March 23, 2023, Defendant Infield sent the following email, with Defendants Walsh, Mance, and Hernandez copied: "We have been pounding the pavement attempting to complete the underwriting file as we know time is of the essence on this file" but we found out from the appraisal company that "the borrower may assign to a different lender" and Plaintiff was "working against" Urban Bay forcing Urban Bay to "pause the file."

9

34.    Plaintiff's broker responded that "we just tried calling you and got voicemail. There seems to be a miscommunication" as Plaintiff is "fully committed to close with Urban Bay. Please DO NOT pause the loan." *See* parties email communications, a true and correct copy of which is attached hereto as **Exhibit M** and incorporated herein by reference.

35.    In reality, Defendant Infield and the other Defendants knew this was bogus and were engaging in delay tactics. She responded, "we are now almost 2 weeks behind waiting on the appraisal which is causing a delay on the loan that we originally wanted to fund quickly." Over the next week, Defendants requested updates, with no response.

36.    On March 30, 2023, Plaintiff's broker asked Mr. Walsh if they could discuss timing, in response to which Mr. Walsh, finally responded and again assured Plaintiff that "we should be able have everything set to proceed and beat the deadline!" *See id.*

37.    Mr. Walsh and Defendants were then asked how much will be funded on day 1 for the loan payoff: "Cale[b] and team…when can we expect an answer….I don't understand why this isn't being dealt with the utmost urgency."

38.    On April 3, Mr. Walsh again attempted to deflect blame onto Plaintiff and said there were "multiple messages exchanged…please review the thread."

39.    On April 5, the broker again emailed Mr. Walsh: "we are going days

with Urban dark on us….Urban committed to closing by end of March, and pressured our client into submitting a very large deposit….[W]e are now past your commitment date and we are not hearing from your team." Mr. Walsh responded: "Urban has not gone dark. Brittany please find out when credit can hold the aforementioned zoom meeting with sponsor." *See id.*

40.    On April 6, Defendant Infield responded and said she needed answers to a number of questions. The broker responded: "Brittany, I must say I am shocked by these questions. This was all discussed on our initial communication and at least an additional 10 times by phone. I have never seen anything like this in my career. Here are the answers again." *See id.*

41.    Again, Defendants were aware they already had the requested information and were instead engaging in yet another delay technique as part of their fraudulent scheme.

42.    Defendant Infield then proceeded to attempt to schedule a zoom call but insisted that Plaintiff must be on the call. The broker responded that "we have already had multiple calls with the borrower. I do not understand why we need to this again otherwise delay the call….I really would like transparency here. Please confirm we are closing on or before April 14."

43.    Mr. Walsh responded: "we are trying to nail down the closing statement and associated loan documents with our credit team….it's hard to shape

the closing with this uncertainty." *See id.* Again, this was bogus. These companies,

including the "credit team" are all alter egos of Mr. Walsh who was engaging in

yet another delay tactic.

44.    Mr. Walsh then insisted that the Plaintiff be on the call for "technical

aspects of the project and "how to structure the proceeds…." Mr. Walsh then

attempted to blame Plaintiff for Defendants' failure to fund the loan, falsely

accusing Plaintiff of failing to provide details. *See id.*

45.    Finally, in a letter dated April 17, 2023, Plaintiff warned Defendants

that their failure to fund the loan would result in Plaintiff losing the Property and

other damages, as follows:

> The purpose of this letter is to demand immediate closing of the Loan in a good-faith effort to prevent the significant losses and damages that Borrower will incur if Lender does not fund the Loan promptly.

> As you know, Lender executed the Commitment, undertaking the obligation to refinance the existing loan from OKOA on or before March 31, 2023…. Pursuant to the Commitment, Borrower paid Lender the $95,500 Commitment Deposit (in addition to the $68,900 good-faith deposit Borrower paid Lender pursuant to the term sheet Lender sent Borrower on January 6, 2023) and provided Lender's preliminary diligence items on the same day that Borrower and Lender executed the Commitment.

> Pursuant to the Commitment, the Closing Date for the Loan was on or before March 31, 2023—over two weeks ago—but Lender has yet to close the Loan. Repeated emails to Lender from the undersigned and Borrower's broker have gone unanswered.

> Please be advised that, Borrower will be in default under the

existing loan from OKOA if Lender does not close the Loan promptly. As you know, Borrower entered into the Amendment to Forbearance Agreement with OKOA on March 2, 2023 (the "Agreement") in reliance on the Commitment…. Borrower paid OKOA significant fees for the forbearance through today.

Specifically, pursuant to the Agreement, Borrower paid a $99,000 extension fee for the $5.5MM Note, and a $6,300 extension fee for the $700,000 Note, to extend the forbearance period through today. Pursuant to the Agreement, Borrower must remit to OKOA by today one final balloon payment for all outstanding principal and unpaid interest—which, as of March 28, 2023, were $5,471,074 for the $5.5MM Note and $348,067 for the $700,000 Note.

In sum, Lender must close the Loan immediately. Therefore, demand is hereby made on Lender to close the Loan immediately—but no later than **April 24, 2023, TIME OF THE ESSENCE**. Please be advised that if the demand set forth herein is not promptly satisfied, Borrower will be compelled to seek all available legal remedies against Lender.

A true and correct copy of which is attached hereto as **Exhibit C** and incorporated herein by reference.

46. In response, Defendants continued their false statements.

47. For example, on April 19, Defendant Hernandez emailed the broker: "I'm reaching [out] to confirm that we still wish to move forward to funding….Urban Bay is still fully invested into this closing…." *See* Exhibit M.

48. Likewise, on April 20, in response to an email from the broker, "please confirm you will…be able to close this Friday," Mr. Hernandez responded with a bogus excuse: "we can verify an exact timeline once on the next call….this is a very quick turnaround considering we've collected the full file and are at a stage where

just the specifics of the budget are what need to be reviewed/discussed."

49.    The broker responded: "please let us know what needs to be discussed that you do not already have, and please explain why we cannot have a timeframe confirmed until we speak."

50.    Mr. Hernandez responded: "we want to hop on another call…to make sure [Plaintiff] is comfortable with the structure….the sooner we all get on to hash this out, the sooner we will close." *Id.* Again, Defendants never had any intention of closing.

51.    Defendants never funded the loan and instead pocketed Plaintiff's good faith deposit and commitment fee.

**Okoa Sells the Property**

52.    On or about April 24, 2013, as a direct and proximate result of Defendants' failure to fund the loan as required by the Loan Commitment, Okoa exercised its right to sell the Property at a trustee sale.

53.    The sale, of course, resulted in Plaintiff losing the Property and all of its significant equity in the Property.

**The Relationship Amongst the Defendants**

54.    The Loan Commitment instructs that it was intended to bind Urban Bay Financial and its "affiliates": "You have advised that URBAN BAY FINANCIAL LLC or an affiliate thereof (the "Lender") . . . ." Exhibit A, at 1.

55.     Furthermore, Urban Bay Financial's proposal letter (the Term Sheet) provides that the prospective lender is "Urban Bay Financial, a Wyoming limited liability company DBA Urban Bay Fund, or an affiliate thereof," and provides wiring instructions to "Urban Bay Tampa Apts LLC." In the top right corner of the Term Sheet,  Urban Bay Financial represents itself as a Florida corporation. *See* Exhibit I.

56.     Urban Bay Financial does not appear to be a legitimate Florida legal entity but is instead  an alter ego of Urban Bay Housing and Mr. Walsh himself. Indeed, Urban Bay's website featured a YouTube video of Mr. Walsh sitting on a golden throne proudly explaining Defendants' business operations.[3]

57.     Further, Defendant Urban Bay Housing Fund is featured prominently on Defendant Urban Bay Financial's website, alongside Mr. Walsh.[4]  The "contact

---

[3]     *See*     https://web.archive.org/web/20221126084739/https://urbanbayfinancial.com/#. Defendants appear to have since updated their website. Here are other links with Mr. Walsh discussing     Urban     Bay:     https://www.youtube.com/watch?v=ckMSERmPGJQ&t=1s; https://www.youtube.com/watch?v=acfD4QbkZeA

[4]     https://urbanbayfinancial.com/behind-the-scenes-of-urban-bay-housing-fund/     (again, Defendants seem to have updated their website). At one point, Defendants listed a Las Vegas, Nevada     address     for     Urban     Bay     Financial. https://web.archive.org/web/20241016031656/https://urbanbayfinancial.com/contact-us/. At another point, Defendants listed a Florida address, 10150 Highland Manor Dr, Tampa, FL 33610, which also appeared to be an address for Urban Bay Housing Fund. *See* https://www.24-7pressrelease.com/press-release/503257/debt-fund-urban-bay-financial-moves-headquarters-to-highland-oaks-office-park-in-tampa-florida; https://web.archive.org/web/20240512051334/https://urbanbayfinancial.com/. And yet at other points, Defendants listed the address as 4868 W Gandy Blvd, Tampa, FL 33611. https://web.archive.org/web/20220808140428/https://urbanbayfinancial.com/. It is clear that at all relevant times Urban Bay Financial has conducted itself as a Florida Corporation.

4938-2816-9283, v. 6

us" link for both Defendant Urban Bay Housing Fund's and Urban Bay Financial's websites lead to the same contact information.[5] Mr. Walsh is listed as the manager and director of Defendant Urban Bay Housing, in the LLC's 2023 annual report, a true and correct copy of which is attached hereto as **Exhibit D**. And, it was Mr. Walsh who negotiated and executed the Loan Commitment as "director" of Defendant Urban Bay Financial. Exhibit A, at 4.

58. Mr. Walsh also had multiple websites which stated Mr. Walsh was the "#1 expert on urban housing development" and then listed the same address for Urban Housing Fund at the bottom, and stated: "Caleb Walsh: Leading the Way in Real Estate Financing at Urban Bay Financial" a true and correct copy of which is attached hereto as **Exhibit J**.

59. Defendant Urban Bay Financial has held itself out as a Florida limited liability company both on its website and to Plaintiff. *See* Exhibits A and G. In actuality, no such entity exists in the state of Florida.[6] Urban Bay Housing is a registered limited liability company in the state of Florida.[7]

60. Mr. Walsh is the owner and director of Urban Bay Housing, Urban Bay Financial, and Urban Bay Apts, and exercises dominion and control over these

---

[5] The website for Urban Bay Housing Fund seems to have been removed by Defendants but previously existed. *See* https://urbanbayhousingfund.com/team/.

[6] *See* **Exhibit E**, a true and correct copy of the search results for "Urban Bay Financial LLC" in the Florida Division of Corporations entity database.

[7] *Id*; *see also* **Exhibit F**, a true and correct copy of the Urban Bay Housing "detail by entity name" page in the Florida Division of Corporations entity database.

entities.[8]

61.    In a current suit in Hillsborough County, Florida, Defendant Mance, Mr. Walsh's former employee, alleges that "Urban Bay Financial purports to be a Florida Limited Liability Company, however, it is not registered with the Florida Department of State" and "Walsh uses the name 'Urban Bay Financial' as an umbrella entity to encompass" Urban Bay Housing Fund and Urban Bay Apts. Defendant Mance asked the court to rule that Urban Bay Housing Fund and Urban Bay Financial are alter-egos of each other and Walsh. *See* Complaint in *Joshua Mance v. Urban Bay Housing Fund, et al.*, Case No. 23-CA-017155 (filed Jan. 21, 2024), attached as **Exhibit K**.

### Other Fraud Cases Involving Defendants

62.    Defendants are also the subject of numerous lawsuits both in state and federal courts involving allegations of fraud. In many of these cases, Mr. Walsh has been accused of setting up alter-egos to defraud his victims, just as he has done in this case.

63.    In *Craven v. Walsh*, No. 8:20-CV-3065-T-30AEP, 2021 WL 2806189 (M.D. Fla. Feb. 24, 2021), the Court entered stipulated judgment against Plaintiff in amount of $565,000.000 after Plaintiff accused Mr. Walsh of fraud, alleging Mr. Walsh has a history of mismanaging investment properties either intentionally or

recklessly. The plaintiff referenced other Bankruptcy Cases in which the court found Mr. Walsh to be "'incompetent' and committed acts of fraud' and 'dishonesty.'" *See* "Other Lawsuits" a true and correct copy of which is attached hereto as **Exhibit K**.

64.    By way of further example, in an almost-exact replica to this case, *Auerbach- III-Houston-Hosptiality I, LLC vs Walsh*, Case Number: 23-CA-000898 (filed in Circuit Court for the Thirteenth Judicial Circuit of Florida on Jan. 31, 2023), the plaintiff brought fraud claims against some of Defendants "arising out of a scheme…to obtain non-refundable deposits…for a loan that Defendants never intended to fund. Defendants induce borrowers to pay deposits toward a potential loan, trump up a meritless excuse to justify not closing and funding the loan, and then abscond with the deposits as 'non-refundable.'"

65.    As is the case here, plaintiff alleged that Mr. Walsh, Urban Bay Housing Fund, and Urban Bay Apartments "began a pattern of delaying the expected closing date for the loan under the ruse of additional document requirements" and that Urban Bay employee, Mr. Hernandez, agreed that Urban Bay "seems like a scam…to get deposits." Mr. Hernandez admitted that Urban Bay has never funded a loan and that everyone in the office suspected fraud. *See* Exhibit K.

66.    In another case, *Affordable Housing Investments, LLC, et al. v. Caleb*

*Walsh, et al.*, the plaintiff advanced $300,000 as an investment into a mobile park home involving Mr. Walsh. Case No. 20-CA-6106 (filed 12/11/2020). Mr. Walsh was accused of utilizing alter egos "to divert the investments while Walsh literally ran the Mobile Home Park into the ground." Moreover, "in other chapter 11 reorganizations initiated by Walsh, it has become apparent that Walsh utilizes bank accounts…to move funds back and forth against myriad business entities…." Similar to his actions in the present case, "Walsh…at all times held himself as a 'mobile home guru' with specialized knowledge and skills.'" The parties appear to have settled the case. *See* Exhibit K.

67.    Likewise, in *Kyle Ballif, et. al. v. Caleb Walsh, et. al.*, Mr. Walsh was sued as the alter ego of multiple trusts and LLCs.   Case No. 20-CA0000280 (Hillsborough County, Fl.) (filed Jan. 11, 2020). Mr. Walsh was accused of defrauding investors by soliciting and receiving funds from investors, who believed they were investing in secured loans and equity interests in real property. Mr. Walsh, however, received the investments and used them for his own benefit. The parties seem to have settled. *See* Exhibit K.

68.    In *Shea Connelly Development LLC v. Urban Bay Housing Fund, LLC d/b/a Urban Bay Financial, LLC*, Urban Bay was accused of breaching its contract with plaintiff arising out of two real estate financing term sheets. As is the case here, Urban Bay accepted deposits from the plaintiff and then failed to fund the loan.

4938-2816-9283, v. 6

Case no. 24-CA-002631 (Hillsborough County, Fl.) (filed March 9, 2024). *See* Exhibit K.

69.     Another replica to the facts here is *Orlando Sun Resort & Spa LLC v. Urban Bay Housing Fund, LLC*, in which the plaintiff sued Urban Bay for fraud and misrepresentation. Case no. 22-CA-000682 (Hillsborough, Fl.) (filed Jan. 25, 2022). Urban Bay agreed to fund the plaintiff with a loan of $27 million dollars and the plaintiff made a $75,000 deposit to Urban Bay. As was the case here, Urban Bay then started pushing off the funding of the loan, giving the excuse that it was performing "due diligence" and started blaming plaintiff for its delay. *See* Exhibit K. The court entered a final entry of default judgment against Urban Bay Housing Fund on July 15, 2022.In sum, based on publicly available filings, Plaintiff is only the latest victim of Defendants fraudulent conduct.

## COUNT I
### (Breach of Contract)
### (Defendants Urban Bay Financial, Urban Bay Housing Fund, Urban Bay Apts, and Mr. Walsh)

70.     Plaintiff incorporates by reference the other paragraphs in this Complaint as if fully restated in this Count.

71.     The Commitment Letter is a valid and binding contract between Plaintiff and Defendants.

72.     Plaintiff performed all conditions to demanding full performance under the Loan Commitment.

73.     Defendants breached their contractual obligations under the Loan Commitment when they failed to timely fund the loan, as required.

74.     As a direct, foreseeable, and proximate result of Defendants' breaches of the Commitment Letter, Plaintiff suffered the loss of real property, resulting in significant and actual financial injury, including lost equity in the Property.

75.     Plaintiff also paid a total of $164,400 under the Term Sheet and Commitment Letter which must be returned to Plaintiff.

76.     Additionally, as explained herein, Plaintiff lost $105,300 in extension fees paid to Okoa as a direct and proximate result of Defendant's breaches.

WHEREFORE, Plaintiff respectfully requests a monetary judgment against Defendants and in favor of Plaintiff for compensatory damages in an amount of at least $7,000,000, with the exact amount to be determined at trial, its costs and expenses, including reasonable attorneys' fees incurred in this action, and such other further relief as this court may deem just and proper.

## COUNT II
**(Fraudulent Inducement)**
**(Defendants Urban Bay Financial, Urban Bay Housing Fund, Urban Bay Apts, and Mr. Walsh)**

77.     Plaintiff incorporates by reference the other paragraphs in this Complaint as if fully restated in this Count.

78.     Defendants represented to Plaintiff that they would fund the Loan Commitment.

79.     This representation induced Plaintiff to enter into the Loan Commitment and forego seeking alternative financing.

80.     Defendants knew this representation was false when made, or in the alternative, acted with reckless indifference as to the truth of the representation.

81.     The representation was made with the intent to fraudulently induce Plaintiff execute the Loan Commitment, pay Defendants more than $164,400, and refrain from seeking alternative financing.

82.     Plaintiff justifiably relied on Defendants' false material representation.

83.     Plaintiff's justifiable reliance on Defendants' false material representation caused Plaintiff to lose the Property and all equity associated therewith.

WHEREFORE, Plaintiff respectfully requests a monetary judgment against Defendants and in favor of Plaintiff for compensatory damages in an amount of at least $7,000,000, with the exact amount to be determined at trial, punitive damages with the exact amount to be determined at trial, its costs and expenses, including reasonable attorneys' fees incurred in this action, and such other further relief as this court may deem just and proper.

## Count III
### (Fraudulent Misrepresentation)
### (All Defendants)

22

84.    Plaintiff incorporates by reference the other paragraphs in this Complaint as if fully restated in this Count.

85.    Defendants made numerous intentional false statements of material fact to Plaintiff in emails, letters, and telephone calls, with the intention that Plaintiff rely on such misstatements, including:

a.  Urban Bay Housing Financial is a legitimate debt fund.

b.  Urban Bay is willing and capable of providing a loan of $19,100,000 to Plaintiff on or before March 31, 2023.

86.    Urban Bay was working towards closing the loan before Plaintiff would lose its property to Okoa on April 24, 2023. Furthermore, Defendants Walsh, Mance, Hernandez, and Infield intended to induce Plaintiff to continue to rely on Urban Bay's false material representations. This game was not new to these Defendants. As Defendant Hernandez admitted in the _Auerbach, which preceded the facts in this case and involved Infield and Mance as Defendants,_ Urban Bay "seems like a scam...to get deposits" with Mr. Walsh as the scam director. Mr. Hernandez admitted that Urban Bay has never funded a loan and that everyone in the office suspected fraud. As can be seen from Exhibit K, this is Urban Bay and Defendants modes operandi.

87.    In reality, Defendants had no intention of ever funding the loan and made these misrepresentations in order to induce Plaintiff to pay Defendants

$164,400.

88.    Additionally, as a direct and proximate result of Plaintiff's justifiable and reasonable reliance on Defendants' intentional misrepresentations, it lost $105,300 in extension fees paid to Okoa.

89.    Plaintiff's justifiable and reasonable reliance on Defendants' false material representations further caused Plaintiff to lose the Property and all equity associated therewith.

WHEREFORE, Plaintiff respectfully requests a monetary judgment against Defendants and in favor of Plaintiff for compensatory damages in an amount of at least $7,000,000, with the exact amount to be determined at trial, punitive damages with the exact amount to be determined at trial, its costs and expenses, including reasonable attorneys' fees incurred in this action, and such other further relief as this court may deem just and proper.

## COUNT IV
### (Negligent Misrepresentation)
### (Defendants Brittany Infield, Joshua Mance, Joseph Hernandez)

90.    Plaintiff incorporates by reference the other paragraphs in this Complaint as if fully restated in this Count.

91.    Defendants Mance, Hernandez, and Infield made numerous false statements of material fact to Plaintiff in letters and telephone calls, continuously assuring Plaintiff that Urban Bay intended to fund the loan when it did not.

24

92.     All the while, Defendants Mance, Hernandez, and Infield were at least negligent, if not reckless, in making these material statements as they at least should have known, if they didn't actually know, that Urban Bay Financial had no intention of fulfilling its contractual obligations to Plaintiff to fund the loan.

93.     Furthermore, Defendants Mance, Hernandez, and Infield intended to induce Plaintiff to continue to rely on Urban Bay's false material representations. This game was not new to these Defendants. As Defendant Hernandez admitted in the _Auerbach_, which preceded the facts in this case and involved Infield and Mance as Defendants, Urban Bay "seems like a scam...to get deposits" with Mr. Walsh as the scam director. Mr. Hernandez admitted that Urban Bay has never funded a loan and that everyone in the office suspected fraud. As can be seen from Exhibit K, this is Urban Bay and Defendants modes operandi. Thus, Defendants Mance, Hernandez, and Infield were at least negligent, if not reckless, if not intentional, in their statements to Plaintiff which were intended to materially induce Plaintiff to rely on Defendants' misrepresentations.

94.     Because of Plaintiff's justifiable reliance on Defendants' negligent misrepresentations, Plaintiff was to induce Plaintiff to pay Defendants $164,400 and  lost $105,300 in extension fees paid to Okoa. Plaintiff's justifiable reliance on Defendants' false material statements caused Plaintiff to lose the Property and all equity associated therewith.

4938-2816-9283, v. 6

WHEREFORE, Plaintiff respectfully requests a monetary judgment against Defendants and in favor of Plaintiff for compensatory damages in an amount of at least $7,000,000, with the exact amount to be determined at trial, punitive damages with the exact amount to be determined at trial, its costs and expenses, including reasonable attorneys' fees incurred in this action, and such other further relief as this court may deem just and proper.

## COUNT V
**(Promissory Estoppel/Detrimental Reliance)**
**(Defendants Urban Bay Financial, Urban Bay Housing Fund, Urban Bay Apts, and Mr. Walsh)**

95.     Plaintiff incorporates by reference the other paragraphs in this Complaint as if fully restated in this Count.

96.     Defendants made a promise to timely provide Plaintiff with sufficient funds to pay off the Existing Debt in full and satisfy the terms of the Forbearance Agreement.

97.     Plaintiff reasonably relied upon Defendants' promises and further assurances by not seeking alternative financing to satisfy the Existing Debt and the Forbearance Agreement.

98.     Defendants failed to fulfill their promise, causing significant detriment to Plaintiff by causing Plaintiff to lose the Property and all equity associated therewith.

99.     Defendants knew and understood that Plaintiff was reasonably

relying upon their promises and further assurances, when they failed to perform as promised.

100.    As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff suffered the loss of real property, resulting in significant and actual financial injury, including lost equity in the Property.

101.    Plaintiff also paid a total of $164,400 which must be returned to Plaintiff.

102.    Additionally, as explained herein, Plaintiff lost $105,300 in extension fees paid to Okoa as a direct and proximate result of Defendant's breaches.

WHEREFORE, Plaintiff respectfully requests a monetary judgment against Defendants and in favor of Plaintiff for compensatory damages in an amount of at least $7,000,000, with the exact amount to be determined at trial, its costs and expenses, including reasonable attorneys' fees incurred in this action, and such other further relief as this court may deem just and proper.

## <u>COUNT VI</u>
### (Florida Deceptive and Unfair Trade Practices Act)
### (Defendants Urban Bay Financial, Urban Bay Housing Fund, Urban Bay Apts, and Mr. Walsh)

103.    Plaintiff incorporates by reference the other paragraphs in this Complaint as if fully restated in this Count.

104.    Urban Bay engaged in deceptive acts and unfair trade practices by pretending to be a debt fund capable of efficiently financing loans up to $100

million dollars for commercial properties. In truth, Urban Bay swindles non-refundable deposits without ever intending to provide funds. To effectuate this scheme, Urban Bay hides behind information requests to excuse failing to close any loans. It does this while knowing the binding contract language within its Term Sheets and Commitment Letters assures non-refundable deposits.

105.    As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff entered into the Term Sheet and Letter Commitment and paid a total of $164,400.

WHEREFORE, Plaintiff respectfully requests a monetary judgment against Defendants and in favor of Plaintiff for actual  damages in an amount of at least $164,400 with the exact amount to be determined at trial, its costs and expenses, including reasonable attorneys' fees incurred in this action, and such other further relief as this court may deem just and proper.

## **COUNT VII**
**(Unjust Enrichment)**
**(Defendants Urban Bay Financial, Urban Bay Housing Fund, Urban Bay Apts, and Mr. Walsh)**

106.    Plaintiff incorporates by reference the other paragraphs in this Complaint as if fully restated in this Count.

107.    Plaintiff conferred a benefit upon Defendants when it paid Defendants $164,400.

108.    Defendants knew and understood that Plaintiff was providing a

28

monetary benefit to Defendants and knew that Plaintiff expected compensation.

109.    Defendants accepted and retained the monetary benefit without providing any benefit whatsoever to Plaintiff.

110.    Under these circumstances, it would be unjust for Defendants to retain funds paid by Plaintiff.

WHEREFORE, Plaintiff respectfully requests a monetary judgment against Defendants and in favor of Plaintiff for compensatory damages in an amount of at least $164,400, with the exact amount to be determined at trial, its costs and expenses, including reasonable attorneys' fees incurred in this action, and such other further relief as this court may deem just and proper.

Dated: May 22, 2025

Respectfully Submitted,

**SHAHADY & WURTENBERGER, P.A.**
200 E. Palmetto Park Road, Suite 103
Boca Raton, FL 33432
Tel: (561) 910-3064
fschwartz@swlawyers.law
Service by Email

By: /s/ Fred A. Schwartz
FRED A. SCHWARTZ, ESQUIRE
Florida Bar No. 360538
*Attorneys for Plaintiff*

# EXHIBIT A



Urban Bay Financial, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

February 22, 2023

<u>*VIA ELECTRONIC MAIL*</u>
<u>*PRIVILEGED AND CONFIDENTIAL*</u>

**Commitment Letter**

Re: Loan for the refinance and construction of single-family home project in Casa Grande, AZ

<u>Property: Cottonwood Lane and Peart Road, Casa Grande, Arizona 85122</u>

Dear Yehoishiah Rubin,

You have advised that URBAN BAY FINANCIAL LLC or an affiliate thereof (the "Lender") that Diamond Elite Community LLC (the "Borrower") is seeking a loan (the "Loan") on the terms and conditions set forth herein (the "Commitment Letter") and in that certain Potential Financial Proposal (the "Term Sheet") Capitalized terms used and not otherwise defined herein shall have the meaning set forth in the Term Sheet.

The Terms and Conditions of the commitment Letter are as follows:

**Closing Requirements:**

1. **Senior Loan Amount:** $19,100,000
   a. **Interest Rate:** SOFR + 8.70%
2. **Borrower Equity Contribution:** $10,302,974 (inclusive of $3,689,528 Borrower equity applied from acquisition and pre-development/entitlements). Within 48 hours of loan closing, the Borrower shall deposit $6,613,446 as their required equity for the Loan into escrow. These funds will serve as Borrower's Equity contribution, completion guaranty, security against taxes, insurance, operating expenses, debt service, servicing costs and borrower default with full ownership and authority granted to lender. The funds will be credited as the borrower's equity dollars into the project.
   a. Lender will credit Borrower with an equity contribution of up to $1,400,000 for pre-development costs/entitlements upon receipt and review of said paid expenses. This will lower the required equity the borrower is required to bring to the closing table, as it increases the amount of equity the borrower has already invested into the project.
3. **Closing Date:** On or before March 31, 2023, subject to remaining due diligence requests, document delays, legal review, closing checklist, and title requirements.
4. **Commitment Deposit:** $95,500.00, equal to 0.5% of the loan amount, shall be remitted to the Lender via wire transfer from Borrower. Commitment fee is refundable if Borrower fails to maintain possession and ownership of the property. Commitment Letter is null and void if Lender is not in receipt of the Fedwire on the same date as Commitment Letter. No additional fees outside of closing will be required of Borrower.

1



Urban Bay Financial, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

5. **Sources & Uses**

**SOURCES AND USES**
*Working Numbers*

| Sources | Pre Closing | Closing | TOTAL |
|---|---|---|---|
| Senior Loan | $ - | $ 19,100,000 | $ 19,100,000 |
| Sponsor Equity | $ 3,689,528 | $ 6,613,446 | $ 10,302,974 |
| **TOTAL** | $ 3,689,528 | $ 25,713,446 | $ 29,402,974 |

| Uses | Pre Closing | Closing | TOTAL |
|---|---|---|---|
| Acquisition Downpayment | $ 2,956,143 | $ - | $ 2,956,143 |
| Pre-Development/Entitlements | $ 733,385 | $ - | $ 733,385 |
| Debt ($9,950,000 Purchase Price) | $ - | $ 6,993,857 | $ 6,993,857 |
| Hard Cost (Horizontal) | $ - | $ 1,528,465 | $ 1,528,465 |
| Hard Cost (Vertical) | $ - | $ 8,670,942 | $ 8,670,942 |
| Soft Costs | $ - | $ 5,435,768 | $ 5,435,768 |
| Carry Cost (Taxes, Ins, G&A) | $ - | $ 54,414 | $ 54,414 |
| Est. Closing Costs/Fees | $ - | $ 350,000 | $ 350,000 |
| Interest Reserve | $ - | $ 2,000,000 | $ 2,000,000 |
| Project Fee | $ - | $ 298,000 | $ 298,000 |
| Origination Cost | $ - | $ 382,000 | $ 382,000 |
| **TOTAL** | $ 3,689,528 | $ 25,713,446 | $ 29,402,974 |

Unless authorized in writing by Urban Bay, from the date hereof to the earlier of (the "Termination Date") (x) the termination by Urban Bay of discussions related to the proposed Transaction and (y) 11:59 P.M. Eastern Time on the 30th day after the date hereof, the Obligors shall not (and shall not permit its affiliates or subsidiaries or any of their respective directors, officers, employees, attorneys, or other representatives) to, directly or indirectly, (a) accept any proposal, offer, or commitment from, or enter into any agreement with, any other person or entity to consummate a competing transaction; (b) take any action to solicit, initiate, facilitate, encourage, or consummate a competing transaction; or (c) engage in discussions or negotiations with, or furnish information or access to the Collateral to, any person (other than Urban Bay or its representatives) with respect to a competing transaction. The Obligors shall cause any discussions or negotiations with any other person or entity regarding a competing transaction to be immediately terminated. Until the Termination Date, the Obligors shall (and shall cause its representatives to) exclusively and in good faith deal and negotiate with, and provide information, documents, and access to the Collateral to, Urban Bay and its representatives with respect to the proposed Transaction. In light of the significant amount of time and expenses to be expended by Urban Bay in connection with the Transaction, if any of the terms of this Exclusivity provision are breached by any Obligor, then, in addition to the other remedies set forth in this Proposal Letter, Urban Bay shall be entitled to such remedies as are available at law or in equity, including, without limitation, injunctive relief, and actual, punitive, special and/or consequential damages.

2



Urban Bay Financial, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

Additionally, if the Prospective Lender is prepared to make the Loan, but prior to funding, the Borrower or any affiliate or controlled person or entity obtains debt or equity financing from another source, then Obligors shall pay a Break-Up Fee to the Prospective Lender in the amount of 1% of the Loan amount. In such a case, the Expense Deposit and Commitment Fee shall be non-refundable and shall be retained by the Prospective Lender. For the avoidance of doubt, this Section 3 shall be binding on the Guarantor(s) and Borrower and their affiliates and representatives and survives termination of this letter.

In addition to the conditions to funding or closing set forth herein and the Conditional Term Sheet, the Commitment is subject to, among other conditions, (a) the negotiation and execution of a definitive loan agreement and other related documentation satisfactory to Lender; (b) there being no material adverse change (in the reasonable opinion of Lender) in the Real Property; (c) ~~approval of, and consent to, the Loan by Lender's credit committee, in its sole discretion~~ and (d) satisfactory appraisal.

Borrower hereby represents and covenants that (a) all information (other than Projections (as defined below)) (the "Information") that has been or will be made available to Lender by Borrower or any of its representatives is or will be complete and correct in all material respects and does not or will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made; and (b) all financial projections ("Projections") that have been or will be made available to Lender by Borrower's representatives have been or will be prepared in good faith based upon assumptions Borrower believes to be reasonable (it being understood that the Projections are subject to significant uncertainties and contingencies, many of which are beyond Borrower's control, and that no assurance can be given that such Projections will be realized). Borrower understands that Lender may use and rely on the Information and Projections without independent verification thereof. Borrower understands rate may change ahead of closing subject to final credit review of property forbearance.

The reasonable out-of-pocket costs and expenses (including all legal (including the allocated fees and disbursements of internal legal services), environmental, accounting and other consultant costs and fees) incurred by Lender in connection with the evaluation and/or documentation of this Commitment Letter and the Loan shall be payable by the Borrower upon demand by Lender, whether or not the Loan closes.

Each party acknowledges that this Commitment Letter supersedes any and all discussions and understandings, written or oral, between or among Lender and any other person as to the subject matter hereof, including, without limitation, any prior proposal or commitment letters and term sheets. This Commitment Letter may only be amended, waived or modified in writing and executed by the parties hereto.

This Lender's obligations and agreements in this Commitment Letter will terminate on March 31, 2022 unless on or before that date you sign and return an enclosed counterpart of this Commitment Letter. Delivery of an executed counterpart of this Commitment Letter by facsimile or other electronic transmission shall constitute valid delivery of an executed counterpart hereof.

This Commitment Letter shall be a contract made and governed by the internal laws and venue selection of the State of Florida applicable to contracts made and to be performed entirely within such state, without regard to conflict of laws principles.

EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS COMMITMENT LETTER OR THE FEE LETTER, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS COMMITMENT LETTER OR THE FEE LETTER, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF FLORIDA OR IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA; PROVIDED THAT NOTHING IN THIS COMMITMENT LETTER SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION. EACH PARTY HERETO EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF FLORIDA AND OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. EACH PARTY HERETO EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Lender is pleased to have this opportunity and looks forward to working with you.

Very truly yours,

By: Urban Bay Financial, LLC
Name: Caleb Walsh
Its: Director

AGREED AND ACCEPTED THIS

22nd DAY OF FEBRUARY 2023

AGREED AND ACCEPTED INDIVIDUALLY AND ON BEHALF OF THE BORROWER:

Diamond Elite Community LLC

4



Urban Bay Financial, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

Signature: _____
By:        Yehoishiah Rubin
Its:       Authorized Member individually and on behalf of Diamond Elite Community LLC

DIAMOND ELITE COMMUNITY LLC
February 17, 2023

Borrower Note: Add comments in the sections notated in BLUE.

I.   **General**
   a.  Loan Application
       • Borrower checked "yes" for the question, "Have you had a property foreclosed upon or given title or deed in lieu?" Please provide a detailed LOE
         o  Borrower Notes: LOE provided, current lender threatening foreclosure if no closing by end of month. Not an active foreclosure.
            a. Lender Note: If a foreclosure has not been filed, then this should be changed to "no." This should only say "yes" if the borrower has been foreclosed on.
            b. Borrower Note: uploaded
       • Borrower checked "yes" for the question, "Are you party to a lawsuit?" Please provide a detailed LOE
         o  Borrower Notes: LOE provided.
            a. Lender Note: LOE does not adequately detail the lawsuit. Please provide more details
            b. Borrower Note: please specify what information is needed. Borrower has a loan that ballooned, at which point lender filed to exercise its remedies under the Deed of Trust in November 2022. Lender entered a forbearance agreement until March 1, 2023. +
       • Borrower checked "yes" for the question, "Is the business party to a lawsuit?" Please provide a detailed LOE
         o  Borrower Notes: LOE provided.
            a. Lender Note: LOE does not adequately detail the lawsuit. Please provide more details
            b. Borrower Note: see above
       • Borrower checked "yes" for the question, "Has the business had property foreclosed upon or given title or deed in Lieu?" Please provide a detailed LOE
         o  Borrower Notes:
            a. Lender Note: If a foreclosure has not been filed, then this should be changed to "no." This should only say "yes" if the business has been foreclosed on.
            b. Borrower Note: uploaded

II.  **Business**
   a.  Organization Chart

5



Urban Bay Financial, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

- Missing some percentages; please complete and upload
    - Borrower Notes: Provided.
        a. Lender Note: Need (1) Articles of Incorporation, (2) Operating Agreements, (3) Organization Charts, and (4) EIN Letters for the following entities – note, please create a folder inside the "Organization Chart" folder for each entity and upload the 4 docs for each entity within their respective folders
            i. Diamond Elite Community Promote LLC
            ii. Diamond Elite Community Investors A LLC
            iii. Diamond Elite Community Investors B LLC
            iv. Diamond Elite Community Investors C LLC
            v. Diamond Elite Community Investors D LLC
            vi. Diamond Elite Community Investors E LLC
            vii. Red Diamonds(please provide further explanation on this entity)
        b. Borrower Note: this is not an entity this is the PROPERTY. Uploaded OA's and articles of org. EIN's are in the process – please advise if you need anything more that what's already in the general org chart.

**III.    Borrower**
a.  REO Entity Operating Agreements
- Under review by Lender
b.  REO Settlement Statements
- Under review by Lender
c.  REO HUDs (if owned in personal name)
- Under review by Lender

**IV.    Subject Property**
a.  Property Insurance
- Additional insurance may be required. Under review by Lender

**V.    Subject Property Reports**
a.  Equity Investment/CapEx Receipts
- Under review

**VI.    Construction Related**
a.  General Contractor Agreement
- Not provided
    - Borrower Notes:
b.  Subcontractor Agreements
- Not provided (please provide further details from GC on subs they will utilize)
    - Borrower Notes:
c.  Permits
- Not provided
    - Borrower Notes: Infrastructure needs to be put in place first.

**VII.    Title & Closing**

# EXHIBIT B

## AMENDMENT TO FORBEARANCE AGREEMENT

THIS AMENDMENT TO FORBEARANCE AGREEMENT ("Amendment") is made and entered into as of the 2nd day of March, 2023 ("Effective Date"), by and among OKOA Capital LLC, a Utah limited liability company ("Lender"), Pinal County Holdings, LLC, an Arizona limited liability company ("PCH"), and Diamond Elite Community LLC, an Arizona limited liability company ("DEC") (collectively, the "Borrowers"); and Yehoishiah Rubin ("Guarantor").

## RECITALS

A.    The Parties entered into a Forbearance Agreement dated as of December 2, 2022 (the "Forbearance Agreement"), and now wish to amend the Forbearance Agreement as specified below; all defined terms used herein and not otherwise defined shall have the meanings specified in the Forbearance Agreement; and

B.    The following loan balances are due and owing to Lender as of March 1, 2023 (the "Loan Balances"), pursuant to the Loan Documents:

$5.5MM Note:

| | |
|---|---|
| Unpaid principal: | $4,919,746 |
| Accrued Interest: | $137,637.50 |

$700,000 Note:

Unpaid principal and accrued interest:    $679,622

The above amounts do not include unpaid reimbursable costs and expenses including, without limitation, default interest (currently accruing at the rate of 2% per month or 24% annually), attorneys' fees, title insurance fees, recording fees, and costs that are, or may become, due under the Loan Documents.

C.    As of the date hereof, the $5.5MM Note and the $700,000 Note (collectively, the "Notes") are in default under the Loan Documents including, without limitation, due to non-payment of scheduled interest payments, and maturity of each Note; Obligors have received Notice of such defaults by Letter dated November 2, 2022 (hereinafter, the "Loan Default").

D.    As a result of the Loan Default, Lender commenced and then postponed trustee's sales of the properties secured by the Deeds of Trust (the "Trustee's Sales"), Notices of which were provided to Obligors; such Trustee's Sales are currently set for March 8, 2023.

E.    Obligors have requested that Lender agree to forbear from further exercising its legal collection rights and remedies under the Loan Documents based upon the occurrence and

00329489

1

continuation of the Loan Default under the Loan Documents; Lender has agreed, upon the terms and conditions herein contained, to so forbear.

## AGREEMENT

In consideration of the foregoing recitals, which are hereby incorporated into this Agreement by reference and for other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1. ***Ratification of Loan Documents and Lien Upon the Properties.*** Each of Obligors hereby: (i) ratify, reaffirm, and acknowledge that the Loan Documents (as such term is used herein, it shall mean as amended by the Forbearance Agreement and this Amendment) executed by them represent valid, enforceable, and collectible obligations; (ii) reaffirm, ratify, acknowledge, and agree that all accrued and unpaid principal, interest, charges, fees, and costs owed to Lender under the terms of the Loan Documents, specifically including the Loan Balances listed herein, remain due and owing according to the terms of the Loan Documents; (iii) agree that all of the future payments, interest, charges, fees, and costs to accrue under the terms of the Loan Documents are valid obligations owing to Lender; and (iv) agree that the Loan Documents and Lender's first-priority and second-priority lien interests in the real properties described in the Deeds of Trust are legal, valid, binding, perfected, and enforceable.

2. ***Ratification of Guaranties.*** Each of Obligors hereby: (i) consent to all matters provided for by this Amendment as they relate to the First Guaranty and the Second Guaranty (collectively, the "Guaranties"); (ii) reaffirm the Guaranties and any other documents and instruments securing or otherwise relate thereto (the "Guarantor Documents"); and (iii) acknowledge that the Guarantor Documents continue in full force and effect, remain unchanged, and are valid binding and enforceable in accordance with their respective terms.

3. ***Waiver Of Defenses to the Loan Documents.*** Each of Obligors acknowledge that, as of the date hereof, they have: (i) no claim, defense (personal or otherwise), right of setoff, counterclaim, cross-complaint, claim, or demand of any nature whatsoever which can be asserted as a basis to seek affirmative relief or damages from Lender or to reduce or eliminate all or any part of their liability to repay the Loans pursuant to the Loan Documents; and (ii) no other claim against Lender with respect to any aspect of the transactions in respect of which the Loans were made. If any such claims exist, they are hereby fully and irrevocably released.

4. ***Consent to Modification of the Loan Documents.*** Each of Obligors hereby: (i) consent to modification of the Loans and Loan Documents and all other matters provided for by this Amendment; and (ii) acknowledge that the Loan Documents continue in full force and effect and are valid, binding and enforceable in accordance with their respective terms.

5. ***Forbearance Period.*** Lender and Obligors hereby agree that the term of this Amendment shall be the period of time commencing on the Effective Date of this Amendment and ending on April 17, 2023 (the "Forbearance Period").

6. ***Extension Payments to Lender.*** Obligors have paid an extension fee of $99,000 for the extension of the $5.5MM Note and an extension fee of $6,300 for the extension of the

00329489

2

$700,000 Note to extend the Forbearance Period as provided herein; such payments shall not cure the Loan Default, which shall continue until the Final Balloon Payment (defined below) is timely made.

7.      ***Final Balloon Payment to Lender.*** On or before April 17, 2023, Obligors shall remit one final balloon payment, in an amount to be calculated by Lender in its reasonable discretion, to pay the remaining balance due under the Loans to Lender (the "Final Balloon Payment"), which amount shall include the unpaid principal balances and unpaid interest accrued at the non-default rate under the Notes, plus unpaid portions of the following: attorney's fees, title insurance fees, recording and posting fees, and other unpaid costs incurred by Lender in proceeding with collection efforts including the Trustee's Sales. In the event that said Final Balloon Payment is timely received by Lender, within ten (10) calendar days, Lender shall: (i) record a release of the Deeds of Trust; and (ii) deliver originals of the Notes and Guaranties marked paid in full to Borrower.

8.      ***Application of Payments.*** Lender and Obligors hereby agree that Lender shall have the right to apply any payments received pursuant to the terms of this Agreement to the Loans toward satisfaction of the Loan Balances in the manner it elects in its sole and absolute discretion.

9.      ***Agreement to Forbear.*** Lender hereby agrees that so long as no Event of Default (as hereinafter defined) has occurred under this Amendment, it shall forbear from commencing any legal proceedings against Obligors pursuant to the Loan Documents and applicable law; provided that Lender make to take all actions necessary to conduct the Trustee's Sales on March 8, 2023, but Lender will cause such Trustee's Sales to be postponed until no earlier than April 24, 2023.

10.     ***Additional Warranties, Representations, and Covenants.*** The provisions of Sections 10 through 26 of the Forbearance Agreement shall remain in full force and effect and are reaffirmed as of the date of this Amendment; no express or implied amendments are made to such provisions and such terms are incorporated herein and continue in force.

[All signatures appear on the following page]

00329489

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed and delivered by their duly authorized representatives as of the date first above written.

**LENDER:**

**OKOA CAPITAL LLC**, a Utah limited liability company

By _____
        Ty Corbridge, Managing Member

**BORROWERS:**

**Diamond Elite Community, LLC**, an Arizona limited liability company

By: Diamond Equity Manager, LLC, a Delaware limited liability company, its Manager

By_____
        Yehoishiah Rubin, Sole Member

**Pinal County Holdings, LLC**, an Arizona limited liability company

By_____
        Yehoishiah Rubin, Member

**GUARANTOR:**

_____
        Yehoishiah Rubin

00329489

4

# EXHIBIT C



April 17, 2023

<u>By E-Mail and U.S. Mail</u>

Urban Bay Financial, LLC
4868 W Gandy Boulevard
Tampa, Florida 33611
Attn: Mr. Caleb Walsh
hq@urbanbayfinancial.com

Re:    Loan secured by the land located at Cottonwood Lane and Peart Road in Casa Grande, Arizona
       85122 (the "**Property**")

Dear Mr. Walsh:

As you know, we represent Diamond Elite Community LLC ("**Borrower**") in connection with the loan to be made by Urban Bay Financial LLC ("**Lender**") secured by the Property (the "**Loan**") pursuant to the Commitment Letter, dated February 22, 2023, from Lender to Borrower (the "**Commitment**") to refinance the existing loan from OKOA Capital LLC ("**OKOA**").

The purpose of this letter is to demand immediate closing of the Loan in a good-faith effort to prevent the significant losses and damages that Borrower will incur if Lender does not fund the Loan promptly.

As you know, Lender executed the Commitment, undertaking the obligation to refinance the existing loan from OKOA on or before March 31, 2023. Pursuant to the Commitment, Borrower paid Lender the $95,500 Commitment Deposit (in addition to the $68,900 good-faith deposit Borrower paid Lender pursuant to the term sheet Lender sent Borrower on January 6, 2023) and provided Lender's preliminary diligence items on the same day that Borrower and Lender executed the Commitment.

Pursuant to the Commitment, the Closing Date for the Loan was on or before March 31, 2023—over two weeks ago—but Lender has yet to close the Loan. Repeated emails to Lender from the undersigned and Borrower's broker have gone unanswered.

Please be advised that, Borrower will be in default under the existing loan from OKOA if Lender does not close the Loan promptly. As you know, Borrower entered into the Amendment to Forbearance Agreement with OKOA on March 2, 2023 (the "**Agreement**") in reliance on the Commitment. Borrower paid OKOA significant fees for the forbearance through today.

NEUBERGER QUINN GIELEN RUBIN GIBBER P.A.

Specifically, pursuant to the Agreement, Borrower paid a $99,000 extension fee for the $5.5MM Note, and a $6,300 extension fee for the $700,000 Note, to extend the forbearance period through today. Pursuant to the Agreement, Borrower must remit to OKOA by today one final balloon payment for all outstanding principal and unpaid interest—which, as of March 28, 2023, were $5,471,074 for the $5.5MM Note and $348,067 for the $700,000 Note.

In sum, Lender must close the Loan immediately.  Therefore, demand is hereby made on Lender to close the Loan immediately—but no later than **April 24, 2023, TIME OF THE ESSENCE**.  Please be advised that if this demand is not promptly satisfied, Borrower will be compelled to seek all available legal remedies against Lender.

This letter is not intended to constitute a complete statement of Borrower's rights and remedies in connection with this matter, and nothing contained herein shall be construed to constitute an express or implied waiver, modification or limitation of any of Borrower's rights or remedies at law, in equity or otherwise (all of which are expressly reserved).

Finally, Lender is obligated, under applicable law, to preserve and not destroy, even inadvertently, any documents and information that might be relevant to the demand asserted in this letter.  Please be aware that the obligation to preserve documents and information that might be relevant to Borrower's demand also applies to electronically stored information and documents that exist in electronic format.  This includes, but is not limited to, all emails, text messages, word processing documents, spreadsheets, databases, calendars, telephone logs, internet usage files, and network access information located on any computer, disc, flash drive, or other devices, such as cell phones, iPhones, or the like.  Electronically stored information is an important and irreplaceable source of discovery and evidence in this matter.  Lender and anyone with access to Lender's electronically stored information must take every reasonable step to preserve this information, and to ensure that it is not deleted inadvertently or pursuant to an established retention policy, until further notice.

I look forward to hearing from you or your counsel promptly.

Sincerely,

/s/ Jeffrey Murphy

cc:    Mr. Yehoishiah Rubin

# EXHIBIT D

**2023 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L19000293153

**FILED**
**Jul 13, 2023**
**Secretary of State**
**2447022966CC**

**Entity Name:** URBAN BAY HOUSING FUND LLC

**Current Principal Place of Business:**

13194 US HWY 301 S
#374
RIVERVIEW, FL 33578

**Current Mailing Address:**

13194 US HWY 301 S
#374
RIVERVIEW, FL 33578 UN

**FEI Number: 84-4024071**                          **Certificate of Status Desired:** Yes

**Name and Address of Current Registered Agent:**

WALSH, CALEB
13194 US HWY 301 S
#374
RIVERVIEW, FL 33578 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:  CALEB WALSH                                              07/13/2023
_____
                  Electronic Signature of Registered Agent                          Date

**Authorized Person(s) Detail :**

| Title | MGR | Title | MGR |
|---|---|---|---|
| Name | WALSH, CALEB | Name | WALSH, CALEB |
| Address | 13194 US HWY 301 S #374 | Address | 13194 US HWY 301 S #374 |
| City-State-Zip: | RIVERVIEW FL 33578 | City-State-Zip: | RIVERVIEW FL 33578 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: CALEB WALSH                          DIRECTOR                    07/13/2023
_____
         Electronic Signature of Signing Authorized Person(s) Detail                 Date

# EXHIBIT E

DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search By Entity Name  /

Next List                                                                          Urban Bay Financial LLC
                                                                                   Search

## Entity Name List

| Corporate Name | Document Number | Status |
|---|---|---|
| URBAN BAY HOUSING FUND LLC | L19000293153 | Active |
| URBAN BAYOU APARTMENTS, LLC | M23000010327 | Active |
| URBAN BAY PROPERTIES, LLC | L09000118163 | INACT |
| URBAN BAY PROPERTIES LLC | L12000142452 | INACT |
| URBAN BAY TAMPA APTS LLC | L21000159645 | Active |
| URBAN BEACH, LLC | L11000055404 | INACT |
| URBAN BEACH E. BAY II LLC | M21000002626 | InActive |
| URBAN BEACH E. BAY III LLC | M21000002629 | INACT |
| URBAN BEACH HARBOR II LLC | M21000002629 | NAME HS |
| URBAN BEACH III LLC | M21000002628 | Active |
| URBAN BEACH PARTNERS LLC | L20000163752 | Active |
| URBAN BEACH PROPERTIES, INC. | P07000033733 | INACT |
| URBAN BEACH WEEK, INC. | N02000004395 | INACT |
| URBAN BEACH XVII LLC | M21000002625 | NAME HS |
| URBAN BEACH XXII LLC | M21000002625 | Active |
| URBAN BEAD, INC. | P04000043063 | INACT |
| THE URBAN BEAN CO. | P13000058341 | Active |
| THE URBAN BEAN FRANCHISE GROUP, LLC | L20000314587 | Active |
| URBAN BEAR CAPITAL, LLC | L20000369401 | Active |
| URBAN BEAT, INC. | P01000120185 | INACT |

Next List                                                                          Urban Bay Financial LLC
                                                                                   Search

# EXHIBIT F

DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Entity Name  /

# Detail by Entity Name

Florida Limited Liability Company
URBAN BAY HOUSING FUND LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L19000293153 |
| **FEI/EIN Number** | 84-4024071 |
| **Date Filed** | 11/27/2019 |
| **Effective Date** | 11/27/2019 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 04/30/2025 |
| **Event Effective Date** | 04/30/2025 |

**Principal Address**

13194 US HWY 301 S
#374
RIVERVIEW, FL 33578 UN

**Mailing Address**

13194 US HWY 301 S
#374
RIVERVIEW, FL 33578 UN

**Registered Agent Name & Address**

WALSH, CALEB
13194 US HWY 301 S
#374
RIVERVIEW, FL 33578

Name Changed: 11/17/2022

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

WALSH, CALEB
13194 US HWY 301 S #374
RIVERVIEW, FL 33578 UN

Title MGR

WALSH, CALEB
13194 US HWY 301 S #374
RIVERVIEW, FL 33578 UN

**Annual Reports**

| Report Year | Filed Date |
|-------------|------------|
| 2021 | 04/30/2021 |
| 2022 | 11/17/2022 |
| 2023 | 07/13/2023 |

**Document Images**

| | |
|---|---|
| 04/30/2025 -- VOLUNTARY DISSOLUTION | View image in PDF format |
| 07/13/2023 -- ANNUAL REPORT | View image in PDF format |
| 11/17/2022 -- REINSTATEMENT | View image in PDF format |
| 04/30/2021 -- ANNUAL REPORT | View image in PDF format |
| 07/19/2020 -- ANNUAL REPORT | View image in PDF format |
| 11/27/2019 -- Florida Limited Liability | View image in PDF format |

# EXHIBIT G

The Wayback Machine - https://web.archive.org/web/20220808140428/https://urbanbayfinancial.com/





813-499-9712 

## PRIVATE MONEY LOANS FOR COMMERCIAL REAL ESTATE INVESTORS

### WHO WE ARE

Urban Bay Financial is a Tampa, Florida based debt fund founded in 2012. The firm specializes in commercial real estate lending, primarily in the United States.

### WHAT WE DO

Are you looking for ways to increase your purchasing power so you can continue pursuing Commercial Real Estate opportunities? You've come to the right place.

## Who is Urban Bay Financial?

Urban Bay Financial is a direct private lender, we provide short-term bridge and Commercial Real Estate Investors for construction loans secured by first position Mortgages or Trust Deeds to developers throughout the United States.



Team   Contact

## Contact

 813.499.9712

nfo@urbanbayfinancial.com

 4868 W Gandy Blvd, Tampa, FL 33611

# EXHIBIT H

Business Center

Online Services    Search

# DETAIL

RETURN TO YOUR SEARCH        FILE YOUR ANNUAL REPORT

Urban Bay Financial LLC

This detail reflects the current data for the filing in the system.                    Print

**Name**
Urban Bay Financial LLC

**Filing ID**
2022-001120713

**Type**
Limited Liability Company - Domestic

**Status**
Active

**Sub Status**
Current

**Initial Filing**
05/31/2022

**Fictitious Name**

**Standing - Tax**
Good

**Standing - RA**
Good

**Standing - Other**
Good

**Term of Duration**
Perpetual

**Formed In**
Wyoming

**Principal Office**
6628 Sky Pointe Dr
STE 129-1121
Las Vegas, NV 89131
USA

**Mailing Address**
6628 Sky Pointe Dr
STE 129-1121
Las Vegas, NV 89131
USA

## Additional Details

**Registered Agent:**
Registered Agents Inc
30 N Gould St Ste R
Sheridan, WY 82801 USA

**Latest AR/Year**
11238466 / 2025

**AR Exempt**
No

**License Tax Paid**
$60.00

## History

2025 Original Annual Report - 11238466                    Date: 04/23/2025

Change of Agent - 2025-005746041                          Date: 04/23/2025

Reinstatement - RA - 2025-005746039                       Date: 04/23/2025

Dissolution / Revocation - RA - 2024-005353924            Date: 10/29/2024

RA Resignation - 2024-005242855                           Date: 08/21/2024

2024 Original Annual Report - 10069516                    Date: 06/26/2024

Delinquency Notice - Tax - 2024-004740379                 Date: 05/02/2024

Reinstatement - Tax - 2023-004284344                      Date: 07/13/2023

2023 Original Annual Report - 08791678                    Date: 07/13/2023

Dissolution / Revocation - Tax - 2023-004276519           Date: 07/09/2023

Delinquency Notice - Tax - 2023-004158162                 Date: 05/02/2023

Initial Filing - See Filing ID                            Date: 05/31/2022

Public Notes

No Public Notes Found...

Parties

(Organizer)                                               Organization: GG GROUP INC
              Address: 6628 Sky Pointe Dr, Ste 129-1121 Las Vegas NV 89131

# EXHIBIT I



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

January 6th, 2023

**_PRIVILEGED & CONFIDENTIAL_**
**_VIA ELECTRONIC MAIL_**

FM Capital
Attn: Yehoishiah Rubin
Cottonwood Lane and Peart Road
Casa Grande, Arizona 85122

Re:     Potential Financing Proposal for Cottonwood Lane and Peart Road, Casa Grande, Arizona 85122

Dear Yehoishiah,

Urban Bay Financial, LLC ("Urban Bay"), and/or one or more of its affiliates (Urban Bay or the affiliate(s) it designates, the "Prospective Lender") is pleased to submit the following proposal letter (this "Proposal Letter"), which outlines the general terms and conditions under which Urban Bay would underwrite and consider the funding of a loan as set forth herein (the "Loan").

This Proposal Letter expires at 5:00 pm Eastern Standard Time on January 6th, 2023, unless it is accepted, countersigned, and returned along with the Expense Deposit (as defined below).

1.     <u>Summary of Terms and Conditions</u>. The following is an outline, in summary format, of proposed terms and conditions of the Loan and does not purport to include or summarize, all terms and conditions that would be expected to be contained in definitive documentation for the proposed Loan and is subject to change, modification, amendment, supplementation, and withdrawal by Urban Bay in whole or in part:

| | |
|---|---|
| **Loan Amount:** | $22,300,000.00 |
| **Borrower:** | Special Purpose Entity (TBD) |
| **Guarantors:** | Yehoishiah Rubin (the "Guarantor"; together with the Borrower, collectively, the "Obligors"). |
| **Guarantor Requirements:** | Guarantor(s) must demonstrate a Net Worth greater than or equal to the total loan request**.** This can be constructed through multiple guarantors. |
| **Prospective Lender:** | Urban Bay Financial LLC, a Wyoming limited liability company DBA Urban Bay Fund, or an affiliate thereof. |
| **Use of Proceeds:** | The Loan proceeds shall be used for (1) refinance of the Real Property (2) fund a draw schedule; and (3) payment of any fees and expenses related to this Transaction. |

1



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

**Sources & Uses:**

| Sources | Pre Closing | Closing | TOTAL |
|---|---|---|---|
| Senior Loan | $ - | $ 22,300,000 | $ 22,300,000 |
| Sponsor Equity | $ 5,150,000 | $ 6,851,719 | $ 12,001,719 |
| TOTAL | $ 5,150,000 | $ 29,151,719 | $ 34,294,719 |
| | $ - | $ - | $ 7,000 |

| Uses | Pre Closing | Closing | TOTAL |
|---|---|---|---|
| Acquisition/Debt | $ 3,750,000 | $ 6,200,000 | $ 9,950,000 |
| Construction Cost | $ - | $ 11,481,458 | $ 11,481,458 |
| Soft | $ 1,400,000 | $ 7,657,261 | $ 9,057,261 |
| Carry Cost | $ - | 860,000 | 860,000 |
| Est. Closing Costs/Fees | $ - | $ 200,000 | $ 200,000 |
| Interest Reserve | $ - | $ 2,300,000 | $ 2,300,000 |
| Origination Cost | $ - | $ 446,000 | $ 446,000 |
| Underwriting Fee | $ 7,500 | $ - | $ - |
| Property Valuation | $ 500 | $ - | $ - |
| Phase 1 Report | $ 1,300 | $ - | $ - |
| Site Inspection | $ 1,100 | $ - | $ - |
| Feasibility Study | $ - | $ 7,000 | $ - |
| Appraisals | $ 18,500 | $ - | $ - |
| UBHF Legal Fees | $ 20,000 | $ - | $ - |
| Participant Legal Fees | $ 20,000 | $ - | $ - |
| TOTAL | $ 5,218,900 | $ 29,151,719 | $ 34,294,719 |
| DUE | $ 68,900 | | |

| **Collateral:** | The Loan will be secured by, inter alia, a perfected first priority lien on, and security interest in, the assets listed on Exhibit A ("Real Property"), and all current and future assets and property associated therewith, along with a pledge of 100% of the membership interests in the Borrower during the term of the Loan. |
|---|---|
| **Loan Term:** | Thirty-six (36) Months. |
| **Interest Rate:** | Interest rate of SOFR + 8.70% per annum. |
| **Estimated Closing Date:** | Within sixty (60) days of execution of this Proposal Letter and confirmed receipt of applicable deposits and due diligence. |
| **Points:** | 2.00% of the Loan at Closing. |
| **Default Interest:** | 24% per annum, but in no event greater than the maximum legal rate. |
| **Governing Law & Venue Selection:** | State of Florida. |



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

**Other Terms
and Conditions
of the Loan:**   The Loan documentation will contain standard acknowledgments, representations, warranties, covenants, conditions, releases, reporting obligations, and other usual and customary provisions for transactions of this type or reasonably requested by the Prospective Lender. If Prospective Lender elects to proceed with the Loan, Prospective Lender may determine in its sole and absolute discretion the structure of the Loan.

**Conditions
Precedent:**   Closing and funding of the Loan will be subject to the satisfaction, in Urban Bay's sole discretion, of all conditions precedent deemed necessary or appropriate by the Prospective Lender, including, without limitation:
- Diligence on Obligor's background and creditworthiness, personal and real property, structure, management, personnel, all agreements, and operations; and
- Site inspection, title, survey and lien review, leases (including estoppels from existing tenants), tenant's financials, environmental review, and valuation review and due diligence requested by Prospective Lender.

**Proposal Letter
Non-Binding:**   It is agreed to and understood by the parties that the terms and provisions of this Proposal Letter are non-binding, except for the following which shall be binding on the parties and shall survive termination of this Proposal Letter.

2.    <u>Confidentiality</u>. The parties acknowledge and agree that this Proposal Letter, its existence and contents are confidential and proprietary and may not be disclosed, in whole or in part, without Prospective Lender's written consent. The obligations under this Section 2 shall survive any occurrence of the Termination Date or Termination of Discussion (as defined hereinafter).

3.    <u>Exclusivity</u>. Unless authorized in writing by Prospective Lender, from the date hereof to the earlier of (the "Termination Date") (a) the termination by Prospective Lender of discussions related to the proposed Transaction or (b) 11:59 P.M. Eastern Time on the 90th day after the date hereof, the Obligors shall not (and shall not permit its affiliates or subsidiaries or any of their respective directors, officers, employees, attorneys, or other representatives) directly or indirectly, (a) accept any proposal, offer, or commitment from, or enter into any agreement with, any other person or entity to consummate a competing transaction; (b) take any action to solicit, initiate, facilitate, encourage, or consummate a competing transaction;  (c) engage in discussions or negotiations with, or furnish information or access to the Collateral to, any person (other than Prospective Lender or its representatives) with respect to a competing transaction; or (d) share the terms of this Proposal Letter either written or verbally with any other person or entity. The Obligors shall cause any discussions or negotiations with any other person or entity regarding a competing transaction to be immediately terminated. <u>Borrower shall retain the rights to continue negotiations with preexisting lenders under the condition that the prospective lender Urban Bay Financial is granted the first right to consummate the transaction contemplated under this Agreement (right of first refusal). Nothing in this Section 3 shall allow the Obligor to obtain funding from another source, with regard to the transaction contemplated hereunder, other than Urban Bay until the termination of this Agreement.</u> Until the Termination Date, the Obligors shall (and shall cause its representatives to) exclusively and in good faith deal and negotiate with, and provide information, documents, and access to



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

the Collateral to, Prospective Lender and its representatives with respect to the proposed Transaction. In light of the significant amount of time and expenses to be expended by Prospective Lender in connection with the Transaction, if any of the terms of this Exclusivity provision are breached by any Obligor, then, in addition to the other remedies set forth in this Proposal Letter, Prospective Lender shall be entitled to such remedies as are available at law or in equity, including, without limitation, injunctive relief, and actual, punitive, special and/or consequential damages. If the Loan does not close due to no fault of the Prospective Lender, the Prospective Lender shall be entitled to any excess portion of the Expense Deposit, as well as any additional resonable out of pocket costs accrued by the Prospective Lender up to $80,000.00. For the avoidance of doubt, this Section 3 shall be binding on the Guarantor(s) and Borrower and their affiliates and representatives and survives termination of this Proposal Letter.

4.    Indemnification. The Obligors shall indemnify and hold harmless the Prospective Lender, its affiliates, and their respective officers, directors, employees, agents, advisors, auditors, attorneys, controlling persons, funding sources, and other representatives and advisors, from and against all suits, actions, proceedings, claims, damages, losses, liabilities, and expenses (including, without limitation, attorneys' fees and other costs), which may be asserted against or incurred by any of them in connection with, or arising out of, this Proposal Letter or any part of the proposed Transaction.

5.    Costs. The Obligors shall be responsible (whether or not the Transaction is consummated) for the payment or reimbursement of all of the Prospective Lender's reasonable costs, fees, and expenses incurred by the Prospective Lender in connection with this Proposal Letter, the proposed Transaction, the Prospective Lender's due diligence, and/or the preparation, negotiation, execution, administration, modification, waiver, or enforcement by the Prospective Lender of any document relating to the proposed Transaction (collectively, the "Costs").

6.    Expense Deposit. Simultaneously with the delivery of this Proposal Letter before end of business day, the Borrower shall deposit $68,900.00 via wire transfer to the Prospective Lender (the "Expense Deposit"), as consideration for the Prospective Lender having incurred and continuing to incur the Costs. Said funds will be used to cover Prospective Lender's out-of-pocket expenses including processing fee, appraisals, environmental reports, engineering reports, site inspections, legal bills, and any other expenses incurred by Prospective Lender while conducting due diligence. Any funds in excess of actual out-of-pocket expenses will be credited to the Borrower at closing. Prospective Lender shall apply the Expense Deposit to the Costs or to any other amounts owed to, or recoverable by, the Prospective Lender. If the Loan does not close or is canceled due to no fault of the Borrower, the Prospective Lender allows for the refund of any unused portion of the Expense Deposit. The Expense Deposit may be converted to a credit to be applied as a payment method for future expense deposits for up to one year from the issuance of this Proposal Letter.

7.    Termination of Discussions; Non-Binding. The terms and provisions of this Proposal Letter are non-binding, except as expressly set forth herein. This Proposal Letter does not represent a commitment to provide financing and should not be relied upon as an indication of the availability of the proposed financing. Upon the completion of Prospective Lender's due diligence to its sole satisfaction, Prospective Lender may issue a commitment letter related to the proposed Transaction and/or commence with preparation of definitive documentation. Prospective Lender may, in its sole discretion, terminate discussions for any or no reason without liability. In no event shall Prospective Lender incur obligations with regard to the proposed Transaction unless and until the Prospective Lender executes and delivers definitive documents reflecting those obligations.



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

8.   <u>Assignment</u>. This Proposal Letter shall inure to the benefit of the successors and assigns of the Prospective Lender but shall not be assignable by the Borrower without the prior written consent of the Prospective Lender. Any purported assignment without such consent shall be null and void. Counterparts; Electronic Signatures; Governing Law. This Proposal Letter may be executed counterparts. All counterparts shall collectively constitute a single instrument. A facsimile or electronic copy of this Proposal Letter shall be considered an original. This Proposal Letter shall be governed by the laws of the State of Florida.

If the terms and conditions outlined in this Proposal Letter are acceptable, please sign and return an executed copy of this Proposal Letter to Prospective Lender along with the Expense Deposit prior to its expiration.

Urban Bay looks forward to working with the Obligors on the proposed Transaction.

Very truly yours,

URBAN BAY FINANCIAL, LLC

By: _____
Name: Caleb Walsh
Its: Director

AGREED AND ACCEPTED:

Special Purpose Entity (TBD)

By: _____

Name: Yehoishiah Rubin, individually and on behalf of Special Purpose Entity (TBD)

Title: _____

5



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

## WIRING INSTRUCTIONS

Bank Name:          Grow Financial FCU

Routing Number:     ██████████

Account Number:     ████████

Account Name:       Urban Bay Tampa Apts LLC

Account Address:    13194 US HWY 301 S #374, Riverview, FL 33578

Reference:          Cottonwood Lane and Peart Road, Casa Grande, Arizona 85122



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

**Exhibit A**

Cottonwood Lane and Peart Road, Casa Grande, Arizona 85122

# EXHIBIT J

**CALEB WALSH**

# Caleb Walsh of Florida



**Caleb Walsh: Leading the Way in Real Estate Financing at Urban Bay Financial**

Caleb Walsh is a seasoned professional in real estate finance with a wealth of experience and entrepreneurial spirit. As the managing director at Urban Bay

Financial, a premier commercial real estate financing company, Caleb Walsh has been instrumental in originating complex large balance loans for developers and portfolio investors, as well as funding quick small balance bridge loans for mid level real estate entrepreneurs.

With a career spanning over a decade, **Caleb Walsh** has established himself as a trusted expert in real estate syndication and investment. Since 2008, he has specialized in multifamily housing, hospitality properties, and affordable housing communities across 10 states. His deep understanding of the real estate market and innovative financing strategies have positioned him as a leader in the industry.

## The Journey into Real Estate Financing

Caleb's journey into real estate financing began with his passion for real estate syndication and investment. Leveraging his knowledge and expertise, Caleb Walsh founded Urban Bay Financial to provide comprehensive financing solutions for developers and investors. Urban Bay Financial specializes in originating complex large balance loans for developers and portfolio investors, as well as funding quick small-balance bridge loans for mid-level real estate entrepreneurs.

One of the key factors that set **Urban Bay Financial < https://urbanbayfinancial.com/>** apart is its ability to create valuable participations, ensuring that clients have the necessary capital to build valuable projects. Whether it's financing office buildings, retail properties, industrial buildings, multi family housing, fix & flips, ground up construction, or pre development/land deals, Urban Bay Financial offers tailored financing solutions to meet the unique needs of each client.

Urban Bay Financial also specializes in financing specialty properties such as hospitality buildings like hotels and lodging properties, trailer parks, and RV parks. Caleb and his team understand the nuances of these niche markets and provide

expert guidance and support to clients seeking financing for these properties.

The qualification criteria vary among lenders, but Caleb Walsh reports that Urban Bay Financial looks at factors such as liquidity, the property being purchased, your financial ability to pay back loans, and your credit history. While a low credit score does not automatically disqualify you from receiving the loan, Urban Bay Financial takes a comprehensive approach to assess your financial health and determine eligibility.

## Commitment to Clients

Caleb Walsh's dedication to his clients and commitment to excellence have earned him a reputation as a trusted leader in the real estate financing industry. His entrepreneurial acumen, combined with his passion for real estate, drives Urban Bay Financial to deliver innovative financing solutions that empower developers and investors to achieve their goals.

Caleb Walsh's role as the managing director at Urban Bay Financial exemplifies his commitment to driving growth and success in the real estate industry. Caleb and his team continue to provide unparalleled financing solutions and support to clients across various sectors of the real estate market, cementing their reputation as industry leaders.



## Real Estate Syndication: How It Works and Why It Matters

Real estate syndication is a powerful investment strategy that allows individuals to pool their financial resources and expertise to participate in larger real estate projects than they could afford on their own. This method of investment has gained popularity in recent years due to its ability to generate passive income, diversify portfolios, and access lucrative opportunities in the real estate market. Caleb Walsh of Florida explains more on how it works, why it matters, and the benefits it offers to investors.

## Caleb Walsh Provides More Details on Syndication

At its core, real estate syndication involves bringing together multiple investors to collectively purchase and manage real estate assets. Typically, a sponsor or syndicator identifies a promising investment opportunity, such as a multifamily apartment complex, commercial property, or development project. The sponsor then creates a legal entity, such as a **limited liability company (LLC) < https://www.irs.gov/businesses/small-businesses-self-employed/limited-liability-company-llc>** or **limited partnership (LP) <**

**https://www.investopedia.com/terms/l/limitedpartnership.asp>** , to acquire
and operate the property.

Investors, also known as limited partners (LPs), contribute capital to the
syndication in exchange for ownership interests or shares in the entity. The
sponsor, often referred to as the general partner (GP), is responsible for sourcing
the deal, securing financing, managing the property, and overseeing the
investment strategy.



## How it Works

- **Deal Sourcing:** The syndicator identifies a promising real estate investment
  opportunity, conducts due diligence, and negotiates the purchase terms.
- **Legal Structure:** The sponsor then establishes a legal entity, such as an LLC
  or LP, to acquire and manage the property. Investors become limited
  partners in the entity, while the syndicator serves as the general partner.

Caleb Walsh | Float(0.0) | caleb-walsh.com

- **Capital Raise:** The sponsor also raises capital from investors by offering ownership interests or shares in the entity. Investors contribute funds based on their investment goals and risk tolerance.
- **Property Acquisition:** Once the necessary capital is raised, the entity acquires the property using a combination of investor funds and financing, such as bank loans or seller financing.
- **Asset Management:** Caleb Walsh explains that the syndicator is responsible for managing the property, implementing the investment strategy, and maximizing returns for investors. This may involve property improvements, leasing efforts, and operational optimizations.
- **Distribution of Profits:** As the property generates income and appreciates in value, profits are distributed to investors based on their ownership interests. These distributions typically occur on a periodic basis, such as quarterly or annually.
- **Exit Strategy:** At the end of the investment period, the syndicator executes an exit strategy to liquidate the property and distribute proceeds to investors. This may involve selling the property, refinancing, or pursuing other disposition options.

## Why Syndication Matters

- **Access to Larger Deals:** Cooperative real estate ventures allow investors to participate in larger and more lucrative real estate projects than they could afford on their own. By pooling resources with other investors, individuals can access premium properties and diversify their portfolios.
- **Diversification:** Syndication provides investors with the opportunity to diversify their real estate holdings across different asset classes, markets, and investment strategies. This helps mitigate risk and enhance long term investment returns.

- **Passive Income:** Passive investors benefit from passive income generated by rental income and property appreciation. Joint real estate investment allows individuals to earn rental income without the responsibilities of property management.
- **Professional Management:** Syndicators, often experienced real estate professionals, handle all aspects of property acquisition, management, and disposition. Caleb Walsh of Florida highlights that investors can leverage the expertise and industry knowledge to maximize returns and mitigate risks.
- **Risk Mitigation:** Cooperative real estate investing spreads risk across multiple investors, reducing individual exposure to market fluctuations,

property vacancies, and other risks. Additionally, syndicators typically conduct thorough due diligence and implement risk mitigation strategies to protect investor capital.

## For More Information

In conclusion, real estate syndication offers investors a unique opportunity to participate in larger real estate projects, diversify their portfolios, and generate passive income. By leveraging the expertise and resources of sponsors, investors can access premium properties, mitigate risks, and achieve their financial goals in the dynamic real estate market.

For more information about Caleb Walsh, Urban Bay Financial, Private Credit, Real Estate, Commercial Real Estate, Real Estate Syndication, Finance, Affordable housing, **follow along at his blog < https://caleb-walsh.com/blog/>** .

---

## CALEB WALSH

Proudly powered by **WordPress < https://wordpress.org/>** .

# EXHIBIT K

**IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION**

AFFORDABLE HOUSING INVESTMENTS,
LLC, ORACLE ENTERPRISES LTD, and
KENNETH SCHEPPKE,

        Plaintiffs,

                                            Case No.:

vs.                                      Division:

CALEB WALSH, JOHNRUTH CAPITAL,
INC. FORT BRAGG ESTATES, LLC, FORT
BRAGG CAROLINA TRUST and PARKS
MANAGEMENT, LLC,

        Defendants.

_____/

## **COMPLAINT**

Affordable Housing Investments LLC ("Affordable"), Oracle Enterprises Ltd. ("Oracle"), and Kenneth Scheppke ("Scheppke"), all of whom are collectively referred to herein as the "Plaintiffs," hereby sue Caleb Walsh ("Walsh"), JohnRuth Capital, Inc. ("JohnRuth"), Fort Bragg Carolina Trust ("Carolina Trust"), and Fort Bragg Estates, LLC ("Fort Bragg Estates") and Parks Management LLC ("Parks Management"), all of whom are collectively referred to herein as the "Defendants," and allege:

### **A.  NATURE OF THE ACTION**

1.      This is an action seeking (a) damages on multiple theories against the Defendants in connection with a fraudulent investment relationship more fully described below (the "Fraudulent Investment Relationship"), (b) declaratory relief that the Fraudulent Investment Relationship is fraudulent and unenforceable, and (c) injunctive relief precluding the Defendants from retaining the Plaintiffs' funds obtained from the Fraudulent Investment Relationship (the "Fraudulent Investment").

### **B.  PRELIMINARY ALLEGATIONS**

2.      Affordable is a Florida limited liability company doing business in Palm Beach County, Florida and with its principal place of business in Palm Beach County, Florida.

3.      Oracle is a Florida limited partnership doing business in Palm Beach County, Florida and

with its principal place of business in Palm Beach County, Florida.

4.      Scheppke is an individual, <u>sui juris</u>, residing in the State of Florida, and doing business in Palm Beach County, Florida.

5.      Walsh is an individual, <u>sui juris</u>, residing in State of Florida, and doing business in Hillsborough County, Florida.

6.      JohnRuth is a Florida profit corporation with its principal place of business located in Hillsborough County, Florida.

7.      Fort Bragg Estates is a Florida limited liability company with its principal place of business located in Hillsborough County, Florida.

8.      Carolina Trust is a Florida profit corporation with its principal place of business located in Cumberland County, North Carolina.

9.      Parks Management is a Florida limited liability company with its principal place of business located in Hillsborough County, Florida.

10.     Pursuant to <u>Florida</u> <u>Statutes</u> §47.011, and other applicable law, venue is proper in Hillsborough County, Florida.

11.     Pursuant to <u>Florida</u> <u>Statutes</u> §26.012(2)(a), and other applicable law, jurisdiction for each count alleged herein lies with this Court because each count of this verified complaint (this "Complaint") is either:

     a.   an action for statutory relief with respect to claims arising in the State of Florida;

     b.   a common law action for damages in excess of $30,000, exclusive of attorneys' fees, court costs, and related expenses;

     c.   an action for declaratory relief with respect to disputes arising in the State of Florida;

     d.   an action for injunctive relief with respect to certain events occurring in the State of Florida; or

     e.   an action seeking other related equitable relief.

12.     With respect to each count set forth in this Complaint, all requirements and conditions precedent to the bringing of this action have been satisfied, performed, or waived.

13.     With respect to each cause of action set forth in this Complaint, the Plaintiffs have retained the undersigned law firm as counsel of record herein, and have agreed to compensate and reimburse it for services rendered and costs incurred in connection with the enforcement of its rights and remedies as more fully set forth below.  Pursuant to applicable contracts and statutes, the Defendants are jointly and severally obligated to reimburse the Plaintiffs.

## C.  <u>BACKGROUND ALLEGATIONS</u>

14.     Scheppke is the principle of Oracle, that is the manager of Affordable.  Walsh is the sole owner of JohnRuth, which is the sole owner of Carolina Trust, Fort Bragg Estates, and Parks Management.  These make up the totality of the parties to this action (collectively, the "Parties").

15.     On November 1, 2017, JohnRuth acquired the mobile home park located at 1403 Misty Circle, Spring Lake, North Carolina, 28390 operated as the "Rosewood Mobile Home Park" pursuant to that certain "North Carolina General Warranty Deed," executed by Christopher Goines ("Goines"), a copy of which is attached hereto as Exhibit "A."  On the same date, JohnRuth and Goines executed an "Assignment of Leases" assigning all rental contracts and/or lease agreements pertaining to the Rosewood Mobile Home Park from Goines to JohnRuth as the assignee, a copy of which is attached hereto as Exhibit "B."

16.     On July 1, 2018, Walsh and JohnRuth as beneficiaries, and Walsh as trustee of the Carolina Trust, joined in forming the Carolina Trust for purposes of acquiring the Rosewood Mobile Home Park, and a second mobile home park located at 406 and 421 D Street, Spring Lake, North Carolina, 28390, operated as the "Fort Bragg Estates Mobile Home Park" both the Rosewood Mobile Home Park and the Fort Bragg Estates Mobile Home Park being referred to herein as the "Mobile Home Parks," a copy of the "Land Trust Agreement" for the is attached hereto as Exhibit "C."

17.     On July 10, 2018, the Carolina Trust acquired the Fort Bragg Estates Mobile Home Park

from Delores G. Lee pursuant to that certain "North Carolina General Warranty Deed" a copy of which is attached hereto as Exhibit "D."

18.    On July 17, 2018, Denise Walsh ("D. Walsh") on behalf of JohnRuth, purported to assign a beneficial interest in the Carolina Trust to Fort Bragg Estates, a copy of which is attached hereto as Exhibit "E."  Upon information and belief, D. Walsh is the spouse of Walsh and has no equity interest in JohnRuth, which is entirely owned by Walsh.

19.    On July 19, 2018, JohnRuth conveyed the Mobile Home Parks to the Carolina Trust pursuant to that certain "North Carolina Quitclaim Deed" a copy of which is attached hereto as Exhibit "F."

20.    On even date therewith, JohnRuth conveyed its beneficial interest in the Carolina Trust to Fort Bragg pursuant to a "Trust Interest Purchase Agreement," a copy of which is attached hereto as Exhibit "G."

21.    On July 19, 2018, the following documents were executed by and between Scheppke, Walsh, Oracle, Fort Bragg Estates, and the Carolina Trust:

   a.   "Operating Agreement of Fort Bragg Estates LLC" (the "Operating Agreement"), executed by Walsh, JohnRuth, and Fort Bragg Estates, a copy of which is attached hereto as Exhibit "H";

   b.   "Joinder Page" (the "Affordable Joinder Page"), executed by Fort Bragg Estates and Affordable, a copy of which is attached hereto as Exhibit "I";

   c.   "Fort Bragg Estates, LLC Board Member Agreement" (the "Walsh Board Member Agreement"), executed by Walsh and Fort Bragg Estates, copies of which are attached hereto as Exhibit "J";

   d.   "Fort Bragg Estates, LLC Board Member Agreement" (the "Scheppke Board Member Agreement"), executed by Scheppke and Fort Bragg Estates, a copy of which is attached hereto as Exhibit "K";

e.  "The General Indemnification Agreement" (the "Walsh Indemnification Agreement"), executed by Walsh and Fort Bragg Estates, a copy of which is attached hereto as Exhibit "L";

f.  "The General Indemnification Agreement" (the "Scheppke Indemnification Agreement"), executed by Scheppke and Fort Bragg Estates, a copy of which is attached hereto as Exhibit "M";

g.  "Purchase Agreement" (the "Purchase Agreement"), executed by JohnRuth and Affordable, a copy of which is attached hereto as Exhibit "N"; and

h.  "Written Consent of the Manager and Sole Voting Unitholder of Fort Bragg Estates, LLC" (the "Written Consent"), executed by Walsh, a copy of which is attached hereto as Exhibit "O."

The set of documents including Exhibits "H" through "O" (the "Fraudulent Transaction Documents") were intended to produce a business result in which Scheppke through Affordable made a $300,000 investment in Fort Bragg Estates in exchange for 4,000,000 units, or forty (40%) percent of the equity in Fort Bragg Estates, all of which was at the time owned by Walsh through Walsh's wholly-owned business entity, JohnRuth.

22.    Scheppke formed Oracle and Affordable to facilitate his intended investment, and advanced $300,000 in anticipation of receipt of an investment that had some value; however, no value was given.

23.    Instead Walsh utilized his familiar alter ego entities, JohnRuth and Parks Management, to divert the investment while Walsh literally and intentionally ran the Mobile Home Park into the ground.

24.    Since making the investment, Scheppke and Affordable have been completely excluded from knowledge of the business, financial, and legal affairs of the Carolina Trust, it being noted that the Carolina Trust was intended to own and operate the Mobile Home Parks for the benefit of JohnRuth pursuant to the Land Trust Agreement and that was modified to account for the investment by Affordable under the Fraudulent Transaction Documents.

25.     It is now apparent that Walsh (a) diverted funds from the business operations of the Mobile Home Parks, (b) failed to pay Affordable its owed portion of rent rolls promised for the consideration of a $300,000 investment, or what Walsh refers to as "the purchase of board membership," (c) mismanaged the Mobile Home Parks by neglecting conditions, (d) failed to address municipal violations relating to the condition of the Mobile Home Parks, and (e) ultimately caused the Mobile Home Parks to reach such a level of disrepair that the town of Spring Lake ("Spring Lake") condemned a portion of the Mobile Home Parks as unfit for human habitation.

26.     On April 15, 2019, the Carolina Trust filed its voluntary petition for protection from creditors pursuant to Bankruptcy Code §301 and other applicable law.

27.     The resulting chapter 11 case (the "Carolina Trust Reorganization") is one of several unsuccessful chapter 11 cases involving failed mobile home parks that Walsh has initiated either pro se or with bankruptcy lawyers.  A copy of the schedules and statement of affairs for the Carolina Trust (the "Bankruptcy Schedules"), executed by you under penalty of perjury on May 10, 2019, lists the equity security holders of the Carolina Trust as "-NONE-," is attached hereto as Exhibit "P."  This statement is factually inaccurate in that it omits reference to Affordable, and JohnRuth.

28.     The Bankruptcy Schedules were not provided to Scheppke, and his awareness of the pendency of the Carolina Trust Reorganization only occurred in connection with more recent bankruptcy filings by other business entities that Walsh controlled.

29.     The public records in the Carolina Trust Reorganization reflect that on November 7, 2018, only a few months after the Plaintiffs' $300,000 investment, Spring Lake condemned a portion of the Mobile Home Parks, specifically the Rosewood Mobile Home Park.  A copy of the Order of Condemnation is attached hereto as Exhibit "Q."  There is no evidence that Walsh provided any notice in these regards to Scheppke before or after Scheppke' s investment.

30.     On April 9, 2020, the Court presiding over the Carolina Trust Reorganization dismissed the same, terminated the automatic stay, and retained jurisdiction for limited purposes.  A copy of the

order dismissing the Columbus Partners Reorganization is attached hereto as Exhibit "R." The Plaintiffs request judicial notice of all records from the Carolina Trust Reorganization pursuant to <u>Florida</u> <u>Statutes</u> §§90.201-204 and other applicable law.

31.    In other chapter 11 reorganizations initiated by Walsh, it has become apparent that Walsh utilizes bank accounts titled in the name of Parks Management to move funds back and forth against myriad business entities, the identities of which Walsh's refused to disclose, including those of the other Defendants. The Plaintiffs' investment has been lost in the resulting mush pot.

32.    Walsh was deposed on June 17, 2020, in the context of another mobile home chapter 11 case, individually and as the corporate representative for Parks Management. During the deposition, Walsh testified that the Carolina Trust has a title claim against its title insurance company relating to the events that lead to the condemnation of a portion of the Mobile Home Parks. Walsh also testified that one or more of the Plaintiffs are listed as insured parties on the title insurance documents, and that the proceeds of an eventual payout would be directed to Scheppke. However, there is no such source of recovery.

33.    Walsh has at all times held himself out as a "mobile home guru" with specialized background knowledge and skills. Based upon his own representations, there can be little doubt that Walsh is far too sophisticated in terms of mobile home investment matters to have simply blundered in dealing with the Plaintiffs' investment. Moreover, all indicia support the proposition that the Plaintiffs were simply defrauded, and the Fraudulent Investment was simply converted by Walsh in the context of a shifting shell game.

34.    Scheppke reposed great trust and confidence in Walsh, that Walsh promptly accepted and acknowledged, and then thoroughly betrayed for his own personal lucre. For purposes of this Complaint, the entire process of Walsh presenting himself to Scheppke as a real estate professional, obtaining the Fraudulent Investment, making false statements and promises in furtherance of the Fraudulent Investment Relationship, and in the process moving the Fraudulent Investment beyond the reach of the Plaintiffs is

referred to herein as the "Fraudulent Activity."  Evidence of Fraudulent Activity predating the tender by the Plaintiffs of the $300,000 is attached hereto as Composite Exhibit "S."  Evidence of Fraudulent Activity postdating the tender by the Plaintiffs of the $300,000 is attached hereto as Composite Exhibit "T."

<u>**COUNT I: DAMAGES FOR ACTUAL FRAUD**</u>

35.    This is an action for damages against all Defendants arising out of the actual fraud perpetrated by the Defendants.

36.    The Plaintiffs reincorporate by reference the allegations contained in paragraphs 1 through 34 above as though fully set forth herein.

37.    The Plaintiffs actually and reasonably reposed trust in the Defendants and the False Representations.

38.    The Defendants knowingly made misrepresentations of material facts to the Plaintiffs, and knowingly made false promises, realizing that the Plaintiffs would rely upon the same.  The Plaintiffs acted in reliance upon the Defendants' Fraudulent Activity.  As a result, the Plaintiffs were damaged in an amount no less than the Fraudulent Investment.

WHEREFORE, the Plaintiffs request judgment in their favor and against the Defendants, jointly and severally, awarding damages based upon required rescission of the purchase and sale of the Fraudulent Investment for reasons set forth above, together with court costs and reasonable attorneys' fees recoverable pursuant to applicable law.

<u>**COUNT II:  FRAUD IN THE INDUCEMENT**</u>

39.    This is an action for damages against all Defendants in connection with the Defendants fraudulently inducing the Plaintiffs to purchase the Fraudulent Investment.

40.    The Plaintiffs reallege and incorporate by reference paragraphs 1 through 34 of this Complaint as though fully set forth herein.

41.    The Defendants engaged in the following wrongful Fraudulent Activity:  (i) promulgated

false information regarding the Fraudulent Investment, (ii) made further false representations and assurances to the Plaintiffs, and (iii) moved the Plaintiffs' funds while lying about their intentions regarding the Fraudulent Investment Relationship.

42.     The Defendants knew that the Fraudulent Activity and statements made were false when made and intended those representations to induce the Plaintiffs to purchase the Fraudulent Investment. The Plaintiffs actually and reasonably relied upon the truth and accuracy of statements made relating to the Fraudulent Activity at the time such statements were made.

43.     The Plaintiffs suffered damages in justifiable reliance on the statements and representations made in relation to the Fraudulent Investment.  But for the False Statements, the Plaintiffs could have utilized the Fraudulent Investment for legitimate and productive endeavors.

WHEREFORE, the Plaintiffs request judgment in their favor against the Defendants, jointly and severally, for damages, equitable and other relief, pre- and post-judgment interest, attorneys' fees, costs, and such other or further relief as is just and proper.

## COUNT III:  DAMAGES FOR BREACH
## OF FIDUCIARY DUTY AGAINST WALSH

44.     This is an action against Walsh for his breach of a fiduciary duty arising under Florida common law.

45.     The Plaintiffs reallege and reincorporate paragraphs 1 through 34 of this Complaint as if fully set forth herein.

46.     Walsh owed fiduciary duties to the Plaintiffs.  The Plaintiffs reposed great trust in Walsh regarding all aspects of their business.  Walsh willingly and knowingly accepted this great trust, required in light of his position then Walsh betrayed all manner of trust reposed by the Plaintiffs.

47.     As highlighted above, Walsh breached his fiduciary duties and duties of loyalty by, among other things, engaging in the Fraudulent Activity.

48.     The Plaintiffs have been damaged by the Fraudulent Activity.

WHEREFORE, the Plaintiffs request judgment in their favor and against Walsh, for his breach of

his fiduciary duties to the Plaintiffs, awarding damages, together with court costs and reasonable attorneys' fees, and granting such other and further relief deemed just, equitable, and proper.

## COUNT IV:  CIVIL THEFT

49.     This is an action for civil theft against the Defendants pursuant to Florida Statutes §772.11, as well as other applicable law.

50.     The Plaintiffs reallege and reincorporate by reference paragraphs 1 through 34 of this Complaint as though fully set forth herein.

51.     By conducting the Fraudulent Activity, accepting the Fraudulent Investment from the Plaintiffs as part of the Fraudulent Investment Relationship, the Defendants engaged in criminal activities (collectively, the "Civil Theft Activities"), and the Defendants knowingly acted with scienter intent to permanently deprive the Plaintiffs of the right to the Fraudulent Investment and to appropriate the Fraudulent Investment to the Defendants' own use in violation of Florida Statutes §772.11.

52.     As a result of the Defendants' theft, the Plaintiffs have been injured by the loss of the Fraudulent Investment, loss of cash flow, and loss of the resources expended in tracking this wrongdoing, plus any interest from the date of the Fraudulent Investment.

53.     On June 25, 2020, the undersigned served the Civil Theft to the Defendants with a written demand (the "Demand Letter"), a copy of which is attached hereto as Exhibit "V," which provided the Defendants with thirty-five (35) days to make restitution in full to the Plaintiffs, plus treble damages pursuant to Florida Statutes §772.11, for a total amount demanded of $900,000 (the "Civil Theft Demand").

54.     The Defendants have refused to refund the Fraudulent Investment, comply with the Civil Theft Demand, or pay any other amount to the Plaintiffs.

55.     The Plaintiffs have retained the undersigned attorneys and are obligated to pay a reasonable fee for their services.  Pursuant to Florida Statutes §772.11, the Plaintiffs are entitled to an award of attorneys' fees.

WHEREFORE, the Plaintiffs respectfully request this Court enter a judgment for damages in their favor and against the Defendants, jointly and severally, in the amount reflecting three (3) times the Fraudulent Investment, this being the Civil Theft Demand, plus accrued interest, attorneys' fees and costs, and any other or further relief as is just and proper.

## COUNT V: DAMAGES FOR CONVERSION

56.    This is an action against the Defendants for conversion of Fraudulent Investment.

57.    The Plaintiffs reincorporate by reference the allegations contained in paragraphs 1 through 34 above as though fully set forth herein.

58.    The Plaintiffs have a clear exclusive ownership right in the Fraudulent Investment. The Plaintiffs view the Fraudulent Investment as their property, the totality of which has considerable and monetary value to the Plaintiffs.

59.    Walsh used his position with the Defendants so as to be used by the Defendants to the detriment of the Plaintiffs, and the Fraudulent Transaction Documents confirm this.

60.    All of the Fraudulent Investment removed by Walsh has been wrongfully converted for the use of the Defendants, as is evident for example from Walsh's filings in the Carolina Trust Reorganization.

61.    The Plaintiffs have been harmed by the conversion of Fraudulent Investment.

WHEREFORE, the Plaintiffs request judgment in its favor, awarding damages against the Defendants, jointly and severally, for their conversion of the Fraudulent Investment, together with court costs and reasonable attorneys' fees recoverable pursuant to applicable law pursuant to the "Wrongful Act Doctrine," and further preventing and restraining the Defendants from further and continuing damages to the Plaintiffs by continuing their unlawful activity.

## COUNT VI: DAMAGES FOR CIVIL CONSPIRACY

62.    This is an action against the Defendants for damages as a result of their civil conspiracy to interfere with the business of the Plaintiffs.

63.    The Plaintiffs reincorporate by reference the allegations contained in paragraphs 1 through 34 above as though fully set forth herein.

64.    The Defendants, collectively and in concert with others, including D. Walsh and Joshua Mance, committed numerous overt acts in furtherance of their conspiracy interfere with the prospective business of the Plaintiffs, including but not limited to:

      a.    secretly converting Fraudulent Investment for the future use and benefit of the Defendants;

      b.    diverting funds from the business operations of the Mobile Home Parks;

      c.    failing to pay the Plaintiffs their owed portion of rent rolls promised for the consideration of a $300,000 investment, or what Walsh referred to as "the purchase of board membership";

      d.    mismanaging the Mobile Home Parks by neglecting conditions;

      e.    failing to address municipal violations relating to the condition of the Mobile Home Parks; and

      f.    ultimately causing the Mobile Home Parks to reach such a level of disrepair that the town of Spring Lake ("Spring Lake") condemned a portion of the Mobile Home Parks as unfit for human habitation.

65.    As a result of the foregoing overt acts, among others perpetrated in collusion by the Defendants, the Plaintiffs have sustained damages.

66.    Pursuant to applicable law, the Plaintiffs are entitled to recover their attorneys' fees from the Defendants.

WHEREFORE, the Plaintiffs request judgment in its favor and against the Defendants, jointly and severally, for the amount of the Fraudulent Investment, together with attorneys' fees and recoverable costs of suit, and further relief deemed just, equitable, and proper.

## COUNT VII:  UNJUST ENRICHMENT

67.    This is an action for damages against the Defendants for unjust enrichment.

68.    The Plaintiffs reallege and incorporate by reference paragraphs 1 through 34 of this Complaint as though fully set forth herein.

69.    The Plaintiffs conferred a benefit upon the Defendants through the payment made to the Defendants in connection with the Fraudulent Investment.  The Defendants' acceptance and retention of the benefits under the circumstances described herein have made it inequitable for the Defendants to retain such benefits without paying the value thereof due and owing to the Plaintiffs.  As a result, the Defendants have been unjustly enriched.

70.    The Defendants are aware of their receipt of the above-described benefits.

71.    The Defendants received the above-described benefits to the detriment of the Plaintiffs.

72.    The Defendants' continued retention of the above-described benefits, to the detriment of the Plaintiffs, is inequitable.

73.    As a result of the Defendants' unjust enrichment, the Plaintiffs have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of said enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged herein.

74.    The unlawful, deceptive, fraudulent, and misleading conduct of the Defendants and any other unknown agents and/or employees as alleged herein was harmful to and caused injury to the Plaintiffs, all as planned by the Defendants in pursuing the Fraudulent Investment Relationship.

75.    The Defendants had a duty to act in good faith and to not engage in conduct that is unlawful, deceptive, fraudulent, misleading, and harmful to the Plaintiffs.

76.    By virtue of the very nature of the conduct alleged, as well as the substantial value conferred by the Plaintiffs upon the Defendants in connection with the Fraudulent Activity, in the amount of the Fraudulent Investment, the Defendants were aware, or should have been aware, that their conduct was unlawful, deceptive, fraudulent, and misleading.

77.     Although the Defendants were aware, or should have been aware, of their unlawful, deceptive, fraudulent, and misleading conduct, and although the Defendants had the ability to take action to control such actions, they did not take the steps necessary and available to prevent the conduct.

78.     As a result of the Defendants' false, misleading, negligent, and fraudulent acts, the Plaintiffs have suffered significant damages.

79.     At this time, the Defendants have been unjustly enriched to the detriment of the Plaintiffs in an amount of no less than the Fraudulent Investment.

WHEREFORE, the Plaintiffs request judgment in their favor and against the Defendants, jointly and severally, for damages, compensatory and punitive, if available, equitable and other relief, pre- and post-judgment interest, attorneys' fees, costs, and such other or further relief as is just and proper.

## COUNT VIII:  DECEPTIVE AND UNFAIR TRADE PRACTICES

80.     This is an action for damages against the Defendants brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), as amended, codified at Florida Statutes §501.201 et seq.

81.     The Plaintiffs reallege and incorporate by reference paragraphs 1 through 34 of this Complaint as though fully set forth herein.

82.     By their conversion and related actions involving the Fraudulent Investment and other actions as more particularly described above, the Defendants have engaged in unconscionable, unfair and deceptive acts or practices relating to the Plaintiffs.  These actions were taken by the Defendants for discriminatory, pretextual, immoral, unethical, oppressive and/or unscrupulous reasons, constituting violations of FDUTPA.

83.     Alternatively, the Defendants have engaged in a pattern of unconscionable, unfair and deceptive acts or practices relating to the Plaintiffs.  The actions of the Defendants consist of multiple instances of wrongdoing, and not one single act.

84.     The multiple instances of wrongdoing were ongoing from the period beginning in 2018 and continuing through the date of this Complaint.

85.     The Plaintiffs are "consumers," as the term is defined in FDUTPA, in that they are investors actively solicited on the internet and thereafter by the Defendants, as reflected in the recap anthology of YouTube videos published by Walsh, memorialized in the attached Exhibit "W."

86.     The Defendants had a duty the Plaintiffs in connection with the Fraudulent Investment Relationship, as well as in other matters.

87.     The Plaintiffs had a direct contractual relationship with the Defendants by virtue of the Fraudulent Investment Relationship.

88.     The Defendants' violation of FDUTPA occurred in the conduct of trade and commerce.

89.     As a direct result of the Defendants' violations of FDUTPA, the Plaintiffs have been injured and have incurred damages.

WHEREFORE, the Plaintiffs request (a) a declaratory judgment that by their actions, the Defendants violated FDUTPA; (b) judgment in the amount of the Fraudulent Investment and other damages against the Defendants, together with interest; (c) all court costs, and reasonable attorneys' fees and costs recoverable under <u>Florida</u> <u>Statutes</u> §§501.2105 and 501.211; and (d) for such other and further relief as is appropriate..

## COUNT IX:  DECLARATORY RELIEF

90.     This is an action by the Plaintiffs against the Defendants for declaratory relief pursuant to Florida's version of the "Declaratory Relief Act," codified at <u>Florida</u> <u>Statutes</u> §86.011, and other applicable law.

91.     The Plaintiffs reallege and incorporate paragraphs 1 through 34 above as though fully set forth herein.

92.     As set forth in greater detail above, the Fraudulent Investment Relationship memorializes a relationship as between the Defendants and the Plaintiffs.

93.     The Defendants have characterized the Fraudulent Investment Relationship as if the Fraudulent Investment were a legitimate investment in Fort Bragg Estates and/or Carolina Trust;

however, this is a mere subterfuge intended to defraud the Plaintiffs.

94.     The Fraudulent Investment Relationship and Fraudulent Investment are patently fraudulent and therefore unenforceable, as are all rights that the Defendants may claim under the Fraudulent Investment Relationship.  This is not an equity investment, it is fraudulent securities mischief.

95.     The Defendants clearly had the corrupt intent in connection with the Fraudulent Investment Relationship.

96.     The Plaintiffs are in doubt as to their rights under the Fraudulent Investment Relationship because the Defendants continue to attempt to collect on the Fraudulent Investment.

97.     The Plaintiffs' ability to properly conduct their affairs is dependent upon a determination by this Court as to the effect of the Fraudulent Investment Relationship.

98.     The Defendants clearly have an interest adverse to the Plaintiffs in connection with the Fraudulent Investment Relationship and vice versa.

99.     A genuine controversy presently exists as to whether the Fraudulent Investment Relationship is enforceable and the Fraudulent Investment collectable.

100.    Accordingly, there is a bona fide, actual, present practical need for this action.  This case presents the very issues and concerns which make it appropriate for entry of declaratory relief.

WHEREFORE, the Plaintiffs request declaratory judgment that:

a.  the Fraudulent Investment Relationship is fraudulent and is not an investment but is instead a mere securities fraud, common law fraud, or other act of misconduct, such that the Fraudulent Transaction Documents were mere tools in furtherance of the Defendants' wrongful scheme; and

b.  for such other and further relief as this Court deems just and proper.

## COUNT X:  INJUNCTIVE RELIEF

101.    This is an action for injunctive relief by the Plaintiffs and against the Defendants with respect to any effort on their part to retain all or any portion of the Fraudulent Investment.

102.    The Plaintiffs reallege and incorporate paragraphs 1 through 34 above as though fully set forth herein.

103.    Due to the nature of the Defendants' conduct, the full extent of damages to the Plaintiffs cannot be calculated in dollars and cents.

104.    The Plaintiffs can demonstrate a clear legal right to the relief sought in this Complaint.

105.    The Plaintiffs are clearly threatened with irreparable harm in connection with the continuing fraudulent acts and other wrongful conduct described above, including in personam efforts to collect on the Fraudulent Investment.

106.    The Plaintiffs have no adequate remedy at law for the Defendants' continuing fraudulent and otherwise improper conduct.  A broad range of equitable remedies are available to this Court in determining how to prevent the Defendants from benefitting from the wrongful taking of the Fraudulent Investment.  For example, but without limitation, relief to be granted by this Court could include an accounting, imposition of an equitable lien on real estate of Fort Bragg Estates and Carolina Trust, imposition of a constructive trust on the mush pot accounts of Parks Management, or any other relief consistent with the equities of the matter at hand.

WHEREFORE, the Plaintiffs respectfully request that this Court enter a temporary and permanent injunction against the Defendants, restraining them from all action consistent with their retention of the Fraudulent Investment, either formal or informal, to enforce or otherwise retain the Fraudulent Investment, together with such other and further relief as this Court deems just and proper.

### D.  RESERVATION OF RIGHTS

107.    Because of the sweeping nature of the theft by the Defendants of all manner of business records and other assets of the Plaintiffs, the Plaintiffs necessarily reserve their rights to amend this Complaint as formal and informal discovery progresses.  Similarly, the Plaintiffs contemplate adding additional parties while this litigation is pending.

### E.  **JURY TRIAL DEMANDED**

108.    The Plaintiffs demand a trial by jury on all issues so triable.

Dated this 31st day of July, 2020.

/s/ John A. Anthony
**JOHN A. ANTHONY, ESQ.**
Florida Bar Number:  0731013
janthony@anthonyandpartners.com
Anthony & Partners, LLC
100 South Ashley Drive, Suite 1600
Tampa, Florida 33602
Telephone:  813-273-5616
Telecopier:  813-221-4113
Attorneys for the Plaintiffs

## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

**KYLE BALLIF, FRANK HOWE, MIDWESTERN**
**LAND DEVELOPMENT INC., CASTLE**
**TRANSFORMATIONS LLC, JASON SMITH,**
**FAIR AND HONEST OFFERS LLC,**

     **Plaintiffs,**

**v.**                                                  **CASE NO.:**

**CALEB WALSH, individually and as Trustee**
**of the HAWAIIAN VILLAGE COMMUNITY**
**TRUST, as Trustee of the COFFEE**
**COUNTY COMMUNITY TRUST, and as**
**Trustee of the HEARTLAND PROPERTIES**
**COMMUNITY TRUST, WBL TRUST,**
**JOHN RUTH CAPITAL INC., SXMW LLC, and**
**MIDWEST BY SOUTH, LLC,**

     **Defendants.**

---

## COMPLAINT

     **COMES NOW**, Plaintiffs, KYLE BALLIF, MIDWESTERN LAND DEVELOPMENT

INC., CASTLE TRANSFORMATIONS LLC, SXMW LLC, and FAIR AND HONEST OFFERS

LLC ("Plaintiffs"), through the undersigned counsel, and file this Complaint against Defendants,

CALEB WALSH, individually and as Trustee of the HAWAIIAN VILLAGE COMMUNITY

TRUST, as Trustee of the COFFEE COUNTY COMMUNITY TRUST, and as Trustee of the

HEARTLAND PROPERTIES COMMUNITY TRUST, WBL TRUST, JOHN RUTH CAPITAL

INC., SXMW LLC, and MIDWEST BY SOUTH, LLC., alleging the following:

### PARTIES

     1.     Defendant CALEB WALSH is a natural person that has at all times material hereto

resided in the State of Florida.

1

2.     WALSH is sued individually because he was a direct participant in the improper dealings alleged herein and committed unlawful acts.

3.     WALSH is also sued as the alter ego of the entity Defendants (HAWAIIAN VILLAGE COMMUNITY TRUST, COFFEE COUNTY COMMUNITY TRUST, HEARTLAND PROPERTIES COMMUNITY TRUST, WBL TRUST, JOHN RUTH CAPITAL INC., SXMW LLC, and MIDWEST BY SOUTH, LLC.) (hereafter the "Alter Ego Defendants").

4.     WALSH held himself out to be a director, officer, managing member, or trustee of the Alter Ego Defendants, and unilaterally controlled the formation, day-to-day operations, assets, liabilities, and lifespan of the Alter Ego Defendants.

5.     WALSH commingled the funds and assets of the Alter Ego Defendants, as well as his personal funds. For example, WALSH solicited and received funds from investors, these investors believed they were investing in secured loans and equity interests in real property.

6.     WALSH received these monies, deposited them, and use them for his own purposes.

7.     None of the investors received what was promised to them.

8.     The Alter Ego Defendants were used by WALSH to unlawfully solicit and usurp investors' funds.

9.     The Alter Ego Defendants do not have the liquid assets they were held out to have.

10.     The Alter Ego Defendants do not have the assets they were held out to have, because WALSH ultimately diverted the assets to himself, other entities and other individuals, to defraud Plaintiffs of their investments, and to defraud creditors of these entities, depriving creditors of their interest and/or principal.

11.     Alter Ego Defendants are severely under-capitalized and are faced with multiple lawsuits from multiple investors.

12.     WALSH transferred the few valuable assets of the Alter Ego Defendants among the Alter Ego Defendants he controlled to steal from investors and hide his wrongdoing.

13.     WALSH used the Alter Ego Defendants as a shell, instrumentality or conduit for the concealment of personal business activities and for his own personal gain as set forth more fully below.

14.     WALSH manipulated the assets, liabilities, revenue, expenses, profits, and losses of the Alter Ego Defendants to steal from investors and hide his wrongdoing.

15.     WALSH used the Alter Ego Defendants as a subterfuge of illegal transactions, as set for more fully herein.

16.     WALSH used the Alter Ego Defendants to attract and deceive investors by inflating the size of the operations, and revenue received.

17.     WALSH created and provided documents, communications, and materials to Plaintiffs that were rife with misrepresentations in his solicitations on communications with Plaintiffs.

18.     Several of the Alter Ego Defendants operating in Florida used the same address(es) for business operations (which appear to be a post office boxes).

19.     The Alter Ego Defendants shared the same director, officer, managing member, or trustee.

## GENERAL ALLEGATIONS

20.     The Circuit Court has subject matter jurisdiction as this complaint alleges claims for equitable and statutory relief and damages over the amount of $30,000.

3

21.     Venue is proper in Hillsborough County as Defendant CALEB WALSH resides in Hillsborough County Florida and JOHN RUTH CAPITAL INC. and MIDWEST BY SOUTH, LLC are all Florida entities with their principal places of business in Hillsborough County, Florida.

22.     Defendant WALSH solicited investments and loans for the purchase of real property and interests in various companies and trusts.

23.     Among the individuals solicited were Plaintiffs BALLIF, HOWE, and SMITH.

24.     Defendant WALSH Convinced Plaintiff HOWE to provide funds for the purchase of several mobile home parks, including one located at 4998 Hawaiian Village Drive in Macon, Georgia.

25.     Plaintiff HOWE was told and understood that the funds provided by HOWE for the located at 4998 Hawaiian Village Drive in Macon, Georgia would be used as a secured Loan for the purchase of the property, and for a membership interest in SXMW LLC which was to have three (3) members: JOHN RUTH CAPITAL INC. (Owned by Defendant Walsh), and MIDWESTERN LAND DEVELOPMENT INC., and CASTLE TRANSFORMATIONS LLC. (which are owned by Plaintiff HOWE).

26.     These funds were used to purchase of mobile home park located at 4998 Hawaiian Village Drive in Macon, Georgia.

27.     Defendant WALSH repeated similar inducements and solicitations to Plaintiffs BALLIF and SMITH to convince them to provide him with funds to purchase the property located at 4998 Hawaiian Village Drive in Macon, Georgia.

28.     Plaintiffs were told that they would have and ongoing equity interest in the property and that Property would produce income which would be received by Plaintiffs.

29.     Plaintiffs were told that their investments had achieved profitability when they had not.

30.     Plaintiffs were told that their investments and loans were secured by the Property and that the Property could not be sold, conveyed, or encumbered without their consent.

31.     Plaintiffs were told their investments would be returned and they were not.

32.     In September 2017, Kyle Ballif, Fair and Honest Offers, LLC, SXMW, LLC, and David Bass entered into a Land Trust Agreement for the purpose of purchasing and managing a 25+ acre mobile home park located at 4998 Hawaiian Village Drive in Macon, Georgia ("Trust Property").

33.     Bass, Ballif, Fair and Honest Offers, LLC, and SXMW, LLC are the Beneficiaries of the Trust.

(a) SXMW, LLC

      a.  John Ruth Capital Inc. (Managing Member)

      b.  Midwestern Land Development Inc. (Member)

            i.  Frank Howe (Director)

      c.  Castle Transformations LLC (Member)

            i.  Frank Howe (Managing Member)

(b) Davis Bass

(c) Kyle Ballif

(d) Fair and Honest Offers, LLC

      a.  Jason Smith (Member)

34.    Defendant WALSH was appointed as the Trustee of the HAWAIIAN VILLAGE COMMUNITY TRUST based on his representations that he had prior successful experiences managing mobile home parks under similar trust agreements.

35.    Despite his representations, WALSH performed extremely poorly as Trustee, and he mortgaged and conveyed the HAWAIIAN VILLAGE COMMUNITY LAND TRUST Property without notice and permission from a majority of the Beneficiaries, refused to provide an accounting for several years, and otherwise mismanaged the Trust Property in a manner adverse to the interests of the Beneficiaries.

36.    Defendant WALSH has conveyed the mobile home park located at 4998 Hawaiian Village Drive in Macon, Georgia from the HAWAIIAN VILLAGE COMMUNITY LAND TRUST to a the WBL TRUST via Quit Claim Deed.

37.    Despite numerous requests, Walsh has refused to voluntarily resign his position as Trustee or to return the Property to the trust.

38.    Defendant WALSH has used the Alter Ego Defendant to defraud the Plaintiffs by inducing them to provide him with funds to purchase a property with which he never intended to provide them with any interest.

39.    Defendant WALSH has and is using his positions in the Alter Ego Defendants to accomplish his goal of defrauding the Plaintiffs by taking their funds to purchase real property and then conveying and encumbering said property to his benefit and at the expense of Plaintiffs.

40.    All conditions precedent to this action have been performed or waived by Defendant.

## COUNT I: BREACH OF FIDUCIARY DUTY

41.    Plaintiffs realleges and incorporates the allegations in paragraphs 1 through 40 as if fully set forth herein.

42.    In administering the HAWAIIAN VILLAGE COMMUNITY LAND TRUST, WALSH is required to exercise the judgment and care of a prudent person acting in a like capacity and familiar with such matters, considering the purposes, provisions, distribution requirements, and other circumstances of the trust.

43.    In administering the Trust, WALSH is required to administer the trust in good faith, in accordance with its provisions and purposes.

44.    In administering the Trust, WALSH is required to administer the trust solely in the interests of the Beneficiaries.

45.    WALSH has acted in bad faith and with reckless indifference to the interests of the Beneficiaries by mortgaging the Trust Property without notice and permission from a majority of the Beneficiaries, refusing to provide an accounting as required, and otherwise mismanaging the Trust Property in a manner adverse to the interests of the Beneficiaries.

46.    WALSH's breach has caused damage to the Beneficiaries.

**WHEREFORE**, Plaintiff demands trial by jury on all issues so triable, awarding damages, attorney's fees and costs, ordering an accounting, enjoining WALSH from committing further breaches of Trust, compelling WALSH to redress prior breaches of Trust by payment of money or otherwise, appointing a temporary Trustee to take possession of the Trust Property and administer the Trust during the pendency of this action, permanently removing WALSH as Trustee and appointing Plaintiffs as Trustees of the Trust, and Taking any and all actions necessary to return property that was removed from the Trust.

7

## COUNT II: VIOLATIONS OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT

47.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 40 as if fully set forth herein.

48.    This is an action for violations of the Florida Securities and Investor Protection Act, Section 517.301, Florida Statutes, against Defendants WALSH and the Alter Ego Defendants, (h "Defendants").

49.    In connection with the rendering of investment advice or in connection with the offer, sale, or purchase of any investment or security as defined by Chapter 517, Florida Statutes, directly or indirectly, WALSH employed devices, schemes, or artifices to defraud, in violation of Section 517.301(1)(a)(1), Florida Statutes.

50.    In connection with the rendering of investment advice or in connection with the offer, sale, or purchase of any investment or security as defined by Chapter 517, directly or indirectly, WALSH obtained money or property by means of untrue statements of a material fact or omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 517.301(1)(a)(2), Florida Statutes.

51.    WALSH knowingly and willfully concealed or covered up, by his schemes, material facts that the including that Plaintiffs would not see a return on or of their investment, that the properties would be transferred and encumbered without the Plaintiffs' consent, and that WALSH was operating multiple schemes in violation of Section 517.301, Florida Statutes.

52.    WALSH operated the Scheme beginning on a date known only by the Defendants, but no later than September of 2017, and continuing until the present.

53.     The Scheme, set forth more fully above, was structured so as to give the appearance to potential/existing investors that they were positioned to reap profits from the purchase of mobile home parks.

54.     Based on these representations, investors invested monies in the Scheme.

55.     While operating the Scheme, WALSH then operated other schemes designed to reap the same alleged profits, from the same mobile home parks and transferred the mobile home parks outside of the entities in which Plaintiffs had an interest.

56.     WALSH continues to employ this scheme to the present.

57.     By continuing to perpetuate the Scheme, WALSH gives investment advice to existing investors that creates the appearance to investors that their investment has/had value, which it does not.

58.     WALSH's scheme leads investors to retain their investments.

59.     WALSH obtained monies from investors by misrepresenting to investors the extent of its operation, that its properties produced more income than they do, the identities and number of its customers, its capabilities, its locations, its business partnerships or relationships, its investors' rates of return, the safety of investing in with WALSH, the timing of returns and payoff dates, customer demand for the properties and the amount that they could be charged, interest in the Scheme by other investors, the extent of the costs associated with the endeavor, and other's interest in acquiring the property or providing loans to refinance so that Plaintiffs could be bought out.

60.     WALSH created false writings, documents, and made false statements or representations during the execution of the Scheme that concealed the Scheme and prevented Plaintiffs from a discovering it earlier.

61.    WALSH knew these writings, documents, and statements were false.

**WHEREFORE**, Plaintiffs demand trial by jury, entry of judgment in its favor against the Defendants, permanent injunction against current and future violations of Chapter 517, Florida Statutes, by the Defendants, a freeze the bank accounts of the Defendants, entering other injunctive relief, including restitution and disgorgement of any ill-gotten gain by the Defendants, order the dissolution of the Alter Ego Defendants, award attorneys' fees, costs, and interest to Plaintiffs, order such civil penalty or further relief available.

## COUNT III: VIOLATIONS OF THE FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

62.    A Plaintiffs realleges and incorporates the allegations in paragraphs 1 through 40 as if fully set forth herein.

63.    This is an action for violations of the Florida Uniform Fraudulent Transfer Act, against Defendants WALSH and the Alter Ego Defendants, ("Defendants").

64.    Plaintiffs are creditors of Defendant WALSH and of the Alter Ego Defendants.

65.    Defendants Transferred Property that could have been applied to the payment of Plaintiffs.

66.    Defendants transferred the property to Insiders, Friends, Family Members, Creditors, or other Entities under which Defendant WALSH is or was in control.

67.    The transfers were violations of Florida's Uniform Fraudulent Transfer Act § 726.101, Fla. Stat.

68.    Plaintiffs are creditors who was defrauded.

69.    Defendant intended to commit the fraud.

**WHEREFORE**, Plaintiffs demand a trial by jury, damages, an accounting, interest, avoidance of the transfer or obligation to the extent necessary to satisfy the Plaintiffs' claim, an

attachment or other provisional remedy against the assets and property transferred, appointment

of a receiver to take charge of the assets and property transferred, attorney's fees if provided by

law, and other relief in the other relief the circumstances may require.

## COUNT IV--FRAUD

70.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 40 as if

fully set forth herein.

71.    Defendants made false statements concerning material facts.

72.    Defendants knew or should have known that the representations were false.

73.    Defendants had the intention that the representations would induce Plaintiffs to act

in reliance upon the representations.

74.    Plaintiffs suffered injury by acting in reliance on Defendants' representation.

75.    Defendants' actions in perpetrating the fraud were willful and wanton.

**WHEREFORE**, Plaintiffs demand a trial by jury, damages, attorney's fees, costs, interest,

and any other relief as is just.

## COUNT V--UNFAIR AND DECEPTIVE TRADE PRACTICES

76.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 40 and

paragraphs 52 through 62 as if fully set forth herein.

77.    This is an alternative count to Count II for violations of the Florida Deceptive and

Unfair Trade Practices Act against Defendant WALSH and Alter Ego Defendants ("Defendants")

78.    Should the investments or securities described in Count II not qualify as an

"investment" under Section 517.301, Florida Statutes, or a "security" under Section 517.021,

Florida Statutes, then the conduct described in Count II is a violation of the Florida Deceptive and

Unfair Trade Practices Act.

79.    Florida Statute declares that unfair or deceptive acts or practices in the conduct of

any trade or commerce are unlawful.

80.    Plaintiffs are consumers.

81.    Defendants acts were deceptive and constituted unfair trade practices.

82.    Defendants unfair and deceptive actions caused Plaintiffs' injury.

83.    Plaintiffs have suffered actual Damages.

**WHEREFORE**, Plaintiffs demand a trial by jury, damages, attorney's fees, costs, interest,

and any other relief as is just.

Respectfully submitted on this 11th day of January 2020.

SHANE M. SMITH, P.A.
**/s/ David Disston**
Shane M. Smith, LL.M., Esq. 107872
David F. Disston, Esq. 119133
3845 W. Eau Gallie Blvd, Suite 104
Melbourne, Florida 32934
Phone: 321-724-1919
Primary Email: service@shanesmithlegal.com

## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
## CIVIL DIVISION

AUERBACH III-HOUSTON-
HOSPITALITY I, LLC,

      Plaintiff,

v.                                  Case No.:
                                         Division:

CALEB WALSH, URBAN BAY FINANCIAL LLC,
URBAN BAY HOUSING FUND LLC,
URBAN BAY TAMPA APTS LLC,
JOSHUA MANCE, JASON SANDUSKY,
BRITTANY INFIELD,

      Defendants.

_____/

## COMPLAINT

Plaintiff, Auerbach III-Houston-Hospitality I, LLC ("Auerbach"), by and through its

undersigned counsel, hereby sues Defendants Caleb Walsh ("Walsh"), Urban Bay Financial LLC

("Urban Bay"), Urban Bay Housing Fund LLC ("UB Housing Fund"), Urban Bay Tampa Apts

LLC ("UB Tampa Apts"), Joshua Mance ("Mance"), Jason Sandusky ("Sandusky"), Brittany

Infield ("Infield," and collectively, "Defendants"), and states as follows:

## PARTIES

1.      This is an action for violation of the Florida Deceptive and Unfair Trade Practices

Act, fraud in the inducement, fraud, negligent misrepresentation, breach of contract, and breach of

the implied covenant of good faith and fair dealing arising from a scheme by Defendants to obtain

non-refundable deposits from the Plaintiff for a loan that Defendants never intended to fund.

Defendants induce borrowers to pay deposits toward a potential loan, trump up a meritless excuse

to justify not closing and funding the loan, and then abscond with the deposits as "non-refundable."

In this case, an employee of Urban Bay, Hernandez, admitted the scheme to Plaintiff after the loan

sought by Plaintiff failed to close and Defendants went radio-silent.

2.      Auerbach is a Delaware limited liability company.

3.      Caleb Walsh is an individual residing in Hillsborough County, Florida.

4.      Urban Bay purports to be a Florida limited liability company and has a principal

place of business in Hillsborough County, Florida.[1]

5.      UB Housing Fund is a Florida limited liability company headquartered and has a

principal place of business in Hillsborough County, Florida.

6.      UB Tampa Apts is a Florida limited liability company and has a principal place of

business in Hillsborough County, Florida.

7.      Joshua Mance is an individual residing in Hillsborough County, Florida.

8.      Jason Sandusky is an individual residing in Pinellas County, Florida.

9.      Brittany Infield is an individual residing in Hillsborough County, Florida.

## JURISDICTION AND VENUE

10.     This is an action for damages in excess of $50,000.00.  Jurisdiction is proper in

this Court pursuant to § 26.012, Florida Statutes, and chapter 558, Florida Statutes.

11.     Venue is proper in Hillsborough County, Florida pursuant to Sections 47.011 and

47.021, Florida Statutes.  The cause of action originates from a contract formed in Hillsborough

County and the Defendants' conduct in Hillsborough County.  In addition, the contract at issue

provides any litigation shall be brought and maintained in either Florida state courts or the Middle

District of Florida.

---

[1] Urban Bay held itself out to Plaintiff as a Florida limited liability company.

2

12.    All conditions precedent to the filing of this suit have occurred, have been satisfied, have been excused, or have been waived.

## GENERAL ALLEGATIONS

13.    Urban Bay pretends to be a debt fund that finances commercial properties. Instead, Urban Bay swindles non-refundable deposits without ever intending to provide the agreed funds.

14.    In 2022, Auerbach sought a blanket loan for the rehabilitation of the Houston Four Points Hotel Property (the "Property"), a hospitality property located at 1450 N. Sam Houston Parkway E, Houston, Texas.

15.    Auerbach desired to close the loan no later than August 31, 2022. Urban Bay led Auerbach to believe that it was capable of doing so.

16.    Urban Bay, via Caleb Walsh, Joshua Mance, Jason Sandusky, Joseph Hernandez, and Brittany Infield, aggressively solicited Auerbach's business.

17.    At all times relevant to the allegations in this Complaint, Caleb Walsh, Joshua Mance, Jason Sandusky, Joseph Hernandez, and Brittany Infield were employees of Urban Bay.

18.    Caleb Walsh is the owner and director of Urban Bay.

19.    Urban Bay represented, and continues to advertise, that its "team works with borrowers to decide the best financing option based on their needs and ensure that the process is easy, stress free, and quick."[2]

20.    Urban Bay represents to the public, including Auerbach, that it has the capacity to finance up to a $100 million loan.

21.    These representations, among others, induced Auerbach to enter into business negotiations and subsequently contract to do business with Urban Bay.

---

[2] https://urbanbayfinancial.com/

3

22.     On July 29, 2022, Auerbach and Urban Bay (the "Parties") executed the term sheet for the loan ("Term Sheet") with the express intent of closing on the financing for the Property. A true and correct copy is attached as **Exhibit A.**

23.     The Term Sheet required Auerbach to wire a $30,496.00 Expense Deposit ("Expense Deposit") to UB Tampa Apts. The Term Sheet specified, "If the Loan does not close or is canceled by either party, the Prospective Lender does not allow refunds of the Expense Deposit."

24.     The Term Sheet included an exclusivity provision, requiring Auerbach to "exclusively and in good faith deal and negotiate with, and provide information, documents, and access to the Collateral to, Prospective Lender and its representatives with respect to the proposed Transaction."

25.     The Term Sheet specified "Urban Bay Financial LLC, a Florida limited liability company DBA Urban Bay Fund, or an affiliate thereof" as the prospective lender. Presently, "Urban Bay Financial LLC" has not filed as a Florida limited liability company. Accordingly, UB Housing Fund is named as a Defendant because it is an active Florida limited liability company affiliated with Caleb Walsh, which could be the entity referenced in the Term Sheet.

26.     After signing the Term Sheet, Auerbach wired the Expense Deposit and cooperated with all of Urban Bay's requests for information and documentation.

27.     Before and after Auerbach entered into the Term Sheet and wired the Expense Deposit funds, Urban Bay, through Walsh, Mance, Sandusky, and Infield, represented that Urban Bay had the financial capacity to close the loan.

28.     Urban Bay quickly began a pattern of delaying the expected closing date for the loan under the ruse of additional document requirements.

4

29.     On August 12, 2022, Auerbach emailed Urban Bay to inquire about the status of the loan, concerned with whether required third parties had been engaged to complete pre-Closing requirements.  Urban Bay claimed it could not move forward without the title commitment, Title Company, and contact information.  Auerbach responded with the requested information within minutes, while also flagging that standard practice was to fill the information in upon receipt at a later date.

30.     On August 15, 2022, Urban Bay represented that closing documents would be ready "sometime between today and tomorrow."

31.     Auerbach again inquired whether Urban Bay had engaged any required third parties.  Hernandez, an Urban Bay Commercial Loan Originator, responded, "I'm still requesting an update on thirds, but I've been reassured by my front office that since the subject property has been built within the past 5 years, we won't allow something like the pcr [sic] to delay the closing process."

32.     On August 16, 2022, Auerbach requested a status update on the loan documents, reminding Urban Bay, "[W]e need to get these today, please push on your end."

33.     On August 17, 2022, Urban Bay blamed the delays on its attorneys, but assured Auerbach that Urban Bay expected documents that day.  Hernandez elaborated, "I've already stressed to them the timeline and our need to meet the desired August 30th closing date."

34.     Urban Bay did not send the required closing documents.

35.     On August 22, 2022, Hernandez sent a preliminary commitment letter ("Preliminary Commitment Letter") and wire instructions to Auerbach.  Within the letter, Urban Bay emphasized its commitment to close on or before September 9, 2022.

5

36.    Along with the Preliminary Commitment Letter, Hernandez also promised that Urban Bay was "kicking this into overdrive and looking to work through loan docs as quick as possible."

37.    Hernandez further represented, "We'll be sending 2 of our investors for a site visit as soon as this Thursday.  Could you please provide us with a point of contact on the property?  Our partners would like to potentially see a few rooms and get a full scope of the property."  Auerbach made the appropriate arrangements to accommodate this request.  But, Urban Bay's purported investors never performed a site visit of the Property.

38.    Without needing to scrutinize the Preliminary Commitment Letter, Auerbach immediately noticed flaws.  Urban Bay unilaterally crafted new deal terms, such as: (1) the loan amount, (2) the interest rate, (3) the equity contribution, and (4) the closing date—ignoring the previously negotiated and executed Term Sheet.  Auerbach communicated its concerns with these inaccuracies and changes.  Auerbach further emphasized that it was waiting on confirmation that Urban Bay had engaged third parties and closing documents for the loan.

39.    Urban Bay did not respond to Auerbach's mounting concerns.  Instead, Urban Bay decided to include its counsel in the correspondence and begin a new round of negotiations.

40.    The loan did not close on August 30, 2022, as Urban Bay represented it would.  Nor did the loan close on August 31, 2022, Auerbach's need-by date.

41.    With new negotiations came new document delay tactics.  Urban Bay proceeded to make duplicative document requests.

42.    The loan did not close on September 9, 2022.

43.    On September 13, 2022, Auerbach attempted to schedule a phone call with Urban Bay, flagging "a lot of these items shown as pending have either been approved or provided to

6

Urban Bay.  We are happy to resend but want to make sure we are on the same page as to what the open items are."  Urban Bay skirted the topic and only vaguely responded by saying, "Urban Bay's meeting with our attorneys got pushed back."

44.    Several days later, on September 16, 2022, Hernandez requested that Urban Bay be added to the insurance, claiming, "[n]aturally, we create a [special purpose entity] for each transaction, so the entity name will be TXUBLN 7242, LLC."

45.    Upon information and belief, Urban Bay and Walsh never formed or registered TXUBLN 7242.

46.    On September 21, 2022, Auerbach asked whether Urban Bay required any additional documents to close the loan.  Urban Bay responded it only needed a good standing certificate, which Auerbach promptly provided.

### Urban Bay Fabricates Another Closing Date

47.    After needless delay, and a full month after sending the Preliminary Commitment Letter, Urban Bay represented it would close the loan on October 7, 2022.

48.    On September 22, 2022, Auerbach directed Urban Bay to finalize the loan documents for execution and inquired whether the loan could close the following day.

49.    The Parties executed a final version of a commitment letter (the "Commitment Letter") with the express intent of closing on the financing for the Property.  A true and correct copy is attached as **Exhibit B.**

50.    The Commitment Letter prohibited Auerbach from negotiating with any other lender parties while working with Urban Bay.

51.    The Commitment Letter emphasized the closing date to be on or before October 7, 2022.

7

52.    Urban Bay committed to providing Auerbach with a loan amount of $8,286,685.00.

53.    In the Commitment Letter, Auerbach agreed to pay Urban Bay a commitment deposit of $41,433.00, or 0.5% of the loan amount (the "Commitment Fee"), via wire transfer once the Parties agreed on a redlined loan document.

54.    The Commitment Letter provided:

Unless authorized in writing by Urban Bay, from the date hereof to the earlier of (the "Termination Date") (x) the termination by Urban Bay of discussions related to the proposed Transaction and (y) 11:59 P.M. Eastern Time on the 30th day after the date hereof, the Obligors shall not (and shall not permit its affiliates or subsidiaries or any of their respective directors, officers, employees, attorneys, or other representatives) to, directly or indirectly, (a) accept any proposal, offer, or commitment from, or enter into any agreement with, any other person or entity to consummate a competing transaction; (b) take any action to solicit, initiate, facilitate, encourage, or consummate a competing transaction; or (c) engage in discussions or negotiations with, or furnish information or access to the Collateral to, any person (other than Urban Bay or its representatives) with respect to a competing transaction.

55.    The Commitment Letter further specified:

Until the Termination Date, Obligors shall (and shall cause its representatives to) exclusively and in good faith deal and negotiate with, and provide information, documents, and access to the Collateral to, Urban Bay and its representatives with respect to the proposed Transaction. In light of the significant amount of time and expenses to be expended by Urban Bay in connection with the Transaction, if any of the terms of the Exclusivity provision are breached by any Obligor, then, in addition to the other remedies set forth in this Proposal Letter, Urban Bay shall be entitled to such remedies as are available at law or in equity, including without limitation, injunctive relief, and actual, punitive, special and/or consequential damages. Additionally, if the Prospective Lender is prepared to make the Loan, but prior to funding, the Borrower or any affiliate or controlled person or entity obtains debt or equity financing from the other source, then Obligors shall pay Break-Up Fee to the Prospective Lender in the amount of 1% of the Loan amount. In such a case, any unused the [sic] Expense Deposit shall be non refundable and shall be retained by the Prospective Lender. For the avoidance of doubt, this Section 3 shall be binding on the Guarantor(s) and Borrower and their affiliates and representatives and survives the termination of this letter.

56.    The Parties agreed to the terms and conditions and signed the Commitment Letter.

8

57.     Auerbach wired the Commitment Fee to Urban Bay and fulfilled all obligations for Urban Bay's information and document requests.

58.     Between the Expense Deposit and the Commitment Fee, Auerbach paid Urban Bay a total of $71,929.00 in purported non-refundable deposits.

59.     On September 28, 2022, Urban Bay and Auerbach finally negotiated and approved the form of the loan documents.

60.     On October 3, 2022, Hernandez requested that Auerbach join a call with investors "to get some questions answered and make sure everything is understood" regarding the loan. Auerbach agreed to the meeting and, shocked, asked, "Quick question, do you not have firm commitments from your investors yet?"  Urban Bay didn't respond and never scheduled the meeting.

61.     On October 5, 2022, Hernandez contacted Auerbach, again asking for further documentation.

62.     On October 6, 2022, Auerbach confronted the ongoing delays, inquiring whether Urban Bay intended to comply with the terms contained within the loan's Term Sheet and Commitment Letter.  Urban Bay did not respond to this direct question.

63.     The loan did not close on October 7, 2022.  Instead, Urban Bay continued to request needless additional and duplicative information from Auerbach.  These requests were a ploy to avoid closing and funding the loan

64.     Bound by the Commitment Letter's exclusivity provision, Auerbach continued to seek the needed financing from Urban Bay and provide all information requested despite growing suspicions.

**Urban Bay Kicks the "Con" Down the Road**

9

65.    On November 7, 2022, Auerbach's sent a demand letter to Urban Bay to address the transparent meritless delays and bad faith in fulfilling the Term Sheet and Commitment Letter. In its demand letter, Auerbach requested a return of the Commitment Fee and an additional twenty-five thousand dollars for reimbursement of its legal expenses caused by Urban Bay's scam.

66.    On November 9, 2022, Hernandez represented Urban Bay would close the loan on November 23, 2022 and attached a letter from Walsh.

67.    In his letter, Walsh opted to rinse and repeat Urban Bay's previous delay tactics—by pretending to need additional items to close the loan.

68.    Walsh attempted to goad Auerbach into expressly terminating the Commitment Letter, which would purport to trigger the Break-Up Fee provision in the Commitment Letter that could result in a penalty of 1% of the loan amount (i.e., an additional fee of $82,866.85).

69.    Although frustrated, Auerbach called Urban Bay's bluff and continued to provide the additional requested information.

70.    Yet, on November 14, 2022, Hernandez asked for even more documentation. And, again, Auerbach complied with the duplicative requests.

71.    On November 17, 2022, the escrow officer sent the Borrower Closing Statement (the "Statement") for review, listing TXUBLN 7242 as the lender.

72.    On November 22, 2022, Walsh emailed Auerbach to establish closing procedures for the loan and without explanation altered the closing date from November 23, 2022, to a vague "first week of December."

73.    Peter Auerbach ("Mr. Auerbach"), founder and managing partner of Auerbach, responded by requesting a phone call that Urban Bay ultimately denied.

74.    The loan did not close on November 23, 2022.

10

75.     Rather than close on the 23rd as previously agreed, Urban Bay's counsel emailed Auerbach to reinforce that Urban Bay anticipated closing on the first week of December.

76.     On November 28, 2022, Auerbach contacted Urban Bay to confirm Urban Bay had all required documents and that the only procedural step outstanding was re-dating the documents. Auerbach suggested December 2, 2022 as a closing date.

77.     Urban Bay confirmed no documents were outstanding, and claimed the closing date was pending further review.

78.     Directly conflicting with this assurance, on November 29, 2022, Hernandez asked for previously disclosed information once more.

79.     Recognizing the pattern of Urban Bay's ploy, Auerbach responded to confirm that Auerbach already provided the requested information.  Auerbach then asked again about the December 2, 2022 closing date.  But Urban Bay failed to respond.

80.     On December 2, 2022, Auerbach addressed Urban Bay's silence regarding the closing of the loan.  Brittany Infield, an Urban Bay employee, responded and claimed, "Adjustments are still being made to the closing statement confirming the specific amount the lender is placing in escrow.  We will confirm details internally and share with title and our counsel to notify you which day we are prepared to close."

81.     The loan did not close during the first week of December 2022 or any date thereafter.

82.     None of the Defendants nor Defendants' counsel responded to Auerbach's communications regarding the December 2, 2022, closing date.

**Joseph Hernandez Exposes Urban Bay's Scheme**

11

83. On or around December 14, 2022, Hernandez responded to texts from Mr. Auerbach and began to show remorse for his affiliation with Urban Bay and the issues that arose with the purported loan.

84. After Mr. Auerbach commented that Urban Bay "seems like a scam . . . to get deposits," Hernandez expressly confirmed that it was "100%".

85. In response to Mr. Auerbach inquiring whether any loans with other borrowers have closed, Hernandez said, "Nope. All in this limbo where we were told they'd close in September. Then October. Then no chance they make it to December."

86. Hernandez later described the mood of the office as: "Terrible. Nobody is motivated because nothing is closing."

87. When asked if anyone else within the company suspected fraud, Hernandez responded, "Yes basically all of us at this point."

88. Despite not funding any loans, Hernandez confirmed that Walsh and Urban Bay were still pushing the employees to originate additional loans every single day.

89. Presently, the average Urban Bay employee's day includes aggressively prospecting, "[b]ut it's to no avail . . . Nothing actually happens. Only recently some much much [sic] smaller transactions are in the pipeline. [Employees are] now too afraid to go after big deals because [they] see what has happened with the ones [they] currently have."

90. In response to Mr. Auerbach asking whether the purpose of the smaller deals was to once again "get more deposits," Hernandez said, "Well now the smaller deals don't require an upfront deposit. Just appraisal cost. So I think they're trying to close/broker smaller deals to get some extra commissions to pay for the wad of shit they've got themselves into with the bigger ones."

12

91.     Auerbach has retained the law firm of Holland & Knight LLP to pursue this litigation against Defendants.  Auerbach is obligated to pay Holland & Knight LLP a reasonable fee in connection with the provision of legal services.

92.     Out of the blue on December 27, 2022, after weeks of silence and ignored communications, Urban Bay sent a letter to Auerbach attempting to cancel the commitment letter and offering to return the "non-refundable" Commitment Fee.  On information and belief, Urban Bay took this action because it sought to avoid ramifications resulting from the exposure of the fraud, which was admitted in the communications between Hernandez and Mr. Auerbach.

93.     Even more, Urban Bay sought a release from Auerbach as part of its attempt to cancel the Commitment Letter, and to limit any recovery from Auerbach against Urban Bay to only the Commitment Fee.

94.     Because of Defendants' misconduct, however, Auerbach suffered damages in the form of the lost Expense Deposit and Commitment Fee plus legal expenses of $33,987 in pursuing the fake loan from Urban Bay, opportunity costs, and consequential damages.

## COUNT I: VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

95.     Auerbach realleges and reincorporates paragraphs 1-94 above as if fully restated herein.

96.     Urban Bay engaged in deceptive acts and unfair trade practices by pretending to be a debt fund capable of efficiently financing loans up to $100 million dollars for commercial properties.  In truth, Urban Bay swindles non-refundable deposits without ever intending to provide funds.  To effectuate this scheme, Urban Bay hides behind information requests to excuse failing to close any loans.  It does this while knowing the binding contract language within its Term Sheets and Commitment Letters assures non-refundable deposits to pocket.

13

97.     Urban Bay's actions are the direct and proximate cause of actual damages to Auerbach.

98.     Urban Bay's deceit caused Auerbach to enter into the Term Sheet and Commitment Letter.  Auerbach was damaged by paying $71,929 in non-refundable deposits to secure financing that never existed.

99.     Auerbach further incurred damages in the form of out-of-pocket expenses of $33,987 in legal fees pursuing the fraudulent loan from Urban Bay.

WHEREFORE, Plaintiff Auerbach demands judgment in its favor and against Defendants for actual damages, including the award of attorneys' fees, costs, pre and post judgment interest, and any further relief this Court deems just and proper.

## COUNT II: FRAUDULENT INDUCEMENT

100.     Auerbach realleges and reincorporates paragraphs 1-94 above as if fully restated herein.

101.     To induce Auerbach into entering into the Term Sheet and Commitment Letter, Urban Bay, through its various employees and representatives, verbally and in writing, made numerous false statements of material fact to secure Auerbach's business:

     a.  Urban Bay represented, and continues to advertise, that its "team works with borrowers to decide the best financing option based on their needs and ensure that the process is easy, stress free, and quick."

     b.  Urban Bay represented that it had the financial capacity to provide a loan up to $100 million.

     c.  Urban Bay represented that it is a legitimate lender.

     d.  Urban Bay represented it could close the loan by August 30, 2022.

14

e. Urban Bay represented it could close the loan by September 9, 2022.

f. Urban Bay represented it could close the loan by October 7, 2022.

g. Urban Bay represented that it would create and fund a special purpose entity, TXUBLN 7242, for the loan.

102.   Urban Bay and its affiliates, Caleb Walsh, and all involved employees knew that each of these statements were false when made.

103.   Urban Bay made these statements with the express purpose of inducing Auerbach to enter into the Term Sheet and Commitment Letter.

104.   Auerbach relied on these statements.  Due to this reliance, Auerbach entered into the Term Sheet and the Commitment Letter, and paid a total of $71,929 in non-refundable deposits to Urban Bay.

105.   Auerbach further incurred damages in the form of out-of-pocket expenses of $33,987 in legal fees pursuing the fraudulent loan from Urban Bay

106.   Auerbach learned Urban Bay's statements were false through Urban Bay's actions and Hernandez's text messages confirming the scheme.

WHEREFORE, Plaintiff Auerbach demands judgment in its favor and against Defendants for damages, costs, pre and post judgment interest, and any further relief this Court deems just and proper.  Auerbach further reserves the right to seek leave to amend this Complaint to assert claims for punitive damages pursuant to Section 768.72, Florida Statutes.

## **COUNT III: FRAUD**

107.   Auerbach realleges and reincorporates paragraphs 1-94 above as if fully restated herein.

15

108.     Walsh, Mance, Sandusky, and Infield, while working on behalf and in the employ of Urban Bay, made numerous false statements of material fact to Auerbach in emails, letters, and telephone calls, from the period of July through December 2022, including:

    a.     Urban Bay is a debt fund.

    b.     Urban Bay is willing and capable of providing a loan amount of $8,286,685.00 to Auerbach.

    c.     Urban Bay was capable of closing on the loan and provide funding to Auerbach.

    d.     Urban Bay was evaluating the merits of the loan to Auerbach.

    e.     Urban Bay would create and fund a special purpose entity, TXUBLN 7242, for the loan to Auerbach.

    f.     Urban Bay was working toward closing the loan to Auerbach on October 7, 2022.

109.     After Urban Bay failed to close the loan on October 7, 2022, Urban Bay maintained its fraud by representing it would close on November 23, 2022.

110.     After failing to close the loan on November 23, 2022, Urban Bay maintained its fraud by representing it would close on the first week of December.

111.     Urban Bay and its affiliates, Caleb Walsh, and all involved employees knew that all of these statements were false.

112.     Urban Bay made these statements with the express purpose of inducing Auerbach to execute the Term Sheet and Commitment Letter.

16

113.    Auerbach relied on these statements.  Due to this reliance, Auerbach entered into the Term Sheet and Commitment Letter, paid $71,929 in non-refundable deposits, incurred $33,987 in legal expenses, and lost significant business income.

114.    Auerbach learned Urban Bay's statements were false through Urban Bay's actions and Hernandez's text messages confirming the scheme.

115.    Because of Urban Bay's fraudulent misrepresentations regarding its ability and willingness to finance the Property, Auerbach has been damaged.

WHEREFORE, Plaintiff Auerbach demands judgment in its favor and against Defendants for damages, costs, pre and post judgment interest, and any further relief this Court deems just and proper.  Auerbach further reserves the right to seek leave to amend this Complaint to assert claims for punitive damages pursuant to Section 768.72, Florida Statutes.

<u>COUNT IV: NEGLIGENT MISREPRESENTATION</u>
**(Jason Sandusky, Joshua Mance, Brittany Infield)**

116.    Auerbach realleges and reincorporates paragraphs 1-94 above as if fully restated herein.

117.    Mance, Sandusky, and Infield, while working on behalf and in the employ of Urban Bay, made numerous false statements of material fact to Auerbach in emails, letters, and telephone calls, from the period of July through December 2022, including:

a.    Urban Bay's "team works with borrowers to decide the best financing option based on their needs and ensure that the process is easy, stress free, and quick."

b.    Urban Bay has the financial capacity to provide a loan up to $100 million.

c.    Urban Bay is a legitimate lender.

d.    Urban Bay is a debt fund.

17

e.      Urban Bay is willing and capable of providing a loan amount of $8,286,685.00 to Auerbach.

f.      Urban Bay was capable of closing on the loan and provide funding to Auerbach.

g.      Urban Bay was evaluating the merits of the loan to Auerbach.

h.      Urban Bay would create and fund a special purpose entity, TXUBLN 7242, for the loan to Auerbach.

i.      Urban Bay was working toward closing the loan to Auerbach on August 30, 2022.

j.      Urban Bay was working toward closing the loan to Auerbach on September 9, 2022.

k.      Urban Bay was working toward closing the loan to Auerbach on October 7, 2022.

l.      Urban Bay was working toward closing the loan to Auerbach on November 23, 2022.

m.      Urban Bay was working toward closing the loan to Auerbach on the first week of December.

118.    All involved employees should have known that all of these statements were false.

119.    All involved employees made these statements with the express purpose of inducing Auerbach to execute the Term Sheet and Commitment Letter.

120.    Auerbach relied on these statements. Due to this reliance, Auerbach entered into the Term Sheet and Commitment Letter, paid $71,929 in non-refundable deposits, incurred $33,987 in legal expenses, and lost significant business income.

18

121.    Because of Urban Bay's employees negligent misrepresentations regarding its ability and willingness to finance the Property, Auerbach has been damaged.

WHEREFORE, Plaintiff Auerbach demands judgment in its favor and against Defendants for damages, costs, pre and post judgment interest, and any further relief this Court deems just and proper.

<u>**COUNT V: BREACH OF CONTRACT**</u>

122.    Auerbach realleges and reincorporates paragraphs 1-94 above as if fully restated herein.

123.    Auerbach and Urban Bay entered into the Term Sheet, the terms of which are set forth in the attached **Exhibit A.**

124.    Auerbach and Urban Bay entered into the Commitment Letter, the terms of which are set forth in the attached **Exhibit B.**

125.    The Term Sheet and the Commitment Letter are valid, enforceable agreements between Auerbach and Urban Bay.

126.    Urban Bay breached these agreements by refusing to close and fund the loan.

127.    Auerbach suffered damages because of Urban Bay's breach of the Commitment letter:

      a.    Auerbach paid an Expense Deposit of $30,496 to secure financing contemplated by the Term Sheet.

      b.    Auerbach paid a Commitment Fee of $41,433 to secure financing promised by the Commitment Letter.

19

c.    The Term Sheet and Commitment Letter's exclusivity provisions barred
Auerbach from pursuing alternative financing, forcing Auerbach to accrue
thousands in unrealized business income because of Urban Bay's scheme.

d.    Auerbach further incurred damages in the form of out-of-pocket expenses
of $33,987 in legal fees pursuing the fraudulent loan from Urban Bay.

WHEREFORE, Plaintiff Auerbach demands judgment in its favor and against Urban Bay
for damages, costs, pre and post judgment interest, and any further relief this Court deems just and
proper.

## COUNT VI: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

128.    Auerbach realleges and reincorporates paragraphs 1-94 above as if fully restated
herein.

129.    Auerbach and Urban Bay entered into the Term Sheet, the terms of which are set
forth in the attached **Exhibit A.**

130.    Auerbach and Urban Bay entered into the Commitment Letter, the terms of which
are set forth in the attached **Exhibit B.**

131.    The Term Sheet and the Commitment Letter are valid, enforceable agreements
between Auerbach and Urban Bay.

132.    Every contract contains an implied covenant of good faith and fair dealing to protect
the reasonable expectations of contracting parties in light of an express agreement.

133.    Auerbach paid an Expense Deposit of $30,496 to secure financing contemplated by
the Term Sheet. Auerbach paid a Commitment Fee of $41,433 to secure financing promised by
the Commitment Letter. Auerbach did not pursue alternative financing to comply with the Term
Sheet and Commitment Letter's exclusivity provisions.

20

134.    Auerbach further incurred damages in the form of out-of-pocket expenses of $33,987 in legal fees pursuing the fraudulent loan from Urban Bay.

135.    Urban Bay did not act in good faith when performing its obligations under the terms of the Term Sheet or the Commitment Letter.

136.    Urban Bay breached the implied covenant of good faith and fair dealing by abusing its discretion in carrying out its rights and obligations under the Term Sheet and the Commitment Letter.

137.    Urban Bay breached the implied covenant of good faith and fair dealing by failing to close on the loan for the Property.

138.    As a result of Urban Bay's breach, Auerbach has incurred damages.

WHEREFORE, Plaintiff Auerbach demands judgment in its favor and against Urban Bay for damages, costs, pre and post judgment interest, and any further relief this Court deems just and proper.

HOLLAND & KNIGHT LLP

*/s/Brandon Faulkner*
Brandon Faulkner
Florida Bar No. 58560
Lauren Robertson
Florida Bar No. 1040176
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, FL 33602
(813) 227-6363
brandon.faulkner@hklaw.com
lauren.robertson@hklaw.com

*Counsel for the Plaintiff*

21

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

AUERBACH III-HOUSTON-
HOSPITALITY I, LLC,

      Plaintiff,

v.                                                                      Case No.:
                                                                        Division:
CALEB WALSH, URBAN BAY FINANCIAL LLC,
URBAN BAY HOUSING FUND LLC,
URBAN BAY TAMPA APTS LLC,
JOSHUA MANCE, JASON SANDUSKY,
BRITTANY INFIELD,

      Defendants.

_____/

**EXHIBIT A**

**TO**

**COMPLAINT**



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

July 29th, 2022

***PRIVILEGED & CONFIDENTIAL***
***VIA ELECTRONIC MAIL***

Auerbach Funds
Attn: Peter Auerbach
1450 N Sam Houston Pkwy E
Houston, Texas, 77032

Re:    Potential Financing Proposal for 1450 N Sam Houston Parkway E, Houston, Texas 77032

Dear Peter,

Urban Bay Financial, LLC ("Urban Bay"), and/or one or more of its affiliates (Urban Bay or the affiliate(s) it designates, the "Prospective Lender") is pleased to submit the following proposal letter (this "Proposal Letter"), which outlines the general terms and conditions under which Urban Bay would underwrite and consider the funding of a loan as set forth herein (the "Loan").

This Proposal Letter expires at 12:00 pm Eastern Standard Time on July 29th, 2022, unless it is accepted, countersigned, and returned along with the Expense Deposit (as defined below).

1.    Summary of Terms and Conditions. The following is an outline, in summary format, of proposed terms and conditions of the Loan and does not purport to include or summarize, all terms and conditions that would be expected to be contained in definitive documentation for the proposed Loan and is subject to change, modification, amendment, supplementation, and withdrawal by Urban Bay in whole or in part:

| | |
|---|---|
| **Loan Amount:** | The lesser of i) $8,422,000, ii) 65% of the as stabilized value (including personal property), as stipulated in the CBRE appraisal report dated May 25th, 2022. The Lender will only charge interest on funds that are drawn upon. |
| **Borrower:** | Auerbach III - Houston - Hospitality I, LLC |
| **Bad Boy Carveout:** | Peter Auerbach |
| **Guarantors:** | TBD Fund Entity (the "Guarantor"; together with the Borrower, collectively, the "Obligors"). |
| **Recourse:** | Non-Recourse except for industry standard "bad boy" carveouts. |

1



Urban Bay Financial, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

| **Guaranty & Repayment:** | Guarantor to provide standard bad boy carveouts detailed in the loan documents, Corporate Guarantor(s) must demonstrate a Net Worth greater than or equal to the total loan request. |
|---|---|

**Interest & Carry Reserve Account:** Loan proceeds shall include a twelve (12) month debt service reserve that can be drawn upon to cover interest payments. Upon the earlier of 1) the expiration of the first 12 months of the Loan Term or 2) achievement of a [1.10x] DSCR (tested on a trailing three (3) month basis), any excess proceeds remaining in the reserve account shall be released to Borrower. Interest will not be charged on the Interest & Carry Reserve Account until such time as those funds are dispersed to Borrower.

**Guarantor Requirements:** With standard bad boy carveouts detailed in the loan documents, Guarantor(s) must demonstrate a Net Worth greater than or equal to the total loan request. This can be constructed through multiple guarantors.

**Prospective Lender:** Urban Bay Financial LLC, a Florida limited liability company DBA Urban Bay Fund, or an affiliate thereof.

**Use of Proceeds:** The Loan proceeds shall be used for (1) acquisition of the Real Property (2) fund a draw schedule; and (3) payment of any fees and expenses related to this Transaction.

**Sources & Uses:**

| Sources | Pre Closing | Closing | TOTAL |
|---|---|---|---|
| Senior Loan | $ - | $ 8,422,000 | $ 8,422,000 |
| Sponsor Equity | $ - | $ 3,609,715 | $ 3,609,715 |
| TOTAL | $ - | $ 12,031,715 | $ 12,031,715 |

| Uses | Pre Closing | Closing | TOTAL |
|---|---|---|---|
| Acquisition Costs | $ - | $ 10,685,734 | $ 10,685,734 |
| Hard Costs | $ - | $ 750,021 | $ 750,021 |
| Soft Costs | $ - | $ 343,300 | $ 343,300 |
| Origination Cost | $ - | $ 252,660 | $ 252,660 |
| Underwriting Fee | $ 5,000 | $ - | $ - |
| Property Valuation | $ 500 | $ - | $ - |
| Phase 1 Report | $ 1,400 | $ - | $ - |
| Site Inspection | $ 846 | $ - | $ - |
| PCR | $ 2,750 | $ - | $ - |
| Appraisals | $ 5,000 | $ - | $ - |
| UBHF Legal Fees | $ 15,000 | $ - | $ - |
| Participant Legal Fees | $ - | $ - | $ - |
| TOTAL | $ 30,496 | $ 12,031,715 | $ 12,031,715 |
| DUE | $ 30,496 | | |

2



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

| | |
|---|---|
| **Collateral:** | The Loan will be secured by, inter alia, a perfected first priority lien on, and security interest in, the assets listed on Exhibit A ("Real Property"), and all current and future assets and property associated therewith, along with a pledge of 100% of the membership interests in the Borrower during the term of the Loan. |
| **Loan Term:** | Thirty-six (36) Months with options for two additional Six (6) Month extensions at 0.50% of the original principal amount of the Loan. |
| **Interest Rate:** | Interest rate of 8.49% per annum, fixed for the life of the Loan. The Interest Rate will be charged on an actual/360 basis. Interest shall be rate to be locked until Closing upon execution of LOI. |
| **Amortization:** | Interest Only. |
| **Exit Fee:** | 0.0% |
| **Prepayment:** | The Loan may be prepaid in whole or in part at any time subject to Lender's receipt of not less than twelve (12) months of projected interest payments (including all interest payments then paid to date, the "Minimum Interest") such that, at the time of prepayment, if Lender has not received twelve (12) months of interest payments, Borrower will, as a condition to such prepayment and in addition to all other amounts that may be due under the Loan at such time, pay to Lender the difference between the Minimum Interest and the amount of interest which Lender has actually received through the date of repayment. |
| **Stabilization Period:** | Period starting from Loan closing until after the 24th month of the Loan term. Any cash management trigger shall not apply during the Stabilization Period |
| **Estimated Closing Date:** | Within sixty (30) days of execution of this Proposal Letter and confirmed receipt of applicable deposits and due diligence. |
| **Points:** | 3.00% of the Loan at Closing. |
| **Default Interest:** | 24% per annum, but in no event greater than the maximum legal rate. |
| **Governing Law:** | State of Florida. |
| **Other Terms and Conditions of the Loan:** | The Loan documentation will contain standard acknowledgments, representations, warranties, covenants, conditions, releases, reporting obligations, and other usual and customary provisions for transactions of this type or reasonably requested by the Prospective Lender. If Prospective Lender elects to proceed with the Loan, Prospective Lender may determine in its sole and absolute discretion the structure of the Loan. |

3



| | |
|---|---|
| **Conditions Precedent:** | Closing and funding of the Loan will be subject to the satisfaction, in Urban Bay's sole discretion, of all conditions precedent deemed necessary or appropriate by the Prospective Lender, including, without limitation: |

- Diligence on Obligor's background and creditworthiness, personal and real property, structure, management, personnel, all agreements, and operations; and
- Site inspection, title, survey and lien review, leases (including estoppels from existing tenants), tenant's financials, environmental review, and valuation review and due diligence requested by Prospective Lender.

| | |
|---|---|
| **Proposal Letter Non-Binding:** | It is agreed to and understood by the parties that the terms and provisions of this Proposal Letter are non-binding, except for the following which shall be binding on the parties and shall survive termination of this Proposal Letter. |

2.    Confidentiality. The parties acknowledge and agree that this Proposal Letter, its existence and contents are confidential and proprietary and may not be disclosed, in whole or in part, without Prospective Lender's written consent. The obligations under this Section 2 shall survive any occurrence of the Termination Date or Termination of Discussion (as defined hereinafter).

3.    Exclusivity. Unless authorized in writing by Prospective Lender, from the date hereof to the earlier of (the "Termination Date") (a) the termination by Prospective Lender of discussions related to the proposed Transaction or (b) 11:59 P.M. Eastern Time on the 45th day after the date hereof, the Obligors shall not (and shall not permit its affiliates or subsidiaries or any of their respective directors, officers, employees, attorneys, or other representatives) directly or indirectly, (a) accept any proposal, offer, or commitment from, or enter into any agreement with, any other person or entity to consummate a competing transaction; (b) take any action to solicit, initiate, facilitate, encourage, or consummate a competing transaction; (c) engage in discussions or negotiations with, or furnish information or access to the Collateral to, any person (other than Prospective Lender or its representatives) with respect to a competing transaction; or (d) share the terms of this Proposal Letter either written or verbally with any other person or entity. The Obligors shall cause any discussions or negotiations with any other person or entity regarding a competing transaction to be immediately terminated. Until the Termination Date, the Obligors shall (and shall cause its representatives to) exclusively and in good faith deal and negotiate with, and provide information, documents, and access to the Collateral to, Prospective Lender and its representatives with respect to the proposed Transaction. ~~In light of the significant amount of time and expenses to be expended by Prospective Lender in connection with the Transaction, if any of the terms of this Exclusivity provision are breached by any Obligor, then, in addition to the other remedies set forth in this Proposal Letter, Prospective Lender shall be entitled to such remedies as are available at law or in equity, including, without limitation, injunctive relief, and actual, punitive, special and/or consequential damages. Additionally, and prior to funding, if the Borrower or any affiliate or controlled person or entity obtains debt or equity financing from another source or elects to terminate discussions with Prospective Lender, then Obligors shall pay a Break-Up Fee to the Prospective Lender in the amount of 3% of the Loan amount specified in this Proposal Letter.~~ In such a case, any unused the Expense Deposit shall be non-refundable and shall be retained by the Prospective Lender. For the avoidance of doubt, this Section 3 shall be binding on the Guarantor(s) and Borrower and their affiliates and representatives and survives termination of this Proposal Letter.

4



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

4.    Indemnification. The Obligors shall indemnify and hold harmless the Prospective Lender, its affiliates, and their respective officers, directors, employees, agents, advisors, auditors, attorneys, controlling persons, funding sources, and other representatives and advisors, from and against all suits, actions, proceedings, claims, damages, losses, liabilities, and expenses (including, without limitation, attorneys' fees and other costs), which may be asserted against or incurred by any of them in connection with, or arising out of, this Proposal Letter or any part of the proposed Transaction.

5.    Costs. The Obligors shall be responsible (whether or not the Transaction is consummated) for the payment or reimbursement of all of the Prospective Lender's reasonable costs, fees, and expenses incurred by the Prospective Lender in connection with this Proposal Letter, the proposed Transaction, the Prospective Lender's due diligence, and/or the preparation, negotiation, execution, administration, modification, waiver, or enforcement by the Prospective Lender of any document relating to the proposed Transaction (collectively, the "Costs").

6.    Expense Deposit. Simultaneously with the delivery of this Proposal Letter before end of business day, the Borrower shall deposit $30,496.00 via wire transfer to the Prospective Lender (the "Expense Deposit"), as consideration for the Prospective Lender having incurred and continuing to incur the Costs. Said funds will be used to cover Prospective Lender's out-of-pocket expenses including processing fee, appraisals, environmental reports, engineering reports, site inspections, legal bills, and any other expenses incurred by Prospective Lender while conducting due diligence. Any funds in excess of actual out-of-pocket expenses will be credited to the Borrower at closing. Prospective Lender shall apply the Expense Deposit to the Costs or to any other amounts owed to, or recoverable by, the Prospective Lender. The Expense Deposit is non-refundable except in the event that Prospective Lender materially changes the terms of the Loan due to no fault of the Borrower during the Closing period and deviates from the terms and conditions agreed upon in this document. If the Loan does not close or is canceled by either party, the Prospective Lender does not allow refunds of the Expense Deposit. The Expense Deposit may be converted to a credit to be applied as a payment method for future expense deposits for up to one year from the issuance of this Proposal Letter.

7.    Termination of Discussions; Non-Binding. The terms and provisions of this Proposal Letter are non-binding, except as expressly set forth herein. This Proposal Letter does not represent a commitment to provide financing and should not be relied upon as an indication of the availability of the proposed financing. Upon the completion of Prospective Lender's due diligence to its sole satisfaction, Prospective Lender may issue a commitment letter related to the proposed Transaction and/or commence with preparation of definitive documentation. Prospective Lender may, in its sole discretion, terminate discussions for any or no reason without liability. In no event shall Prospective Lender incur obligations with regard to the proposed Transaction unless and until the Prospective Lender executes and delivers definitive documents reflecting those obligations.

8.    Assignment. This Proposal Letter shall inure to the benefit of the successors and assigns of the Prospective Lender but shall not be assignable by the Borrower without the prior written consent of the Prospective Lender. Any purported assignment without such consent shall be null and void. Counterparts; Electronic Signatures; Governing Law. This Proposal Letter may be executed counterparts. All counterparts shall collectively constitute a single instrument. A facsimile or electronic copy of this Proposal Letter shall be considered an original. This Proposal Letter shall be governed by the laws of the State of Florida.

5



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813 499 9712 (p)
813 499 9487 (f)

If the terms and conditions outlined in this Proposal Letter are acceptable, please sign and return an executed copy of this Proposal Letter to Prospective Lender along with the Expense Deposit prior to its expiration.

Urban Bay looks forward to working with the Obligors on the proposed Transaction.

Very truly yours,                    Subject to expiration date indicated on page 1.

URBAN BAY FINANCIAL, LLC

By: _____

Name: Caleb Walsh
Its: Director

AGREED AND ACCEPTED:

Auerbach III - Houston - Hospitality I, LLC

By: _____

Name: Peter Auerbach, individually and on behalf of Auerbach Funds

Title: President _____

6



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813 499 9712 (p)
813 499 9487 (f)

## WIRING INSTRUCTIONS

| | |
|---|---|
| Bank Name: | Grow Financial FCU |
| Routing Number: | 263182914 |
| Account Number: | ▮▮▮▮▮▮▮ |
| Account Name: | Urban Bay Tampa Apts LLC |
| Account Address: | 13194 US HWY 301 S #374, Riverview, FL 33578 |
| Reference: | Auerbach Funds |

7



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

### Exhibit A

1450 N Sam Houston Parkway E, Houston, Texas 77032

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

AUERBACH III-HOUSTON-
HOSPITALITY I, LLC,

      Plaintiff,

v.

CALEB WALSH, URBAN BAY FINANCIAL LLC,
URBAN BAY HOUSING FUND LLC,
URBAN BAY TAMPA APTS LLC,
JOSHUA MANCE, JASON SANDUSKY,
BRITTANY INFIELD,

      Defendants.

_____/

Case No.:
Division:

**EXHIBIT B**

**TO**

**COMPLAINT**



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

September 22, 2022

*<u>VIA ELECTRONIC MAIL</u>*
*<u>PRIVILEGED AND CONFIDENTIAL</u>*

*CC: Geraci LLP*

### Commitment Letter

Re: Blanket Loan for the acquisition and rehabilitation of a hospitality property in Houston, TX

<u>Property: 1450 N Sam Houston Parkway E, Houston, TX 77032</u>

Dear Peter Auerbach,

You have advised that URBAN BAY FINANCIAL LLC or an affiliate thereof (the "Lender") that Auerbach III – Houston – Hospitality I, LLC (the "Borrower") is seeking a loan (the "Loan") on the terms and conditions set forth herein (the "Commitment Letter") and in that certain Potential Financial Proposal (the "Term Sheet") Capitalized terms used and not otherwise defined herein shall have the meaning set forth in the Term Sheet.

The Terms and Conditions of the commitment Letter are as follows:

**Closing Requirements:**

1. **Loan Amount:** $8,286,685.00
2. **Interest Rate:** 8.49%
3. **Equity Contribution:** Borrower equity requirement shall be deducted from the Lender Loan Amount of $8,286,685.00 at closing. The borrower will bring twenty-five percent of the Total Cost of the Construction Budget and Fees totaling $327,996.00. These funds will serve as Borrowers Equity contribution completion guaranty, security against taxes, insurance, operating expenses, debt service, servicing costs and borrower default with full ownership and authority granted to lender. The funds will be credited as the borrower's equity dollars into the project.
4. **Closing Date:** <u>On or before October 7, 2022</u>, subject to estimated six due diligence requests, document delays, legal review, and title requirements.
5. **Commitment Deposit:** $41,433.00, equal to 0.5% of the loan amount, shall be remitted to the Lender via wire transfer from Borrower once redlined loan document have been agreed upon by both Lender and Borrower.

Unless authorized in writing by Urban Bay, from the date hereof to the earlier of (the "Termination Date") (x) the termination by Urban Bay of discussions related to the proposed Transaction and (y) 11:59 P.M. Eastern Time on the 30th day after the date hereof, the Obligors shall not (and shall not permit its affiliates or subsidiaries or any of their respective directors, officers, employees, attorneys, or other representatives) to, directly or indirectly, (a) accept any proposal, offer, or commitment from, or enter into any agreement

1




Urban Bay Financial, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

with, any other person or entity to consummate a competing transaction; (b) take any action to solicit, initiate, facilitate, encourage, or consummate a competing transaction; or (c) engage in discussions or negotiations with, or furnish information or access to the Collateral to, any person (other than Urban Bay or its representatives) with respect to a competing transaction. The Obligors shall cause any discussions or negotiations with any other person or entity regarding a competing transaction to be immediately terminated. Until the Termination Date, the
Obligors shall (and shall cause its representatives to) exclusively and in good faith deal and negotiate with, and provide information, documents, and access to the Collateral to, Urban Bay and its representatives with respect to the proposed Transaction. In light of the significant amount of time and expenses to be expended by Urban Bay in connection with the Transaction, if any of the terms of this Exclusivity provision are breached by any Obligor, then, in addition to the other remedies set forth in this Proposal Letter, Urban Bay shall be entitled to such remedies as are available at law or in equity, including, without limitation, injunctive relief, and actual, punitive, special and/or consequential damages. Additionally, if the Prospective Lender is prepared to make the Loan, but prior to funding, the Borrower or any affiliate or controlled person or entity obtains debt or equity financing from another source, then Obligors shall pay a Break-Up Fee to the Prospective Lender in the amount of 1% of the Loan amount. In such a case, any unused the Expense Deposit shall be non refundable and shall be retained by the Prospective Lender. For the avoidance of doubt, this Section 3 shall be binding on the Guarantor(s) and Borrower and their affiliates and representatives and survives termination of this letter.

In addition to the conditions to funding or closing set forth herein and the Conditional Term Sheet, the Commitment is subject to, among other conditions, (a) the negotiation and execution of a definitive loan agreement and other related documentation satisfactory to Lender; (b) there being no material adverse change (in the reasonable opinion of Lender) in the Real Property; (c) approval of, and consent to, the Loan by Lender's credit committee, in its sole discretion and (d) satisfactory appraisal.

Borrower hereby represents and covenants that (a) all information (other than Projections (as defined below)) (the "Information") that has been or will be made available to Lender by Borrower or any of its representatives is or will be complete and correct in all material respects and does not or will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made; and (b) all financial projections ("Projections") that have been or will be made available to Lender by Borrowers' representatives have been or will be prepared in good faith based upon assumptions Borrowers believe to be reasonable (it being understood that the Projections are subject to significant uncertainties and contingencies, many of which are beyond Borrower's control, and that no assurance can be given that such Projections will be realized). Borrowers understand that Lender may use and rely on the Information and Projections without independent verification thereof.

The reasonable out-of-pocket costs and expenses (including all legal (including the allocated fees and disbursements of internal legal services), environmental, accounting and other consultant costs and fees) incurred by Lender in connection with the evaluation and/or documentation of this Commitment Letter and the Loan shall be payable by the Borrower upon demand by Lender, whether or not the Loan closes.

Each party acknowledges that this Commitment Letter supersedes any and all discussions and understandings, written or oral, between or among Lender and any other person as to the subject matter hereof, including, without limitation, any prior proposal or commitment letters and term sheets. This Commitment Letter may only be amended, waived or modified in writing and executed by the parties hereto.

This Lender's obligations and agreements in this Commitment Letter will terminate on September 22, 2022 unless on or before that date you sign and return an enclosed counterpart of this Commitment Letter.

2



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

Delivery of an executed counterpart of this Commitment Letter by facsimile or other electronic transmission shall constitute valid delivery of an executed counterpart hereof.

This Commitment Letter shall be a contract made and governed by the internal laws of the State of Florida applicable to contracts made and to be performed entirely within such state, without regard to conflict of laws principles.

EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS COMMITMENT LETTER OR THE FEE LETTER, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS COMMITMENT LETTER OR THE FEE LETTER, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF FLORIDA OR IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA; PROVIDED THAT NOTHING IN THIS COMMITMENT LETTER SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION. EACH PARTY HERETO EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF FLORIDA AND OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. EACH PARTY HERETO EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Lender is pleased to have this opportunity and looks forward to working with you.

Very truly yours,

By: Urban Bay Financial, LLC
Name: Caleb Walsh
Its: Director

3



**Urban Bay Financial, LLC**
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

AGREED AND ACCEPTED THIS

22nd DAY OF SEPTEMBER 2022

AGREED AND ACCEPTED INDIVIDUALLY AND ON BEHALF OF THE BORROWER:

Auerbach III – Houston – Hospitality I, LLC

Signature: _____
By:          Peter Auerbach
Its:          Authorized Member individually and on behalf of Auerbach III – Houston – Hospitality I, LLC

4

IN THE CIRCUIT COURT OF THE 13TH
JUDICIAL CIRCUIT IN AND FOR
HILLSBOROUGH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO:

ORLANDO SUN RESORT & SPA LLC,
a Delaware limited liability company,

      Plaintiff,

v.

URBAN BAY HOUSING FUND, LLC,
a Florida limited liability company,

      Defendant.

_____/

## **COMPLAINT**

Plaintiff ORLANDO SUN RESORT & SPA LLC, a Delaware limited liability company,

sues URBAN BAY HOUSING FUND, LLC, a Florida limited liability company, and alleges as

follows:

1.     Plaintiff ORLANDO SUN RESORT & SPA LLC ("Orlando Sun"), is a limited

liability company organized, existing and in good standing under the laws of the state of Delaware.

Orlando Sun owns a parcel of real property located at 6375 W Irlo Bronson Memorial Highway,

Kissimmee, Florida 34747 (the "Property").

2.     Defendant URBAN BAY HOUSING FUND, LLC ("Urban Bay"), is a limited

liability company organized, existing and in good standing under the laws of the state of Florida,

with its principal place of business located in Tampa, Florida. Urban Bay is in the business of

making loans.

3.     This is an action for the recovery of damages in excess of the jurisdictional limit of

this Court, excluding interest, costs and attorney's fees, for breach of contract, breach of implied covenant of good faith, misrepresentation, and promissory estoppel. This Court has jurisdiction over this cause pursuant to Article V, § 5(b), of the Florida Constitution, and § 26.012, Fla. Stat. Venue of this cause properly lies in Hillsborough County, Florida, because Defendant Urban Bay resides, and the causes of action accrued in Hillsborough County, Florida.

4.    During June 2021, Orlando Sun was searching for a lender from whom to borrow approximately $25 million to refinance an existing loan encumbering the Property. At the time, Orlando Sun communicated with Urban Bay with respect to such a loan.

5.    On July 7, 2021, Urban Bay and Orlando Sun executed a letter, a copy of which is attached as **Exhibit "A"** (the "Letter Agreement"), pursuant to which Urban Bay submitted a proposal for a loan. Pursuant to the Letter Agreement, Urban Bay agreed to fund a $27 million loan, to be secured by a mortgage on the Property, with a 24 month term, at a 6.25% interest rate (the "Loan"). In consideration of the Loan, Urban Bay was to receive a fee of 1% of the original principal amount of the Loan at closing, and an additional 1% of the original principal amount on the exit of the Loan. The Letter Agreement states that the anticipated closing date was on or before September 2, 2021.

6.    In conjunction with the execution of the Letter Agreement, Orlando Sun tendered $75,000 to Urban Bay which, pursuant to paragraph 6 of the Letter Agreement, was to be held by Urban Bay as a deposit for Urban Bay to use to pay specified expenses, including appraisal reports, environmental site assessments, property condition reports, and further due diligence items and site visits (the "Expense Deposit").

7.    Thereafter, Orlando Sun provided Urban Bay with all required information and documentation regarding the Property and the Loan. Urban Bay represented that it performed due

diligence with respect to the Loan.

8. On August 5, 2021, Urban Bay presented certain of the Loan documents to Orlando Sun. On August 16, 2021, Orlando Sun provided its comments to the Loan documents to Urban Bay. Throughout August and September 2021, the parties worked on finalizing all Loan documents.

9. Thereafter, Orlando Sun undertook to follow up with Urban Bay to confirm that the Loan documents were in acceptable form, and to verify the closing date of the Loan. During this time, Urban Bay and its counsel did not respond to Orlando Sun's inquiries regarding the status of the Loan documents and the closing date.

10. On November 5, 2021, Orlando Sun's counsel sent Urban Bay's counsel an email, as follows:

> Following up on yesterday's email below. Our client has not heard back from anyone at Urban Bay. Please ask you[sic] client to promptly return the $75,000 deposit if they have no intention of closing. A response will be appreciated.

> All rights reserved.

11. On November 9, 2021, Urban Bay's counsel responded by email to this email, and copied Orlando Sun's counsel and both parties' principals, as follows:

> Good afternoon all,

> I had the chance to speak to Marc this afternoon. <u>The deal is still moving forward and is in underwriting</u>. <u>We are trying to nail down a closing date in the first week of December</u>. The file has been a little more difficult due to the vacant status. If there had been entitlements in place, this would have been closed. We have put many months of work into this file and <u>fully intend to close, issue a commitment, and set a concrete closing date by next week</u>. (emphasis added).

Accordingly, Urban Bay affirmed its intention to close on the Loan. In reasonable reliance thereon, Orlando Sun understood that the Loan closing would occur in early December, and forbore

pursuing another lender to make the needed loan.

12.    Thereafter, Orlando Sun continued to follow up with Urban Bay to seek to confirm that the Loan documents were in final form, and to verify the closing date. Urban Bay did not respond to Orlando Sun's inquiries.

13.    On December 1, 2021, counsel for Orlando Sun sent counsel for Urban Bay a letter, a copy of which is attached as **Exhibit "B"**, requesting confirmation of the proposed early December closing of the Loan. Orlando Sun advised that if Urban Bay failed to close the Loan, it was responsible to return the full $75,000 Expense Deposit, to reimburse to it all fees and costs that it had incurred in connection with the Loan, and to pay all damages that Orlando Sun might incur in procuring a replacement loan. Urban Bay never responded to this letter.

14.    Pursuant to paragraph 6 of the Letter Agreement, Urban Bay is required to provide an accounting of its expenditure of the Expense Deposit within twenty-four (24) hours of a request for an accounting (the "Accounting"). On December 9, 2021, Orlando Sun sent Urban Bay a letter, a copy of which is attached as **Exhibit "C"**, requesting Urban Bay to provide an Accounting of the Expense Deposit, identifying all such sums allegedly expended by Urban Bay.

15.    On December 22, 2021, Urban Bay sent Orlando Sun the email attached as **Exhibit "D"**, purporting to provide the requisite Accounting, and again affirming its commitment to close the Loan. The purported Accounting identifies line items of claimed expenses, some of which are not authorized to be paid from the Expense Deposit, and none of which were explained or supported by source documentation such as invoices or checks. Thereafter, despite Orlando Sun's request, Urban Bay failed to provide Orlando Sun with any explanation or back up regarding the information included in the Accounting.

16.    On January 14, 2022, Urban Bay notified Orlando Sun that it does not have, and

that it is attempting to secure $17 million of the $27 million required to fund the Loan, and, nonetheless, again affirmed its alleged commitment and intention to close the Loan. Thereafter, notwithstanding Orlando Sun's efforts, Urban Bay failed to confirm that it had obtained the money necessary to fund the Loan, and did not confirm a closing date.

17.    Orlando Sun has performed all conditions precedent to the maintenance of this action.

## COUNT I – BREACH OF LETTER AGREEMENT

18.    Orlando Sun incorporates by reference paragraphs 1 through 17.

19.    Urban Bay breached the Letter Agreement in manners including, and not limited to the following:

      a.    failing to timely provide Orlando Sun with the requested and required Accounting,

      b.    failing to provide Orlando Sun with a proper Accounting,

      c.    failing to close the Loan, and

      d.    alternatively, failing to return the Expense Deposit to Orlando Sun.

20.    Orlando Sun has sustained damages as a proximate result of Urban Bay's breaches of the Letter Agreement.

WHEREFORE, Orlando Sun demands judgment in its favor and against Urban Bay for consequential damages, prejudgment interest thereon, and the cost of the maintenance of this action.

## COUNT II – BREACH OF IMPLIED COVENANT OF GOOD FAITH

21.    Orlando Sun incorporates by reference paragraphs 1 through 17.

22.    All agreements include an implied covenant of good faith.

23.    Pursuant to the Letter Agreement and the implied covenant of good faith, Urban Bay was obligated to proceed with the Loan, particularly because it confirmed its intention to do so. Further, Urban Bay never notified Orlando Sun of the termination of the Letter Agreement, or of the termination of discussions regarding the Loan, and instead, affirmed that it was attempting to proceed with the Loan, thereby obligating Urban Bay to close the Loan transaction.

24.    Urban Bay affirmed its intention to perform pursuant to the Letter Agreement and fund the Loan.

25.    Urban Bay breached the implied covenant of good faith included in the Letter Agreement by failing to close the Loan.

26.    Orlando Sun has sustained damages as a proximate result of Urban Bay's actions.

WHEREFORE, Orlando Sun demands judgment in its favor and against Urban Bay for consequential damages, prejudgment interest thereon, and the cost of the maintenance of this action.

## COUNT III – PROMISSORY ESTOPPEL

27.    Orlando Sun incorporates by reference paragraphs 1 through 17.

28.    Orlando Sun and Urban Bay executed the Letter Agreement.

29.    Thereafter, Urban Bay assured Orlando Sun that it was proceeding to close the Loan, and that it would do so.

30.    Orlando Sun reasonably relied in good faith to its detriment on Urban Bay's assurances, and forbore taking action to seek the return of the Expense Deposit, and seeking to secure a loan from another lender.

31.    Orlando Sun's forbearance constituted a change in position detrimental to it as a result of its reasonable reliance on Urban Bay's representations.

32.    Orlando Sun has sustained damages as a result of Urban Bay's failure to honor its commitment to close the Loan.

WHEREFORE, Orlando Sun demands judgment in its favor and against Urban Bay for consequential damages, prejudgment interest thereon, and the cost of the maintenance of this action.

## COUNT IV – MISREPRESENTATION

33.    Orlando Sun incorporates by reference paragraphs 1 through 17.

34.    During the parties' negotiations, Urban Bay represented to Orlando Sun that:

a.    it had the funds, and the ability to close the Loan, and

b.    the Loan closing would occur within a few months, at the latest.

35.    At the time that Urban Bay made these representations, it did not have the funds on hand to be able to close the Loan. Further, Urban Bay was not in any position to close the Loan within a few months. Urban Bay was aware of these circumstances at the time it represented otherwise to Orlando Sun.

36.    Orlando Sun reasonably and detrimentally relied on Urban Bay's representations in executing the Letter Agreement, and in paying the $75,000 Expense Deposit to Urban Bay. In this regard, but for these representations, Orlando Sun would not have executed the Letter Agreement, and would not have paid the $75,000 Expense Deposit to Urban Bay.

37.    Orlando Sun has sustained damage as a proximate result of Urban Bay's misrepresentations.

WHEREFORE, Orlando Sun demands judgment in its favor and against Urban Bay:

a.    rescinding the Letter Agreement, and entering judgment in favor of Orlando Sun and against Urban Bay for the $75,000 Expense Deposit paid to Urban Bay,

b.    alternatively, awarding compensatory damages and prejudgment interest thereon, and

c.    awarding Orlando Sun the costs of the maintenance of this action.

LAVIN LAW GROUP, P.A.
*Attorneys for Plaintiff*
2670 NE 215th Street
Miami, Florida 33180
Telephone: (954) 967-2788
Facsimile: (954) 983-7021
Email: alavin@lavinlawyers.com

By: _____

Andrew T. Lavin, Esq.
Florida Bar No. 260827

\\llgserver\Common Files\Clients\ATL\Orlando Sun - Urban Bay\Pleadings\Complaint (Rev. by ALavin 1.21.22).docx

Page **8** of **8**



**UB** Housing Fund

Urban Bay Housing Fund, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

July 7, 2021

**_VIA ELECTRONIC MAIL_**

Orlando Sun Resort & Spa LLC
Attn: Joseh Moinian
3 Columbus Circle 26th Floor
New York, NY 10019

Re:    Potential Financing Proposal for 6375 W Irlo Bronson Memorial Hwy, Kissimmee, FL 34747

Dear Joseh,

Urban Bay Housing Fund, LLC ("Urban Bay") is pleased to submit the following proposal letter (this "Proposal Letter"), which outlines the general terms and conditions under which Urban Bay would underwrite and consider the funding of a loan as set forth herein (the "Loan").

This Proposal Letter expires at 5:00 pm Eastern Standard Time on July 9, 2021 unless it is accepted, countersigned, and returned along with the Expense Deposit (as defined below).

1.    <u>Summary of Terms and Conditions</u>. The following is an outline, in summary format, of proposed terms and conditions of the Loan and does not purport to include or summarize, all terms and conditions that would be expected to be contained in definitive documentation for the proposed Loan and is subject to change, modification, amendment, supplementation, and withdrawal by Urban Bay in whole or in part:

| | |
|---|---|
| **Loan Amount:** | $27,000,000 |
| **Borrower:** | Orlando Sun Resort & Spa LLC |
| **Non-Recourse Guarantors:** | Joseh Moinian (the "Non-Recourse Guarantor"; together with the Borrower, collectively, the "Obligors"). The guarantee of the Non-Recourse Guarantor will contain standard carve-out language for non-recourse loans. |
| **Prospective Lender:** | Urban Bay Housing Fund, LLC, or an affiliate thereof. |
| **Use of Proceeds:** | The Loan proceeds shall be used for (1) refinance/re-development of the Real Property (2) subject to a draw schedule; and (3) payment of any fees and expenses related to this Transaction. |
| **Collateral:** | The Loan will be secured by, inter alia, a perfected first priority lien on and security interest in the assets listed on Exhibit A ("Real Property") and all current |

1

**EXHIBIT A**



**UB**
Housing Fund

Urban Bay Housing Fund, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

and future assets and property associated therewith, along with a pledge of 100% of the membership interests in the Borrower during the term of the Loan.

| | |
|---|---|
| **Loan Term:** | 24 month-term |
| **Extension:** | Borrower may extend the loan term for one additional six (6) month terms subject to payment to Prospective Lender of an amount equal to one percent (1.0%) of the original principal amount of the Loan provided, however, that such option to extend shall be null and void if Borrower defaults under any of its Loan obligations. |
| **Interest Rate:** | Interest rate of 6.25%. Interest shall be computed on an actual/360 simple interest basis. Rate is contingent upon receiving appraisal confirming an LTV of 50% to 60%. |
| **Interest Payments:** | Borrower shall pay interest in cash monthly. |
| **Yield Maintenance:** | Upon subdivision approval, Lender will provide a release with no prepayment penalty on a per unit basis for units sold on lots 1,3,4 & 5 if 100% of the sale proceeds go toward payment of the underlying mortgage. Upon the total sale of the parcel identified as lot 2, the borrower will pay a lump sum of $17,000,000 on the underlying note bringing the balance to $10,000,000. The remainder of the loan will be secured with a minimum 6-month pre-payment penalty. |
| **Anticipated Closing Date:** | On or before September 2, 2021. Subject to old reports being updated with qualified appraisers, engineers, and assessors. Reports are deemed necessary by UBHF. An independent appraisal apart from the updated appraisal will be necessary for confirmation of valuation. |
| **Points:** | To pay an amount necessary to lock the Interest Rate, the Borrower will pay 1% of the original principal amount of the Loan at Closing and 1% of the original principal amount on exit of the loan. |
| **Default Interest:** | 12% per annum, but in no event greater than the maximum legal rate. |
| **Governing Law:** | Florida. |
| **Other Terms and Conditions of the Loan:** | The Loan documentation will contain standard acknowledgments, representations, warranties, covenants, conditions, releases, reporting obligations, and other usual and customary provisions for transactions of this type or reasonably requested by the Prospective Lender. If Prospective Lender elects to proceed with the Loan, Prospective Lender may determine in its sole and absolute discretion the structure of the Loan. |

**Conditions**

2


**UB**
Housing Fund

Urban Bay Housing Fund, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

**Precedent:** Closing and funding of the Loan will be subject to the satisfaction, in Urban Bay's sole discretion, of all conditions precedent deemed necessary or appropriate by the Prospective Lender, including, without limitation:

- Diligence on Obligor's background and creditworthiness, personal and real property, structure, management, personnel, all agreements, and operations; and
- Site inspection, title, survey and lien review, leases (including estoppels from existing tenants), tenant's financials, environmental review, and valuation review.

**Proposal Letter
Non-Binding:** It is agreed to and understood by the parties that the terms and provisions of this Proposal Letter are non-binding, except for the following which shall be binding on the parties and shall survive termination of this Proposal Letter.

2.    Confidentiality. The parties acknowledge and agree that this Proposal Letter, its existence and contents are confidential and proprietary and may not be disclosed, in whole or in part, without Urban Bay' written consent. The obligations under this Section 2 shall survive any occurrence of the Termination Date or Termination of Discussion (as defined hereinafter).

3.    Exclusivity. Unless authorized in writing by Urban Bay, from the date hereof to the earlier of (the "Termination Date") (x) the termination by Urban Bay of discussions related to the proposed Transaction and (y) 11:59 P.M. Eastern Time on the 60th day after the date hereof, the Obligors shall not (and shall not permit its affiliates or subsidiaries or any of their respective directors, officers, employees, attorneys, or other representatives) to, directly or indirectly, (a) accept any proposal, offer, or commitment from, or enter into any agreement with, any other person or entity to consummate a competing transaction; (b) take any action to solicit, initiate, facilitate, encourage, or consummate a competing transaction; or (c) engage in discussions or negotiations with, or furnish information or access to the Collateral to, any person (other than Urban Bay or its representatives) with respect to a competing transaction. The Obligors shall cause any discussions or negotiations with any other person or entity regarding a competing transaction to be immediately terminated. Until the Termination Date, the Obligors shall (and shall cause its representatives to) exclusively and in good faith deal and negotiate with, and provide information, documents, and access to the Collateral to, Urban Bay and its representatives with respect to the proposed Transaction. In light of the significant amount of time and expenses to be expended by Urban Bay in connection with the Transaction, if any of the terms of this Exclusivity provision are breached by any Obligor, then, in addition to the other remedies set forth in this Proposal Letter, Urban Bay shall be entitled to such remedies as are available at law or in equity, including, without limitation, injunctive relief, and actual, punitive, special and/or consequential damages. Additionally, if the Prospective Lender is prepared to make the Loan, but prior to funding, the Borrower or any affiliate or controlled person or entity obtains debt or equity financing from another source, then Obligors shall pay a Break-Up Fee to the Prospective Lender in the amount of 3% of the Loan amount. In such a case, any unused the Expense Deposit shall be non-refundable and shall be retained by the Prospective Lender. For the avoidance of doubt, this Section 3 shall be binding on the Guarantor(s) and Borrower and their affiliates and representatives and survives termination of this Proposal Letter.

4.    Indemnification. The Obligors shall indemnify and hold harmless the Prospective Lender, its affiliates, and their respective officers, directors, employees, agents, advisors, auditors, attorneys, controlling persons, funding sources, and other representatives and advisors, from and against all suits,

3



**UB**
Housing Fund

Urban Bay Housing Fund, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

actions, proceedings, claims, damages, losses, liabilities, and expenses (including, without limitation, attorneys' fees and other costs), which may be asserted against or incurred by any of them in connection with, or arising out of, this Proposal Letter or any part of the proposed Transaction.

5.    Costs. The Obligors shall be responsible (whether or not the Transaction is consummated) for the payment or reimbursement of all of the Prospective Lender's reasonable costs, fees, and expenses incurred by the Prospective Lender in connection with this Proposal Letter, the proposed Transaction, the Prospective Lender's due diligence, and/or the preparation, negotiation, execution, administration, modification, waiver, or enforcement by the Prospective Lender of any document relating to the proposed Transaction (collectively, the "Costs").

6.    Good Faith Expense Deposit. Simultaneously with the delivery of this Proposal Letter, the Borrower shall pay $75,000 to the Prospective Lender (the "Expense Deposit"), by wire transfer, as consideration for the Prospective Lender having incurred and continuing to incur the Costs. Prospective Lender shall apply the Expense Deposit to the Costs or to any other amounts owed to, or recoverable by, the Prospective Lender. If Prospective Lender terminates discussions of the proposed Transaction, Prospective Lender shall return any unused portion of the Expense Deposit to the Borrower, subject to the Obligors' execution of the Prospective Lender's standard release letter. Proceeds of the good faith deposit to be utilized as follows: ordering of two appraisal reports, environmental site assessment, property condition reports, and further due diligence items and site visits. At any time, Borrower may request an accounting of good faith deposit uses, which reporting will be delivered within 24 hours to Borrower.

7.    Termination of Discussions; Non-Binding. The terms and provisions of this Proposal Letter are non-binding, except as expressly set forth herein. This Proposal Letter does not represent a commitment to provide financing and should not be relied upon as an indication of the availability of the proposed financing. Upon the completion of Urban Bay' due diligence to its sole satisfaction, Urban Bay may issue a commitment letter related to the proposed Transaction and/or commence with preparation of definitive documentation. Urban Bay may, in its sole discretion, terminate discussions for any or no reason without liability. In no event shall the Urban Bay or Prospective Lender incur obligations with regard to the proposed Transaction unless and until the Prospective Lender executes and delivers definitive documents reflecting those obligations.

8.    Assignment. This Proposal Letter shall inure to the benefit of the successors and assigns of the Prospective Lender but shall not be assignable by the Borrower without the prior written consent of the Prospective Lender. Any purported assignment without such consent shall be null and void. Counterparts; Electronic Signatures; Governing Law. This Proposal Letter may be executed counterparts. All counterparts shall collectively constitute a single instrument. A facsimile or electronic copy of this Proposal Letter shall be considered an original. This Proposal Letter shall be governed by the laws of the State of Florida.

If the terms and conditions outlined in this Proposal Letter are acceptable, please sign and return an executed copy of this Proposal Letter to Urban Bay, along with the Expense Deposit, on or before 5:00 P.M. Eastern Time on July 9, 2021, at which time this Proposal Letter shall expire.

Urban Bay looks forward to working with the Obligors on the proposed Transaction.

Very truly yours,

4



Urban Bay Housing Fund, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

URBAN BAY HOUSING FUND, LLC

By:

Name: Caleb Walsh
Its: Director

AGREED AND ACCEPTED:

Joseh Moinian

By:

Name:  Joseph  Moinian

Title:  Authorized  Signatory

Joseh Moinian, individually and on behalf of Orlando Sun Resort & Spa LLC

5

 **UB**
Housing Fund

Urban Bay Housing Fund, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

## WIRING INSTRUCTIONS

Bank Name: Fifth Third Bank
ABA Routing Number: ▓▓▓▓▓▓
Account Number ▓▓▓▓
Account Name: Urban Bay Housing Fund
Account Address: 4868 W Gandy Blvd, Tampa, FL 33611
Ref: 6375 W Irlo Bronson Memorial Hwy, Kissimmee, FL 34747

6

 UB
Housing Fund

Urban Bay Housing Fund, LLC
4868 W Gandy Blvd
Tampa, FL 33611
813.499.9712 (p)
813.499.9487 (f)

Exhibit A

6375 W Irlo Bronson Memorial Hwy, Kissimmee, FL 34747

7



# L A V I N

Andrew T. Lavin
Writer's Direct E-Mail:
alavin@lavinlawyers.com

2670 NE 215th Street
Miami, Florida 33180
Telephone (954) 967-2788
Facsimile (954) 983-7021

December 1, 2021

**VIA: EMAIL TRANSMISSION**
Mr. Thomas Maniotis, Esq.
Equity Legal
1317 Edgewater Drive, Suite 690
Orlando, FL 32804
Email: tamaniotis@equitylegal.net

  Re: Orlando Sun Resort & Spa, LLC - Urban Bay Housing Fund, LLC Loan

Dear Thomas:

  Our firm has been retained by Orlando Sun Resort & Spa, LLC (the "Borrower"), to represent it in connection with the July 7, 2021 proposal letter (the "Letter Agreement"), issued by Urban Bay Housing Fund, LLC ("Urban Bay").

  Pursuant to the Letter Agreement, Urban Bay is to make a $27 million loan to Borrower (the "Loan"). In consideration thereof, Borrower paid $75,000 to Urban Bay as an Expense Deposit. To our knowledge, none of the Expense Deposit has been spent on any of the authorized items of expenses identified in the Letter Agreement.

  Since July 2021, the parties have been actively working together to implement the Loan. All documents and information requested by Urban Bay were submitted to it by Borrower. Urban Bay has not notified Borrower that it has any issues with any of the Borrower's submissions, or with their completeness.

  During August, Urban Bay prepared proposed Loan documents and presented them to Borrower. Borrower's counsel revised the Loan documents and promptly returned them to Urban Bay for approval. For months, in good faith reliance upon Urban Bay's actions and statements with respect to the Loan, Borrower has incurred substantial legal fees and expenses in connection with the Loan, and forbore pursuing other loans.

**EXHIBIT**
tabbies
**B**

Mr. Thomas Maniotis, Esq.
December 1, 2021
Page 2

In this regard, on November 9, 2021, on behalf of Urban Bay, you sent Marc S. Brodsky, Esq., transaction counsel for Borrower, the email attached as Exhibit "A," which was also sent to all individuals involved with the Loan. Your email responded to Mr. Brodsky's email requesting a response to his emails seeking confirmation that Urban Bay was closing the Loan, and alternatively requesting the return of the $75,000 Expense Deposit. In response, you affirmed Urban Bay's intention to close the Loan, and to set a concrete closing date for the first week of December. This statement was consistent with Caleb Walsh's ongoing assurances made to Borrower that Urban Bay was going to close the Loan.

Since you sent your email, Borrower and its counsel have unsuccessfully attempted to follow up with Urban Bay and you to confirm that the revised Loan documents are acceptable, and to verify the closing date. Despite these ongoing efforts, there has not been any response to these inquiries, and there has not been any activity undertaken by Urban Bay to close the Loan.

Under the circumstances, Urban Bay is obligated to close the Loan. Borrower remains prepared to promptly close on the Loan. Please contact me to confirm that Urban Bay is proceeding with the Loan, and to verify on which day, before December 8, 2021, the Loan shall close.

Urban Bay's failure to close the Loan shall constitute a breach of the Letter Agreement, and of the implied duty of good faith incorporated therein. If Urban Bay refuses to fund the Loan, it shall be obligated to refund to Borrower the full $75,000 Expense Deposit, to reimburse to Borrower all of the fees and costs in excess of $50,000, that it has incurred pursuing the Loan, and to pay all damages that Borrower sustains in connection with obtaining a replacement loan.

We trust that we shall hear from you by this Friday confirming a closing date for the Loan during early next week, failing which Borrower shall proceed accordingly.

Sincerely,

LAVIN LAW GROUP, P.A.

Andrew T. Lavin

ATL/gr
Enclosure

cc:    Michael Zarifpoor, Esq. (michaelz@molnlangroup.com)
       Marc S. Brodsky, Esq. (mbrodsky@brodskylawgroup.com)

Z:\Clients\ATL\Orlando Sun Resort & Spa, LLC\Orlando Sun - Urban Bay\Correspondence\Maniotis, Thomas.01 (Rev. by ALavin 12.1.21).docx

## Galina Radgon

| | |
|---|---|
| From: | Marc Brodsky <mbrodsky@brodskylawgroup.com> |
| Sent: | Tuesday, November 30, 2021 11:05 AM |
| To: | Andrew Lavin |
| Subject: | FW: Orlando Sun/Urban Bay-Closing Date |

From: Thomas Maniotis <tamaniotis@equitylegal.net>
Sent: Tuesday, November 9, 2021 4:00 PM
To: Marc Brodsky <mbrodsky@brodskylawgroup.com>
Cc: Thomas Maniotis <tamaniotisesq@gmail.com>; Mark Lynn <Mark.Lynn@gmlaw.com>; Michael Ross <Michael.Ross@gmlaw.com>; Joshua Mance <josh@urbanbayhousingfund.com>; Husein Razak <husein@molnlangroup.com>; Caleb Walsh <caleb@urbanbayhousingfund.com>; Michael Zarifpoor <michaelz@molnlangroup.com>; Matthew Carver <matthew@urbanbayhousingfund.com>; Joseph Molnian <joseph@molnlangroup.com>
Subject: Re: Orlando Sun/Urban Bay-Closing Date

Good Afternoon All,

I had the chance to speak to Marc this afternoon. The deal is still moving forward and is in underwriting. We are trying to nail down a closing date in the first week of December. The file has been a bit more difficult due to the vacant status. If there had been entitlements in place, this would have been closed. We have put many months of work into this file and fully intend to close, issue a commitment, and set a concrete closing date by next week.

Sincerely,

Thomas Maniotis



On Fri, Nov 5, 2021 at 5:15 PM Marc Brodsky <mbrodsky@brodskylawgroup.com> wrote:

Thomas,

Following up on yesterday's email below. Our client has not heard back from anyone at Urban Bay. Please ask you client to promptly return the $75,000 deposit if they have no intention of closing. A response would be appreciated.

All rights reserved.

Marc

EXHIBIT
A

1

**Galina Radgon**

| | |
|---|---|
| **From:** | Galina Radgon |
| **Sent:** | Thursday, December 9, 2021 7:48 PM |
| **To:** | 'tamaniotis@equitylegal.net' |
| **Cc:** | Andrew Lavin; 'Marc Brodsky' |
| **Subject:** | Orlando Sun Resort & Spa, LLC - Urban Bay Housing Fund, LLC Loan |
| **Attachments:** | Maniotis, Thomas.01.pdf |

Thomas:

You never responded to my December 1, 2021 letter to you regarding the above-referenced matter, another copy of which is enclosed. Based thereon, we understand that Urban Bay has no intention of closing on the loan.

Pursuant to paragraph 6 of the July 7, 2021 letter issued by Urban Bay (the "Letter Agreement"):

>      At any time, Borrower may request an accounting of good faith deposit uses,
>      which reporting will be delivered within 24 hours to Borrower.

This letter constitutes Borrower's request for an accounting regarding the $75,000 Expense Deposit paid by Borrower.

In accordance with the terms of the Letter Agreement, we trust that we shall receive this accounting within twenty-four (24) hours of the time of this email to you.

This request is made without prejudice, and with reservation of all rights.

Andrew T. Lavin, Esq.

**Please make sure to send any responses directly to alavin@lavinlawyers.com or Mr. Lavin may not see your email until Sol or I can print them out.**



Andrew T. Lavin, Esq.
E-Mail: alavin@lavinlawyers.com
2670 N.E. 215th Street
Miami, Florida 33180
Phone: (954) 967-2788
Fax:     (954) 983-7021
kalbamonte@lavinlawyers.com

**EXHIBIT**
**C**

1

NOTICE: This e-mail is from a law firm, Lavin Law Group, P.A. ("LLG"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of LLG, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to LLG in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of LLG, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal, is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.

**From:** Galina Radgon
**Sent:** Wednesday, December 1, 2021 5:28 PM
**To:** tamaniotis@equitylegal.net
**Cc:** Andrew Lavin <alavin@lavinlawyers.com>; Michael Zarifpoor <michaelz@moiniangroup.com>; Marc Brodsky <mbrodsky@brodskylawgroup.com>
**Subject:** Orlando Sun Resort & Spa, LLC - Urban Bay Housing Fund, LLC Loan

Dear Thomas:

Our firm has been retained by Orlando Sun Resort & Spa, LLC (the "Borrower"), to represent it in connection with the July 7, 2021 proposal letter (the "Letter Agreement"), issued by Urban Bay Housing Fund, LLC ("Urban Bay").

Pursuant to the Letter Agreement, Urban Bay is to make a $27 million loan to Borrower (the "Loan"). In consideration thereof, Borrower paid $75,000 to Urban Bay as an Expense Deposit. To our knowledge, none of the Expense Deposit has been spent on any of the authorized items of expenses identified in the Letter Agreement.

Since July 2021, the parties have been actively working together to implement the Loan. All documents and information requested by Urban Bay were submitted to it by Borrower. Urban Bay has not notified Borrower that it has any issues with any of the Borrower's submissions, or with their completeness.

During August, Urban Bay prepared proposed Loan documents and presented them to Borrower. Borrower's counsel revised the Loan documents and promptly returned them to Urban Bay for approval. For months, in good faith reliance upon Urban Bay's actions and statements with respect to the Loan, Borrower has incurred substantial legal fees and expenses in connection with the Loan, and forbore pursuing other loans.

In this regard, on November 9, 2021, on behalf of Urban Bay, you sent Marc S. Brodsky, Esq., transaction counsel for Borrower, the email attached as Exhibit "A," which was also sent to all individuals involved with the Loan. Your email responded to Mr. Brodsky's email requesting a response to his emails seeking confirmation that Urban Bay was closing the Loan, and alternatively requesting the return of the $75,000 Expense Deposit. In response, you affirmed Urban Bay's intention to close the Loan, and to set a concrete closing date for the first week of December. This statement was consistent with Caleb Walsh's ongoing assurances made to Borrower that Urban Bay was going to close the Loan.

Since you sent your email, Borrower and its counsel have unsuccessfully attempted to follow up with Urban Bay and you to confirm that the revised Loan documents are acceptable, and to verify the closing date. Despite these ongoing efforts, there has not been any response to these inquiries, and there has not been any activity undertaken by Urban Bay to close the Loan.

Under the circumstances, Urban Bay is obligated to close the Loan. Borrower remains prepared to promptly close on the Loan. Please contact me to confirm that Urban Bay is proceeding with the Loan, and to verify on which day, before December 8, 2021, the Loan shall close.

Urban Bay's failure to close the Loan shall constitute a breach of the Letter Agreement, and of the implied duty of good faith incorporated therein. If Urban Bay refuses to fund the Loan, it shall be obligated to refund to Borrower the full $75,000 Expense Deposit, to reimburse to Borrower all of the fees and costs in excess of $50,000, that it has incurred pursuing the Loan, and to pay all damages that Borrower sustains in connection with obtaining a replacement loan.

We trust that we shall hear from you by this Friday confirming a closing date for the Loan during early next week, failing which Borrower shall proceed accordingly.

Sincerely,

LAVIN LAW GROUP, P.A.


Andrew T. Lavin

ATL/gr
Enclosure

**Please make sure to send any responses directly to alavin@lavinlawyers.com or Mr. Lavin may not see your email until Sol or I can print them out.**



Andrew T. Lavin, Esq.
E-Mail: alavin@lavinlawyers.com
2670 N.E. 215th Street
Miami, Florida 33180
Phone: (954) 967-2788
Fax:    (954) 983-7021
kalbamonte@lavinlawyers.com

NOTICE: This e-mail is from a law firm, Lavin Law Group, P.A. ("LLG"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of LLG, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to LLG in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of LLG, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal, is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.

**Galina Radgon**

| | |
|---|---|
| **From:** | Thomas Maniotis <tamaniotis@equitylegal.net> |
| **Sent:** | Wednesday, December 22, 2021 2:09 PM |
| **To:** | Andrew Lavin |
| **Cc:** | Galina Radgon; Marc Brodsky |
| **Subject:** | Re: Orlando Sun Resort & Spa, LLC - Urban Bay Housing Fund, LLC Loan |
| **Attachments:** | Orlando_Sun_Expense_Accounting.pdf |
| | |
| **Categories:** | Green category |

Good Afternoon Mr. Lavin,

I just received the expense report from my client. Please see attached. I just followed up as to the progress of the status report letter. My client has indicated that it remains committed to closing this transaction.

Sincerely,

Thomas Maniotis



On Tue, Dec 21, 2021 at 9:07 AM Andrew Lavin <alavin@lavinlawyers.com> wrote:
Thomas I just called your cell and got your voicemail, which was full. Please call me on my cell (954)309-0323.

Sent from my iPhone

> On Dec 15, 2021, at 6:02 PM, Thomas Maniotis <tamaniotis@equitylegal.net> wrote:
>
> Good evening Mr. Lavin,
>
> I had a chance to discuss this with my client and they are gathering the accounting and will have it and a status letter tomorrow for you client.
>
> I am working to coordinate a conference call as well.
>
> Sincerely,
>
> Thomas Maniotis, Esq.
> Attorney at Law
> Equity Legal
> 1317 Edgewater Drive
> Ste. 690
> Orlando, FL 32804
>
> Tamaniotis@equitylegal.net
> Phone: 321-313-8642
>
> ****************************************************************
> *****************************

**EXHIBIT**

**D**

1

6375 W Irlo Bronson Memorial Hwy, Kissimmee, FL 34747
# Expense Deposit Accounting

| Expense | Amount | | Comments |
|---|---|---|---|
| Expense Deposit | $ | 75,000.00 | 7/7/2021 Expense Deposit |
| Underwriting | $ | (8,940.80) | Broker, Underwriting, Loan Processing |
| Director | $ | (19,690.00) | Director Research, Review, & Site Visit |
| Legal Fees | $ | (6,912.00) | General Counsel, Documents/Research |
| Market Reporting | $ | (9,000.00) | Property Background, Borrower History, Statistical History, County Records, Market Comps/Sales |
| Estimated Professional Fees | $ | (39,250.00) | Environmental 1 Hazardous Materials, Environmental 2 Soil, Appraisal 1 As-is, Appraisal 2 After-improved Value |
| | | | |
| TOTAL | $ | (8,792.80) | |

*working numbers subject to change, ongoing expenses

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SHEA CONNELLY DEVELOPMENT,
LLC

      Plaintiff,                   Case No.:

v.

URBAN BAY HOUSING FUND, LLC d/b/a
URBAN BAY FINANCIAL, LLC

      Defendant.
_____/

## COMPLAINT

Plaintiff Shea Connelly Development, LLC ("Shea" or "Plaintiff") files this Complaint against Defendant Urban Bay Housing Fund, LLC d/b/a Urban Bay Financial, LLC ("Urban Bay" or "Defendant"), and states as follows:

### NATURE OF THE ACTION

1.      This is an action by Plaintiff against Urban Bay for breach of contract arising out of Defendant's breach of two real estate financing terms sheets effective as of November 29, 2023 and December 1, 2023, respectively  (collectively, the "Agreements").

2.      Shea seeks $225,000 in damages from Urban Bay, which represents the underwriting retainers paid by Shea, as a result of Defendant's unlawful breach of the Agreements and any additional relief that the Court deems just and proper.

### JURISDICTIONAL ALLEGATIONS

3.      This is an action in excess of $30,000.00, exclusive of costs, interest, and attorney's fees, and is otherwise within the jurisdiction of this Court.

75422993;2

4.     This Court has subject matter jurisdiction over this action pursuant to §26.012(2)(a), Florida Statutes.

5.     Venue is proper in Hillsborough County, Florida pursuant to §47.051, Florida Statutes, because the contract negotiation, conversations and damages that Plaintiff suffered occurred in Hillsborough County.

## THE PARTIES

6.     Urban Bay Housing Fund, LLC d/b/a Urban Bay Financial LLC is a Florida Limited Liability Company with its principal place of business at 13194 US HWY 301 S #374, Riverview, FL 33578.

7.     Shea Connelly Development is an Arizona Limited Liability Company with its principal place of business at 8777 E Via De Ventura Ste 250 Scottsdale, AZ, 85258-3344.

## GENERAL ALLEGATIONS

8.     Urban Bay is a direct private real-estate lender providing large balance real-estate loans for developers and portfolio investors.

9.     On or about November 29, 2023 and December 1, 2023, Shea and Urban Bay entered into the Agreements whereby Urban Bay agreed to provide Shea with various loans for property development in Maricopa County, Arizona (the "Property") as further detailed in the Agreements. True and correct copies of the Agreements are attached hereto as **Exhibits A and B.**

10.     Pursuant to the terms of the Agreements, Urban Bay was required to obtain senior and mezzanine financing for Shea to fund the construction of a senior living facility on the Property. However, Urban Bay wholly failed to perform any of its obligations under the Agreements.

11.     In January 2024, Shea corresponded with Urban Bay regarding the postponement of implementation of the Agreement because of purported issues with Urban Bay.  However,

Urban Bay continued its non-performance under the Agreements and failed to otherwise respond to Shea.

12.    To date, Urban Bay has not provided any written notice of breach or termination of the Agreements, nor has Urban Bay set forth any material breaches that were not cured that would entitle Urban Bay to not perform under the terms of the Agreements.

13.    Therefore, Urban Bay is liable to Shea for the return of the unearned underwriting deposits paid by Shea pursuant to the Agreements in the amounts of $100,000 and $125,000, respectively, for a total of $225,000.

**COUNT I**
**<u>BREACH OF CONTRACT</u>**

1.    The allegations in Paragraphs 1 through 13 above are incorporated by reference as if fully set forth herein.

2.    On or about November 29, 2023 and December 1, 2023, Shea entered into two valid contracts with Urban Bay to provide financing for real estate development on the Property. *See* Ex. A and B.

3.    Shea abided by and honored all of its obligations provided for in the Agreements.

4.    Shea did not breach any material terms of the Agreements.

5.    Urban Bay has materially breached the Agreements by failing to provide the required financing to Shea.

6.    In total, pursuant to the terms of the Agreements Urban Bay owes Shea $225,000, for the return of the unearned retainers under the Agreements.

7.    As a direct and proximate result of Defendant's contractual breaches, Plaintiff Shea has suffered damages in an amount of not less than $225,000, exclusive of interest, costs and attorneys' fees.

3

WHEREFORE, Shea demands judgment against Urban Bay in the amount of at least $225,000, plus pre and post-judgment interest, attorneys' fees, costs, and all such other and further relief as this Court deems just and proper.

Dated: March 29, 2024

**AKERMAN LLP**

*/s/ Steven R. Wirth*
**Steven R. Wirth**
Florida Bar No.:  170380
Primary Email:  steven.wirth@akerman.com
Secondary Email:  caren.deruiter@akerman.com
**Benjamin G. Robinson III**
Florida Bar No.:  1045169
Primary Email: Benjamin.robinson@akerman.com
Secondary Email: caren.deruiter@akerman.com
401 E. Jackson Street, Suite 1700
Tampa, FL  33602
Telephone:    (813) 223-7333
Facsimile:    (813) 223-2837
*Attorney for the Plaintiff*

75422993;2



# Exhibit "A"

**COMMERCIAL REAL ESTATE FINANCING TERM SHEET**

November 24, 2023

**Shea Connelly Development LLC**
**2055 S Cottonwood Dr,**
**Tempe, AZ 85282**

Re: Potential Financing Proposal for the development of a 152 Senior Living Community that will include all or some of the following senior residentail uses; independant living, assisted living, memory care located at 44345 West Martin Luther King Jr. Blvd Maricopa Arizona 85138, as more specifically set forth in the Plats and Plans provided by the borrowers' financing team.

THE TERMS OF THIS CONTRACT WILL EXPIRE AT 5:00PM TUESDAY 11/29/2023

Mr. Shea,

Thank you for the opportunity to submit this Term Sheet. Urban Bay Financial LLC (Lender) (Urban Bay or the affiliate(s) it designates, the "Prospective Lender") is pleased to submit the following proposal letter (this "Proposal Letter"), which outlines the general terms and conditions under which Urban Bay would underwrite and consider the funding of a loan as set forth herein (the "Loan").

| | |
|---|---|
| Borrower(s): | Shea Connelly Development LLC, an Arizona Limited Liability Company and or Special Purpose Entity TBD |
| Guarantor(s): | Bart Shea (Corporate Guaranty with standard bad boy Carveout) |
| Loan Amount: | $ 42,075,000 (Forty-Two Million Seventy Five Thousand Dollars) <br> *85% Loan To Cost* |

Total Sources:

```
UBF SENIOR LOAN.........................................$32,175,000 (65% LOAN TO COST)
UBF MEZZANINE LOAN..................................$9,900,000 (20% LOAN TO COST)
SPONSOR EQUITY..........................................$7,425,000 (15% LOAN TO COST)
TOTAL PROJECT COST.................................. $49,500,000
```

Total Uses:

```
LAND REFINANCE.......................................... $6,000,000
CONSTRUCTION LOAN..................................$39,600,000
```

| | |
|---|---|
| Loan Term: | Senior / Mezz 36 months |
| Interest Rate: | Senior SOFR + 7% Mezzanine SOFR + 10 will be the ceiling interest rate but remain adjustable. (disbursement of funds will be based on a structured draw schedule) |
| Loan Fee: | 1.5% |
| Processing: | $10,075 plus customary 3rd party closing costs such as escrow, title, recording, fund control (if applicable), appraisal (if applicable), travel (if applicable), etc. (Legal $35,000, Phase 1 Estimate $4500 Appraisal Estimate |

Urban Bay Financial 6628 Sky Pointe Drive, Ste 129, Las Vegas, Nevada 89131 813-499-9712
www.UrbanBayFinancial.com



**UrbanBay**
Financial

$25,000, Land Use $3,500, Cost Analysis Study $20,000 Legal Cost for Participation Partner, Travel $2,000, Credit Check $150). Some of these prices may be multiplied depending on the number of parcels.

| | |
|---|---|
| Underwriting Retainer: | $100,000  (One Hundred Thousand Dollars)  *payment to be paid in conjunction with the term sheet. |
| Payments: | Interest-only monthly from interest reserve. |
| Prepayment: | 50% of projected interest to be paid, No prepayment penalty on Mezzanine Loan. |
| Collateral: | 1st deed of trust on the above-referenced property / Membership pledge in Land Ownership Entity |
| Release: | 125% of par. |
| Exit Fee: | N/A |
| Other Provisions: | A) Performance Bond to cover 75% of contract value from GC.  N/A |
| | B) Lender Requires each Sub obtain Subcontractors Default Insurance for 100% of the contract value.  N/A |
| | C) Urban Bay Financial to be mentioned in all project related press releases |

# The Funding Process: Participation Lending

Urban Bay Financial buys and sells participation loans to positively enhance our bottom line and yours. We strive to enrich the communities we serve through lending practices that enable even the larger projects to secure financing. Urban Bay Financial is proud to assist with your portfolio.

**With participations, the contractual relationship runs from the borrower to the lead lender "Urban Bay Financial" and from the lead bank to the participants. (Example Of Participation Lending Below)**

**Video Description of Funding Process from Urban Bay Financial Director:** https://youtu.be/Jb8U4tF9BUM



🖅 **Urban Bay Financial** 6628 Sky Pointe Drive, Ste 129, Las Vegas, Nevada 89131 🖅  813-499-9712 🖅
www.UrbanBayFinancial.com



In a loan participation, a bank will originate a loan to a borrower. This is the only loan the borrower enters into. Subsequently, or concurrently, with the origination of this loan, the originating bank arranges a participation with other lenders. Under the participation arrangement, the participating banks agree to assume the risks and rewards of a portion of this loan by transferring funds to the originating bank in return for the rights to cash payments for that portion of the loan participated out to the participating bank. Upon receiving a signed Term Sheet with the underwriting retainer, Urban Bay offer its investors participation or percentages of interest in the transaction based on Urban Bay Financials superior underwriting and origination capability. All decision making and authority of the loan funding rest with Urban Bay Financial.

This funding is contingent upon conditions specified in this letter as well as approval of property value, condition of title and Lender due diligence. Upon receipt of the signed Term Sheet and deposit, Urban Bay Financial will commence the due diligence process which shall include, in part, a site visit with the borrower. On land and construction loans we reserve the right to include a 1% Default Reserve budget line item to be used by the Lender if foreclosure proceedings are required; any unused funds will be netted out of the subject loan's payoff demand. Fixed rates will be honored provided the loan closes within 45 days of term sheet issuance. If at any point during the initial or any extension term(s) of this Loan, there is an event of default, a fee equal to one and a half percent (1.5%) of the principal loan value will be due to the Lender. The borrower acknowledges and represents that this is a commercial transaction not subject to any state's consumer protection laws. Governing Law: This Term Sheet and all other Loan Documents (except the mortgage or deed of trust which shall be governed by the law of the jurisdiction of the realty), shall be governed by and construed in accordance with the internal substantive laws of the State of Wyoming,
without regard to the choice of law principles of such a state. Borrower and Guarantor(s) (i) consent to the jurisdiction of the state courts in the State of Wyoming, for the purpose and adjudication of any dispute, suit, action or proceeding between the Borrower and Guarantor(s), their principals, officers, agents, or employees.

If you wish Urban Bay to proceed with its approval process, please sign and return a copy of this letter along with a **deposit of $100,000 to Urban Bay Financial** upon execution of the term sheet. Any unused portion of the underwriting retainer will be applied towards closing costs. If an executed copy of this Term Sheet and deposit are not delivered to Urban Bay Financial by the expiration date outlined in this document, the proposed terms and conditions will no longer be valid.

The charge for our professional services is based primarily upon the current hourly rates of our personnel performing the services. Our billing rates and charges are revised annually, and we reserve the right to revise them at other times with 30 days' advance notice. Our current rates for the work are as follows: Hourly Rate Director $600 Underwriting Department $400 Administrative $63. Any portion of the Professional Services Fees paid prior to a termination of this Agreement is earned when paid and nonrefundable. The borrower acknowledges that these fees are not an advance payment of commissions, but rather the cost of professional services paid to consultants for the underwriting and assembly of an extensive loan package for a potential funding proposal. The borrower acknowledges that without the time, effort and expertise to underwrite such a file it would be impossible for the proposed lender's credit committees to be able to make a lending decision.

Your signature acknowledges agreement of all foregoing terms and conditions and that you will reimburse Urban Bay for actual expenses incurred in evaluating the proposed credit, including but not limited to; legal expenses, environmental review, third-party reports and appraisals, and loan documentation, regardless of whether the loan hereby proposed is approved or closed. Customary 3rd party closing costs such as escrow, title, recording, fund control (if applicable), are not part of lender loan costs and will be determined prior to closing. The undersigned specifically acknowledges and agrees that one or more credit reports may be obtained by Urban Bay Financial, LLC.

_____   _____

Urban Bay Financial 6628 Sky Pointe Drive, Ste 129, Las Vegas, Nevada 89131   813-499-9712
www.UrbanBayFinancial.com



Borrower Signature

Printed Name

Date  _11-29-2023_

Thank you for the opportunity to submit this Term Sheet. We look forward to working with you.

Respectfully,

Caleb Walsh
Director



WIRE INSTRUCTIONS:

BANK NAME: CHASE BANK

Routing Number: Redacted

Account Number: Redacted

Account Name: URBAN BAY FINANCIAL LLC

ADDRESS  10150 Highland Manor Dr, Tampa, FL 33610

Reference:  44345 W Martin Luther King Jr



# Exhibit "B"

### COMMERCIAL REAL ESTATE FINANCING TERM SHEET

December 1, 2023

Shea Connelly Development LLC
2055 S Cottonwood Dr,
Tempe, AZ 85282

Re: Potential Financing Proposal for the development of 82 residential Luxury Apartment Units with ground floor retail space here in referred to as Phase 1, and the development of 102 residential units herein referred to as Phase 3. Combined through both phases will be the development of a community parking garage. This project is located at 16725-16845 East Avenue of the Fountains, Fountain Hills, Maricopa, Arizona as more specifically set forth in the Plats and Plans provided by the borrowers' financing team.

==THE TERMS OF THIS CONTRACT WILL EXPIRE AT 5:00PM TUESDAY 12/05/2023==

Mr. Shea,

Thank you for the opportunity to submit this Term Sheet. Urban Bay Financial LLC (Lender) (Urban Bay or the affiliate(s) it designates, the "Prospective Lender") is pleased to submit the following proposal letter (this "Proposal Letter"), which outlines the general terms and conditions under which Urban Bay would underwrite and consider the funding of a loan as set forth herein (the "Loan").

Borrower(s):      Shea Connelly Development LLC, an Arizona Limited Liability Company and or Special Purpose Entity TBD

Guarantor(s):     Bart Shea (Corporate Guaranty with standard bad boy Carveout)     _CW_

Loan Amount:     ~~$ 54,108,000 (Fifty-Four Million One Hundred Eight Thousand Dollars)~~
$56,780,000 (FIFTY-SIX MILLION, SEVEN-HUNDRED EIGHTY THOUSAND)

Total Sources:

| Sources | Amount | Uses | Amount |
|---|---|---|---|
| | (U.S. dollars, in millions) | | |
| Senior Construction Loan | $ 36,740,000 | Land Cost | $ 5,300,000 |
| Mezzanine Loan | $ 17,368,000 | Hard Cost | $ 43,074,831 |
| Equity Contribution  68,800,000 | $ 14,692,800 | A&E  SEE ATTACHED | $ 1,527,000 |
| | | Soft Costs | $ 7,531,808 |
| | | Development Fee | $ 1,566,361 |
| | | Financing Costs | $ 7,801,380 |
| **Total Sources** | **$ 66,800,000** | **Total Uses** | **$ 66,800,000** |

_CW_

Loan Term:     Senior / Mezz 36 months

✈ Urban Bay Financial 6628 Sky Pointe Drive, Ste 129, Las Vegas, Nevada 89131 ✈ 813-499-9712 ✈
**www.UrbanBayFinancial.com**



**Interest Rate:**  Senior SOFR + 7% Mezzanine SOFR + 9.5%   ✓  *ADJUSTIBLE WITH CEILING* ✓
(disbursement of funds will be based on a structured draw schedule)

**Loan Fee:**  1.85%  ✓   *CW*

**Processing:**  $10,075 plus customary 3rd party closing costs such as escrow, title, recording, fund control (if applicable), appraisal (if applicable), travel (if applicable), etc. (Legal $35,000, Phase 1 Estimate $4500 Appraisal Estimate $25,000, Land Use $3,500, Cost Analysis Study $20,000 Legal Cost for Participation Partner, Travel $2,000, Credit Check $150). Some of these prices may be multiplied depending on the number of parcels.

**Underwriting Retainer:**  $125,000 (One Hundred Twenty Five Thousand Dollars) *payment to be paid in conjunction with the term sheet.

**Payments:**  Interest-only monthly from interest reserve.  ✓

**Prepayment:**  50% of projected interest to be paid  ✓

**Collateral:**  1st deed of trust on the above-referenced property / Membership pledge in land ownership entity  ✓

**Release:**  125% of par.

**Exit Fee:**  N/A

**Other Provisions:**
A) Corporate Guarantee replaces Bond requirement  ✓
B) Urban Bay Financial to be mentioned in all project related press releases  ✓

*C) 2 - 6 MONTH TERM EXTENSIONS UPON 30 DAY NOTICE* ✓

*CW*

Urban Bay Financial 6628 Sky Pointe Drive, Ste 129, Las Vegas, Nevada 89131  813-499-9712
**www.UrbanBayFinancial.com**



# The Funding Process: Participation Lending

Urban Bay Financial buys and sells participation loans to positively enhance our bottom line and yours. We strive to enrich the communities we serve through lending practices that enable even the larger projects to secure financing. Urban Bay Financial is proud to assist with your portfolio.

With participations, the contractual relationship runs from the borrower to the lead lender "Urban Bay Financial" and from the lead bank to the participants. (Example Of Participation Lending Below)

Video Description of Funding Process from Urban Bay Financial Director: https://youtu.be/Jb8U4tF9BUM



loan participation, a bank will originate a loan to a borrower. This is the only loan the borrower enters into. Subsequently, or concurrently, with the origination of this loan, the originating bank arranges a participation with other lenders. Under the participation arrangement, the participating banks agree to assume the risks and rewards of a portion of this loan by transferring funds to the originating bank in return for the rights to cash payments for that portion of the loan participated out to the participating bank. Upon receiving a signed Term Sheet with the underwriting retainer, Urban Bay offer its investors participation or percentages of interest in the transaction based on Urban Bay Financials superior underwriting and origination capability. All decision making and authority of the loan funding rest with Urban Bay Financial.

This funding is contingent upon conditions specified in this letter as well as approval of property value, condition of title and Lender due diligence. Upon receipt of the signed Term Sheet and deposit, Urban Bay Financial will commence the due diligence process which shall include, in part, a site visit with the borrower. On land and construction loans we reserve the right to include a 1% Default Reserve budget line item to be used by the Lender if foreclosure proceedings are required; any unused funds will be netted out of the subject loan's payoff demand. Fixed rates will be honored provided the loan closes within 45 days of term sheet issuance. If at any point during the initial or any extension term(s) of this Loan, there is an event of default, a fee equal to one and a half percent (1.5%) of the principal loan value will be due to the Lender. The borrower acknowledges and represents that this is a commercial transaction not subject to any state's consumer protection laws. Governing Law: This Term Sheet and all other Loan Documents (except the mortgage or deed of trust which shall be governed by the law of the jurisdiction of the realty), shall be governed by and construed in accordance with the internal substantive laws of the State of Wyoming,

✈ Urban Bay Financial 6628 Sky Pointe Drive, Ste 129, Las Vegas, Nevada 89131✈  813-499-9712  ✈
**www.UrbanBayFinancial.com**



without regard to the choice of law principles of such a state. Borrower and Guarantor(s) (i) consent to the jurisdiction of the state courts in the State of Wyoming, for the purpose and adjudication of any dispute, suit, action or proceeding between the Borrower and Guarantor(s), their principals, officers, agents, or employees.

If you wish Urban Bay to proceed with its approval process, please sign and return a copy of this letter along with a **deposit of $125,000 to Urban Bay Financial** upon execution of the term sheet. Any unused portion of the underwriting retainer will be applied towards closing costs. If an executed copy of this Term Sheet and deposit are not delivered to Urban Bay Financial by the expiration date outlined in this document, the proposed terms and conditions will no longer be valid.

The charge for our professional services is based primarily upon the current hourly rates of our personnel performing the services. Our billing rates and charges are revised annually, and we reserve the right to revise them at other times with 30 days' advance notice. Our current rates for the work are as follows: Hourly Rate Director $600 Underwriting Department $400 Administrative $63. Any portion of the Professional Services Fees paid prior to a termination of this Agreement is earned when paid and nonrefundable. The borrower acknowledges that these fees are not an advance payment of commissions, but rather the cost of professional services paid to consultants for the underwriting and assembly of an extensive loan package for a potential funding proposal. The borrower acknowledges that without the time, effort and expertise to underwrite such a file it would be impossible for the proposed lender's credit committees to be able to make a lending decision.

Your signature acknowledges agreement of all foregoing terms and conditions and that you will reimburse Urban Bay for actual expenses incurred in evaluating the proposed credit, including but not limited to; legal expenses, environmental review, third-party reports and appraisals, and loan documentation, regardless of whether the loan hereby proposed is approved or closed. Customary 3rd party closing costs such as escrow, title, recording, fund control (if applicable), are not part of lender loan costs and will be determined prior to closing. The undersigned specifically acknowledges and agrees that one or more credit reports may be obtained by Urban Bay Financial, LLC.

_____          12 · 1 ·2023
Borrower Signature                        Date
BART M. SNEA

Printed Name


Thank you for the opportunity to submit this Term Sheet. We look forward to working with you.


Respectfully,

Caleb Walsh
Director

**Urban Bay Financial** 6628 Sky Pointe Drive, Ste 129, Las Vegas, Nevada 89131  813-499-9712
**www.UrbanBayFinancial.com**



**WIRE INSTRUCTIONS:**

BANK NAME: CHASE BANK

Routing Number: Redacted

Account Number: Redacted

Account Name: URBAN BAY FINANCIAL LLC

ADDRESS  10150 Highland Manor Dr, Tampa, FL 33610

Reference:  **Fountain Hills**



**Park Place II and III**
**Fountain Hills, AZ**     12/1/2023

## Development Budget

| Unit Count | 184 |
| Total Net Rental Residental SF | 183,533 |
| Commercial Space included in Other Income | |
| Net Commercial Space | 8,000 |

### Initial Sizing

| | Total | $/Unit | $/SF | % |
|---|---|---|---|---|
| **Land** | | | | |
| Land Acquisition | $ 5,300,000 | $ 28,804 | $ 28.88 | |
| **Total Land Cost** | $ 5,300,000 | $ 28,804 | $ 28.88 | 7.9% |
| **Hard Costs** | | | | |
| Construction Costs | $42,599,192 | $ 231,517 | $ 232.11 | |
| FF&E | $ 475,639 | $ 2,585 | $ 2.59 | |
| Commercial Finish Allowance | $ 600,000 | $ 3,261 | $ 3.27 | |
| **Total Hard Cost** | $43,674,831 | $ 237,363 | $ 237.97 | 65.4% |
| **Architect/Engineering/Interior** | | | | |
| Arch/Eng./Landscape/Interior/Reports/Zon | $ 1,527,000 | $ 8,299 | $ 8.32 | |
| **Total Architect/Engineering/Interior** | $ 1,527,000 | $ 8,299 | $ 8.32 | 2.3% |
| **Soft Costs** | | | | |
| Legal & Accounting | $ 550,000 | $ 2,989 | $ 3.00 | |
| Property Taxes During Construction | $ 52,000 | $ 283 | $ 0.28 | |
| Insurance | $ 660,000 | $ 3,587 | $ 3.60 | |
| Impact and Permits | $ 1,734,000 | $ 9,424 | $ 9.45 | |
| Closing Costs | $ 291,700 | $ 1,585 | $ 1.59 | |
| Development Agreement | $ 2,100,000 | $ 11,413 | $ 11.44 | |
| Operating Reserve | $ 674,108 | $ 3,664 | $ 3.67 | |
| Contingency | $ 870,000 | $ 4,728 | $ 4.74 | |
| **Total Soft Costs** | $ 6,931,808 | $ 37,673 | $ 37.77 | 10.4% |
| **Financing** | | | | |
| Debt Placement | 0.00% | $ - | $ - | |
| Equity Placement | 0.00% | $ - | $ - | |
| Loan Origination Fee | 1.85% | $ 1,050,430 | $ 5,709 | $ 5.72 |
| Loan Processing | | $ 125,000 | | |
| Title and Escrow | 0.25% | $ 167,000 | | |
| Interest Reserve | | $ 5,000,000 | | |
| **Total Financing** | $ 6,342,430 | $ 34,470 | $ 34.56 | 9.5% |
| **Project Management** | | | | |
| Development Fee | $ 3,023,931 | $ 16,434 | $ 16.48 | |
| **Total Project Management** | $ 3,023,931 | $ 16,434 | $ 16.48 | 4.5% |
| **TOTAL DEVELOPMENT BUDGET** | $ 66,800,000 | $ 363,043 | $ 363.97 | 100.0% |

$ 66,800,000

| Budget | $ 66,800,000 | 100.0% |
| Equity | $ 10,020,000 | 15.0% |
| Debt | $ 56,780,000 | 85.0% |

Development Budget

### Urban Bay Term Sheet

| | 12/1/2023 | Equity | Closing costs | WIP |
|---|---|---|---|---|
| | $ 5,300,000 | $ 5,300,000 | | $ - |
| | | | | |
| | $42,599,192 | | | $ 42,599,192 |
| | $ 475,639 | | | $ 475,639 |
| | $ 600,000 | | | $ 600,000 |
| | | | | $ 42,599,192 |
| | | | | |
| | $ 1,527,000 | $ 1,527,000 | | $ - |
| | | | | |
| | $ 550,000 | $ 550,000 | | $ - |
| | $ 52,000 | | | $ 52,000 |
| | $ 660,000 | | | $ 660,000 |
| | $ 1,734,000 | | | $ 1,734,000 |
| | $ 291,700 | | | $ 291,700 |
| | $ 2,100,000 | $ 2,100,000 | | $ - |
| | $ 674,108 | | | $ 674,108 |
| | $ 870,000 | | | $ 870,000 |
| | | | | |
| | $ - | | | |
| | $ - | | | |
| | $ 1,050,430 | | $ 1,050,430 | $ - |
| | $ 125,000 | | $ 125,000 | |
| | $ 167,000 | | $ 167,000 | |
| | $ 5,000,000 | | | $ 5,000,000 |
| | | | | |
| | $ 3,023,931 | $ 543,000 | | $ 2,480,931 |
| | $ 66,800,000 | $ 10,020,000 | $ 1,342,430 | $ 55,437,570 |

### Sources and Uses

| Sources | Total | | |
|---|---|---|---|
| Senior Debt | 38,610,400 | | |
| Mezz Debt | 18,169,600 | | |
| **Total Source of Funds** | 56,780,000 | | |

| Uses | Total | Closing Costs | LP |
|---|---|---|---|
| Total Hard Cost | 43,674,831 | | 43,674,831 |
| Total Soft Costs | 4,281,808 | | 4,281,808 |
| Financing | | | - |
| Loan Origination Fee | 1,050,430 | 1,050,430 | - |
| Loan Processing | 125,000 | 125,000 | |
| Title and Escrow | 167,000 | 167,000 | |
| Interest Reserve | 5,000,000 | | 5,000,000 |
| Project Management | 2,480,931 | | 2,480,931 |
| **Total Uses** | 56,780,000 | 1,342,430 | 55,437,570 |

Park Place II and III

Page 3

**Park Place II and III**
**Fountain Hills, AZ**



**12/1/2023**

## Financing                                    Initial Sizing

| Construction Funding | | | | | |
|---|---|---|---|---|---|
| Value | | | $ 89,986,034 | | |
| Development Budget | | | $ 66,800,000 | | |
| | | | | | |
| Lender | TBD | | | | |
| Construction Loan | | | $ 56,780,000 | | |
| | | LTV | 63.1% | | |
| | | LTC | 85.0% | | |
| | | | | | |
| Senior Debt | 68% | | $ 38,610,400 | | |
| Mezz Debt | 32% | | $ 18,169,600 | | |
| | 100% | | $ 56,780,000 | 85.0% | |
| | GP | 100% | $ 10,020,000 | | |
| | LP | 0% | $ - | | |
| Equity | | | $ 10,020,000 | 15.0% | |
| Total | | | $ 66,800,000 | 100.0% | |

| Anticipated Loan Terms | | Senior Debt | Mezz |
|---|---|---|---|
| SOFR | 30 day spread | 5.33% | 5.33% |
| Margin | | 7.00% | 9.50% |
| Interest Rate | | 12.33% | 14.83% |
| Blended Rate | | | 13.13% |
| Type | | | Non-recourse |
| | | | Completion Guarantee |
| During Construction | | | Interest Only |
| Term | | | 36 Months |
| | | | Interest Only |
| Extensions | | Two | 6 Months |

| Loan Fees | | | 1.85% |
|---|---|---|---|
| 3rd Party | | 10,075.00 | |
| legal | | 35,000.00 | |
| Phase 1 | | 4,500.00 | |
| Appraisal | | 25,000.00 | |
| Land Use | | 3,500.00 | |
| Cost Analysis | | 20,000.00 | |
| Travel | | 2,000.00 | |
| Credit Check | | 150.00 | |
| Others | | 24,775.00 | |
| Total Loan Processing | | | 125,000.00 |
| Title and Escrow | 0.25% | | 167,000 |

Financing                                              Page 5

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOSHUA J. CRAVEN and CRG
PROPERTIES, INC.,

      Plaintiffs,

v.                                          Case No.:

CALEB J. WALSH and PARKS
MANAGEMENT LLC,

      Defendants.

_____/

## COMPLAINT

Plaintiffs, Joshua J. Craven ("Craven") and CRG Properties, Inc. ("CRG," with Craven, "Plaintiffs"), sue Defendants, Caleb J. Walsh ("Walsh") and Parks Management LLC ("Parks Management," with Walsh, "Defendants"), and allege:

## JURISDICTION AND VENUE

1.     This action involves, among other things, fraud, breach of fiduciary duty, theft, conversion, unjust enrichment, and securities violations that Defendants perpetrated on Plaintiffs to obtain Plaintiffs' investments in excess of $565,000.00.

2.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a) based on diversity of citizenship.

3.     This is an action for money damages in excess of seventy five thousand dollars ($75,000.00), exclusive of costs, interest, and attorneys' fees.

4.     Venue lies in the Middle District of Florida pursuant to 28 U.S.C. §1391(b).

## THE PARTIES

5.      Plaintiff Craven is an individual with his primary place of residence in California, and is otherwise *sui juris*. Craven is a citizen of California for purposes of §1332(c).

6.      Plaintiff CRG is a California corporation with its principal place of business located at 5256 South Mission Road # 1006, Bonsall, California 92003. CRG is deemed a citizen of California for purposes of §1332(c).

7.      Defendant Walsh is an individual with his primary place of residence in Hillsborough County, Florida, and is otherwise *sui juris*. Walsh is a citizen of Florida for purposes of §1332(c).

8.      Walsh holds himself out to the public as a leading authority on affordable housing, property management, real estate investment and foreclosures:

> Acclaimed as a leading authority on affordable housing, property management, real estate investment and foreclosures, Caleb Walsh has built up and controls a 10 state real estate portfolio from his home in Tampa, Florida. For the past 10 years he developed one of the most sought after property management formulas in the nation which he used to train a team that manages his assets so he can focus on acquiring multiple properties per month.

*see* https://www.calebwalsh.org/ (last accessed on December 22, 2020).

9.      Walsh has a history of mismanaging investment properties either intentionally or recklessly. Indeed, he has filed numerous bankruptcy cases relating to properties of which he was either the manager or trustee. Most recently, Walsh filed bankruptcy cases in the United States Bankruptcy Court for the Middle District of Florida for Gainesville Road Community Trust (Case No. 8:20-bk-03888-CPM) and Plum Circle Community Trust (Case No. 8:20-bk-04249-CPM). In each case, the Bankruptcy Court found that Walsh was "incompetent" and committed acts of "fraud" and "dishonesty." In the Plum Circle Community Trust case and the Gainesville Road

Community Trust case, the Bankruptcy Court ultimately removed Walsh as the manager/trustee of each entity and replaced him with a Chapter 11 trustee.

10.     Defendant Parks Management is a Florida limited liability company with its principal place of business located in Hillsborough County, Florida at 13194 US HWY 301 S #374, Riverview, Florida 33578. Walsh utilized Parks Management to perpetrate his scheme and improperly obtain Plaintiffs' funds. The LLC members of Parks Management are not citizens of California.

## GENERAL ALLEGATIONS

### The Gainesville Road Investment

11.     In December, 2017, Craven received an email from Walsh (the "December 2017 Email") about an opportunity to invest in two mobile home parks (the "Gainesville Road Investment"). The December 2017 Email was a solicitation for an investment.

12.     With the goal of extracting investment money from Plaintiffs, Walsh assured Plaintiffs that he *knew* the "two mobile home parks…inside and out (as I was hired to advise on it 6 months ago) and ha[d] vetted the numbers 9 ways to Sunday."

13.     Walsh described the two mobile home parks as follows:

   a. Our Lucaya (Sunny Oaks) Mobile Home Park, Real Property Tax ID No: 13206-002-00. 55 Spaces on 7.72 acres, 49 parked owned homes, 1 office/laundry, 3 storage mobile homes ("Sunny Oaks"); and

   b. Edgewood Mobil Home Park, Real Property Tax ID No: 13923-000-00. 24 spaces on 2.64 acres, 22 parked owned homes, 2 single family houses ("Edgewood," with Sunny Oaks, the "Gainesville Road Properties").

14.     In connection with inducing Plaintiffs to invest, Walsh represented to Craven that the Gainesville Road Investment included the purchase of the Gainesville Road Properties. According to Walsh's representations to Craven, the Gainesville Road Properties were to be

purchased for a price of two million dollars ($2,000,000.00) with a $300,000.00 down payment and the remainder to be financed.

15.     In regards to the Gainesville Road Investment, Walsh promised Craven:

a.  To have financing in place;

b.  The equity in the Gainesville Road Properties was $3,120,000.00;

c.  The Gainesville Road Investment would "more than double the existing 33k/month income by doing the renovations and rent the empty units/empty sites;"

d.  Refinancing would happen within 6-10 months of purchase;

e.  Walsh would use one of his "private lenders to do a cash out refinance;" and

f.  Craven would "get paid back at cashout [*sic*] of the property."

16.     In short, Walsh promised Craven that he would use the investment funds that he sought from Plaintiffs for the down payment and necessary renovations to the Gainesville Road Properties.

17.     Walsh promised Craven that with said renovations the value of the Gainesville Road Properties would quickly increase the value.

18.     Specifically, Walsh assured Craven that, within a few months, he would refinance the Gainesville Road Properties, cash-in on the equity, and repay Plaintiffs their down payment plus profit.  In the December 2017 Email sent to Craven, Walsh wrote:

> If we are able to use you for the down payment for short term financing and our capital to get the park at a point of refinance with my private lenders than we can speed up the time line to a short 4-6 months easily based on the fact that we wouldn't be dependent on funds from the park itself.

19.     In reliance on Walsh's representations, on or about December 28, 2017, Craven entered into The Land Trust Agreement for the Gainesville Road Community Trust (the "GRC Trust") (attached hereto as **Exhibit A**) for the purposes of acquiring and investing in the

Gainesville Road Properties and thereafter, on or about December 28, 2017, invested $50,000.00 to be used as a down payment to acquire the Gainesville Road Properties.

20.     Pursuant to the GRC Trust, Walsh appointed himself trustee, thereby creating a fiduciary relationship between Walsh and the beneficiaries of the GRC Trust, including Craven.

21.     Among other responsibilities, Walsh was entrusted with acquiring, renovating, and capitalizing the Gainesville Road Properties to the point of refinance, cash out, and payback of the initial investment.

22.     As Trustee, Walsh was also required "to keep [] careful books showing the receipts and disbursements he[] has made on behalf of the Trust and also of the Trust Property and to keep books of the Trust open to the inspection of the beneficiaries." Walsh grossly disregarded this duty, as the record keeping was in disarray and Walsh was unable to accurately account to Plaintiffs for the receipts and disbursements of the GRC Trust.

23.     In addition to Plaintiffs' initial $50,000.00 investment in the GRC Trust, on or about January 18, 2018, Plaintiffs invested an additional $250,000.00 for a total of $300,000.00 (collectively, the "Gainesville Road Investment Funds"). Again, this investment was to be for the down payment and rehabilitation of the Gainesville Road Properties. Plaintiffs were to be passive investors and acquire a 8.3% beneficial interest in the Gainesville Road Properties through the GRC Trust.[1]

24.     Contrary to Walsh's representations, upon information and belief, neither Walsh nor any of his affiliated entities invested any capital into the GRC Trust with respect to the Gainesville Road Properties.

---

[1] Plaintiffs subsequently acquired the 16.6% interest of Kyle Ballif and 8.3% interest of Jason Boley.

25.     Plaintiffs invested in the GRC Trust based on Walsh's promises, representations, purported experience, and expertise in buying and rehabilitating mobile home parks for investment and profit, and Walsh's alleged vetting of the Gainesville Road Properties.

26.     Walsh made these representations to Plaintiffs although he knew they were false. For example:

a.  Walsh did not invest all of the money into the down payments for the Gainesville Road Properties, instead Walsh kept some or all of the invested funds for himself or affiliate entities.

b.  Walsh knowingly overstated the value of the Gainesville Road Properties.

c.  Walsh inflated the purchase prices of the Gainesville Road Properties.

d.  Walsh did not invest his own funds to improve the Gainesville Road Properties as promised.

e.  Walsh misappropriated rents from the Gainesville Road Properties.

f.  Walsh commingled monies from the Gainesville Road Properties with other properties managed by Walsh.

g.  Walsh did not bring the property to "maximum capacity" instead selling, without requisite authority, assets of the GRC Trust, including the mobile homes.

h.  Walsh took a 10% management fee from the income while claiming that the Gainesville Road Properties were otherwise operating at a loss.

i.  Walsh intentionally allowed the Gainesville Road Properties to fall into disrepair.

j.  Walsh failed to execute his duties as trustee of the GRC Trust.

k.  Walsh intentionally forced the properties into foreclosure and the GRC Trust into bankruptcy.

l.  Walsh entered into contracts for deed for the Gainesville Road Properties without properly acquiring title by deed with a title policy.

27.     Walsh knowingly and intentionally misrepresented the value of the Gainesville Road Properties to induce Plaintiffs to make an investment of $300,000.00.

28.     Upon information and belief, Walsh misappropriated the Gainesville Road Investment Funds for personal use, to pay off debts unrelated to the Gainesville Road Properties, and intentionally did not rehabilitate (or at a minimum maintain) or manage the Gainesville Road Properties. As a result, Plaintiffs have likely lost their entire $300,000.00 investment.

29.     On May 19, 2020, Walsh caused the GRC Trust to file a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Middle District of Florida (Tampa Division).

30.     While Walsh signed the bankruptcy petition on behalf of the GRC Trust, Walsh did not have the requisite authority to commence the bankruptcy filing.

31.     After a three-day trial, on August 12, 2020, the Bankruptcy Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee in the GRC Trust bankruptcy case, thereby removing Walsh as the manager/trustee of the GRC Trust. In coming to that decision, based on the evidence presented at the trial, the Bankruptcy Court found "that there are some disturbing transactions, compelling to me, that lead to my finding that Mr. Walsh has been – you can call it 'incompetent,' you can call it 'fraud,' you can call it 'dishonesty.'"

32.     The Bankruptcy Court also expressed grave concern over Walsh's actions as manager because of his cross-collateralization of properties and the fact that Walsh created fraudulent transfers between the GRC Trust and the PCC Trust (defined below). The Bankruptcy Court found numerous other bad acts and mismanagement committed by Walsh, including that Walsh was "dealing out of trust," Walsh had a board and failed to conduct board meetings, Walsh failed to adhere to contractual requirements of the GRC Trust, Walsh failed to properly account for funds received by the GRC Trust, and Walsh failed to adequately maintain books and records.

Overall, the Bankruptcy Court found Walsh's testimony regarding his management of the Gainesville Road Properties to be not credible, evasive, non-responsive, and meandering.

33.     The GRC Trust bankruptcy case brought to light Walsh's mismanagement of the Gainesville Road Properties and uncovered the fraudulent scheme that Walsh utilized to obtain the Gainesville Road Investment funds from Plaintiffs.

### The Plum Circle Investment

34.     On February 14, 2018, Walsh sent Craven another email (the "February 14 Email") about an opportunity to invest in another mobile home park located in Chipley, Florida (the "Chipley Property"). A true and correct copy of the February 14 Email is attached hereto as **Exhibit B**. The February 14 Email was a solicitation for an investment.

35.     In the February 14 Email, Walsh wrote:

> Hi Josh,
>
> The more I dug into numbers on South Dakota the more i (*sic*) am convinced it is too tight and want to hold off until further investigation.
>
> That being said, the same seller who sold us Ocala property is offering a steal on the following park in Chipley, Florida since he had such a good experience with the last closing.  I advised on contract on this property since it was empty within the past six months and due to my advising they filled it to 11 tenants so far….This is under contract and closing Feb 28th and we would need to fund (open escrow) this Friday Feb 16th 2018.
>
> Interested?  I can have this doing $18,500 in 45-60 days at tops.  The rents are so far below market value and I know for a fact the demand is tremendous in this area.  I will be closing either way if you pass on this one but I thought this would be a great one to pivot since the South Dakota still needs more investigation for that high of a purchase price and down payment.
>
> Bottom line, I'll do 50/59 (*sic*) after my management entity gets 10% if you put up the $265k downpay (*sic*) needed.  I'll put up all

renovation money + cost of new homes.  Thoughts? See details below …this one will have a BIG payday in 11 months.

**Park Specifics:**

30 SPACES (ALL SEPARATELY METERED FOR COUNTY WATER, SEWER, GARBAGE, AND ELECTRIC). 26 HOMES IN THE PARK NOW (ALL PARK OWNED) HOMES ARE MOSTLY 3 BED/ 2 BATH WITH A FEW  2 BED/1 BATH AND SOME 4 BED/2 BATH.  HOMES ARE 1978 THROUGH 1993.

**Deal Terms:**

1) Downpayment (*sic*): $265,000

2) Purchase Price: $805,000

3) Value: $1,200,000 ($395,000 Equity Day 1)

**Mortgage Specifics:**

PURCHASE MONEY NOTE (1st Mortgage) : Seller agrees to take back a Purchase Money Note for the amount of $540,000.000 at an interest rate of 7.5% per annum amortized over 25 years. Monthly Payment payable by Purchaser is $3,990.55 per month for a period of 12 months with payments (*sic*)

beginning (*sic*) May 1st, 2018 and continuing on the same day of each month thereafter for the period of 11 months.  The unpaid balance of $536,344.67 becoming due and payable on April 1, 2019 as one final balloon payment.

**Strategy:**

Bring property to $18,500/month through conversion to tenant owned properties within 45 days.  Grow the equity to $695,000 for a high case out refinance in 11 months.

Seller finance, doesn't pay on the mortgage and forces the seller to foreclose on the property and forced the trust into bankruptcy

(the "Plum Circle Investment").

36.     According to Walsh, the Plum Circle Investment included the purchase of the Chipley Property for $805,000.00 with a down payment of $265,000.00 and seller financing of $540,000.00 with a 7.5% interest rate per annum amortized over 25 years.

37.     On or about February 20, 2018, Craven, through CRG, entered into the Land Trust Agreement for the Plum Circle Community Trust (the "PCC Trust") (attached hereto as **Exhibit C**) for the purpose of acquiring and rehabilitating the Chipley Property.

38.     On or about February 20, 2018, Plaintiffs invested $265,000.00 (the "Plum Circle Investment Funds") to be used solely as a down payment towards the purchase price of the Chipley Property. Plaintiffs were to be passive investors and acquire a 50% beneficial interest in the Chipley Property through the PCC Trust.

39.     Walsh designated himself as the Trustee of the PCC Trust, thereby creating a special relationship between himself and Plaintiffs. Walsh was entrusted with, among other responsibilities, acquiring, renovating and capitalizing the Chipley Property to the point of refinance, cash out and payback of the initial investment plus profit. The PCC Trust documents, prepared by Walsh, specifically reference that the Plum Circle Investment Funds was solely for the acquisition of the Chipley Property.

40.     Upon information and belief, neither Walsh nor any of his affiliated entities invested any capital into the PCC Trust with respect to the Chipley Property.

41.     As Trustee, Walsh was also required "to keep [] careful books showing the receipts and disbursements he[] has made on behalf of the Trust and also of the Trust Property and to keep books of the Trust open to the inspection of the beneficiaries." Walsh failed in this duty, as the record keeping was in disarray and Walsh was unable to accurately account to Plaintiffs for the receipts and disbursements of the PCC Trust.

42.     Meanwhile, despite Walsh's representations to Plaintiffs, Walsh convinced the seller of the Chipley Property to finance the mortgage for the remainder of the purchase price.

43.     Plaintiff's investment in the PCC Trust was based on Walsh's knowingly false representations, purported experience and expertise in buying and rehabilitating mobile home parks for investment and profit, and his alleged vetting of the Chipley property.

44.     Walsh's representations were knowingly false. For example:

    a.  Walsh did not invest all of the money into the down payments for the Chipley property, instead he misappropriated some or all of the invested funds for personal use or use on his affiliate entities.

    b.  Walsh knowingly overstated the value of the Chipley property.

    c.  Walsh inflated the purchase price of the Chipley property.

    d.  Walsh did not invest his own funds to improve the Chipley property as promised.

    e.  Walsh misappropriated rents from the Chipley property.

    f.  Walsh did not bring the Chipley property to "maximum capacity". Instead, without the requisite authority, Walsh sold the assets of the PCC Trust, including the mobile homes.

    g.  Walsh took a 10% management fee from the income of the Chipley property while claiming that the property was otherwise operating at a loss.

    h.  Walsh, through misuse or misappropriation of investment funds, intentionally allowed the Chipley property to fall into disrepair.

    i.  Walsh failed to execute his duties as trustee of the PCC Trust.

    j.  Walsh intentionally forced the Chipley property into foreclosure and the PCC Trust into bankruptcy without the requisite consent or approval of the PCC Trust beneficiaries.

    k.  Walsh entered into contracts for deed for the Chipley property that the PCC Trust without properly acquiring title by deed with a title policy.

45.     Walsh knowingly and intentionally misrepresented the value of the Chipley Property to induce Plaintiffs to make an investment of $265,000.00.

46.     Upon information and belief, Walsh misappropriated the Plum Circle Investment Funds for personal use, to pay off debts unrelated to the Chipley Property, and intentionally neglected to rehabilitate (or at a minimum maintain) and manage the Chipley Property. As a result, Plaintiffs have likely lost their entire $265,000.00 investment.

47.     Moreover, Walsh misrepresented the purchase price of the Chipley Property to Plaintiffs. Pursuant to the February 14 Email, Walsh represented to Plaintiffs that the purchase price for the Chipley Property was $805,000.00—this was false. At the time Walsh made this representation, Walsh knew the representation was false, as the purchase price for the Chipley Property was never $805,000.00. A true and correct copy of the closing statement for the Chipley Property is attached hereto as **Exhibit D**. Walsh never provided Plaintiffs with a copy of the closing statement.

48.     Walsh has testified under oath that at the time he sent the February 14 Email to Craven that the purchase price was not $805,000.00, it was actually $700,000.00. As reflected in the closing statement, Walsh or his affiliated entities pocketed approximately $100,000.00 from the closing of the Chipley Property—this was never disclosed to Plaintiffs.

49.     On May 31, 2020, Walsh caused the PCC Trust to file a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Middle District of Florida (Tampa Division).

50.     While Walsh signed the bankruptcy petition on behalf of the PCC Trust, Walsh did not have the requisite authority to commence the bankruptcy filing.

51.     After a three-day trial, on August 12, 2020, the Bankruptcy Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee in the PCC Trust bankruptcy case, thereby removing Walsh as the manager/trustee of the PCC Trust. The Bankruptcy Court's findings, *i.e.*,

"that Mr. Walsh has been – you can call it 'incompetent,' you can call it 'fraud,' you can call it 'dishonesty,'" applied equally to the PCC Trust bankruptcy case and the PCC Trust bankruptcy case.

52.     Further, when the Bankruptcy Court appointed a chapter 11 trustee with respect to the Chipley Property, the Bankruptcy Court noted numerous misrepresentations by Walsh and specifically made the following finding: "Mr. Craven is another example of a misrepresentation. You told Mr. Craven that the purchase price was $800,000 for [the Chipley Property] and it wasn't and **you knew it wasn't.**" The Bankruptcy Court further found that Walsh never advised Plaintiffs that the purchase price for the Chipley Property was actually $700,000.00 before Plaintiffs parted with their money and made the investment.

53.     In participating in the Plum Circle Investment and delivering the Plum Circle Investment Funds to Walsh and Parks Management, Plaintiffs relied on Walsh's representations regarding the use of the funds and the purchase price of the Chipley Property. Had Walsh disclosed to Plaintiffs the true purchase price of the Chipley Property and that Walsh and his affiliates would improperly retain approximately $100,000.00 from the closing, then Plaintiffs would have never made the investment and parted with the Plum Circle Investment Funds.

54.     The PCC Trust bankruptcy case brought to light Walsh's mismanagement of the Chipley Property and uncovered the fraudulent scheme that Walsh utilized to obtain the Plum Circle Investment funds from Plaintiffs.

**Civil Theft Demand Letter**

55.     On June 12, 2020, Plaintiffs sent a demand letter to Walsh pursuant to Fla. Stat. § 772.11 (the "Demand Letter"). In the Demand Letter, Plaintiffs sought the return of the Gainesville Road Investment Funds and Plum Circle Investment Funds.

56.     Plaintiffs advised Walsh that (i) the Gainesville Road Investment Funds and Plum Circle Investment Funds were not used for the purpose in which the funds were provided to Walsh; (ii) Walsh intentionally obtained the Gainesville Road Investment Funds and Plum Circle Investment Funds by false pretenses, fraud, deception, willful misrepresentations, or false promises; (iii) Walsh knowingly converted the Gainesville Road Investment Funds and Plum Circle Investment Funds to his own personal use; and (iv) Walsh deprived Plaintiffs of the Gainesville Road Investment Funds and Plum Circle Investment Funds and any correlating benefit.[2]

57.     Walsh never returned the Gainesville Road Investment Funds or Plum Circle Investment Funds to Plaintiffs and has never accounted to Plaintiffs for such funds. In fact, as of the filing of this Complaint, Walsh has never even responded to the Demand Letter.

58.     Walsh has repeatedly referred to Craven as his "partner" with respect to the Gainesville Road Properties and the Chipley Property; however, Walsh certainly has not treated Craven as a "partner." Walsh took advantage of Craven by fraudulently inducing Plaintiffs to invest the Gainesville Road Investment Funds and Plum Circle Investment Funds with the false promise of the return of the investments, plus profit and interest, and then failing to account to Plaintiffs for his actions.

59.     Plaintiffs have retained the law firm of Lewis Brisbois Bisgaard & Smith LLP to provide legal services to represent their interests in this action and have agreed to pay the firm a reasonable fee for services rendered.

---

[2] Plaintiffs also noted in the Demand Letter that they were entitled to rescission of their investments under Florida and Federal securities laws.

60.     All conditions precedent to this action have been performed, occurred, satisfied, waived, or excused, or the performance of conditions precedent would be futile.

## COUNT I – FRAUD
### (as to the Gainesville Road Investment)

61.     Plaintiffs re-allege and incorporate paragraphs 1 through 60 as if fully set forth herein.

62.     This is an action against Defendants for fraud.

63.     As alleged herein, Walsh made statements to Plaintiffs concerning the material facts of, *inter alia*, how the Gainesville Road Investment Funds would be invested, the circumstances regarding the Gainesville Road Properties, how the Gainesville Road Investment Funds would be repaid, actions Plaintiffs would take with respect to rehabilitating the Gainesville Road Properties and investing their own funds, and his purported knowledge, experience, and expertise in buying and rehabilitating mobile home parks for investment and profit.

64.     Walsh made these statements to Plaintiffs although he knew these representations to be false.

65.     In an effort to perpetrate his scheme and obtain and steal Plaintiffs' Gainesville Road Investment Funds, Walsh convinced Craven to enter into a Land Trust Agreement with respect to the GRC Trust that would allegedly benefit Plaintiffs.

66.     Walsh then convinced Plaintiffs to entrust him as the sole trustee of the GRC Trust. Walsh knew that as the sole trustee he would have the opportunity to conceal his misuse of the Gainesville Road Investment Funds. As Trustee, Walsh, individually and through Parks Management, was able to ultimately utilize the Gainesville Road Investment Funds for his personal use and/or for the benefit of other affiliate entities and not for the purpose in which Plaintiffs provided the funds to Defendants.

67.     In making the knowingly false representations, Walsh intended to, and did, induce Plaintiffs to deliver the Gainesville Road Investment Funds to Defendants and execute the GRC Trust documents.

68.     Plaintiffs acted in reliance on Walsh's false representations and invested the Gainesville Road Investment Funds under the belief that said funds would be invested as Walsh promised and to which Plaintiffs agreed and Defendants would take such other actions as they represented that they would.

69.     As a result of Plaintiffs' reliance upon Walsh's false representations, they suffered significant monetary damages, including the loss of $300,000.00 (the Gainesville Road Investment Funds), the lost equity in the Gainesville Road Properties of $1,120,00.00, income, and interest.

## COUNT II – FRAUD
### (as to the Plum Circle Investment)

70.     Plaintiffs re-allege and incorporate paragraphs 1 through 60 as if fully set forth herein.

71.     This is an action against Defendants for fraud.

72.     As alleged herein, Walsh made statements to Plaintiffs concerning the material facts of, *inter alia*, how the Plum Circle Investment Funds would be invested, the circumstances regarding the Chipley Property, how the Plum Circle Investment Funds would be repaid, actions Plaintiffs would take with respect to rehabilitating the Chipley Property and investing their own funds, and his purported knowledge, experience, and expertise in buying and rehabilitating mobile home parks for investment and profit.

73.     Walsh made these statements to Plaintiffs although he knew these representations to be false.

74.    In an effort to perpetrate his scheme and obtain and steal Plaintiffs' Plum Circle Investment Funds, Walsh convinced Plaintiffs to enter into a Land Trust Agreement with respect to the PCC Trust that would allegedly benefit Plaintiffs.

75.    Walsh then convinced Plaintiffs to entrust him as the sole trustee of the PCC Trust. Walsh knew that as the sole trustee he would have the opportunity to conceal his misuse of the Plum Circle Investment Funds. As Trustee, Walsh, individually and through Parks Management, was able to ultimately utilize the Plum Circle Investment Funds for his personal use and/or for the benefit of other affiliate entities and not for the purpose in which Plaintiffs provided the funds to Defendants.

76.    In making the knowingly false representations, Walsh intended to, and did, induce Plaintiffs to deliver the Plum Circle Investment Funds to Defendants and execute the PCC Trust documents.

77.    Plaintiffs acted in reliance on Walsh's false representations and invested the Plum Circle Investment Funds under the belief that said funds would be invested as Walsh promised and to which Plaintiffs agreed, and Defendants would take such other actions as they represented that they would.

78.    As a result of Plaintiffs' reliance upon Walsh's false representations, they suffered significant monetary damages, including the loss of $265,000.00 (the Plum Circle Investment Funds), the lost equity in the Chipley Property of $395,000.00, income, and interest.

## COUNT III – VIOLATION OF FLORIDA BLUE SKY LAWS
### (as to the Gainesville Road Investment)

79.    Plaintiffs re-allege and incorporate paragraphs 1 through 60 as if fully set forth herein.

80.     This is an action against Defendants for violations of the Florida Securities and Investor Protection Act ("FISPA"), Fla. Stat. §§ 517.011, *et seq.*

81.     Pursuant to Fla. Stat. § 517.301(1)(a), it is unlawful and a violation of FSIPA for a person, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of § 517.051 and including any security sold in a transaction exempted under the provisions of § 517.061, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

82.     It is also unlawful to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry. Fla. Stat. § 517.301(1)(c).

83.     Pursuant to Fla. Stat. § 517.211(2), any person purchasing or selling a security in violation of § 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

84.     A purchaser may recover the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of income received by the purchaser on the

security or investment, in addition to an award of prevailing party attorneys' fees. *See* Fla. Stat. § 517.211(3).

85.     Defendants employed a scheme to defraud Plaintiffs into making an investment in the GRC Trust and the Gainesville Road Properties—the Gainesville Road Investment.

86.     The acceptance of Plaintiffs' investment, *i.e.*, the Gainesville Road Investment Funds, in exchange for a beneficial interest in title to notes, evidence of indebtedness, property, profits, or earnings is a "Security" as defined within the meaning and intent of Fla. Stat. § 517.021(21).

87.     Pursuant to the terms offered by Walsh, individually and on behalf of his affiliate entities, Plaintiffs would "invest" funds with Walsh, for which Plaintiffs would receive a beneficial interest in real property plus a return on their investment from the income the property produced.

88.     Walsh, individually and through Parks Management, purported to engage in the essential managerial effort and activities which would drive the success of the investment. Plaintiffs were only to provide the Gainesville Road Investment Funds and share in the earnings and profits generated by the income producing properties that were to be invested in by Walsh, leaving the management, control, and operation to Defendants.

89.     Walsh, in violation of §§ 517.211 and 517.301, knowingly and willfully, during the sale of a security, obtained the Gainesville Road Investment Funds by means of untrue statements of a material fact. In addition, Walsh omitted material facts that were necessary under the circumstances to render said statements not misleading.

90.     Defendants engaged in transactions, practices, and a course of business that operated as a fraud on Plaintiffs.

91.    Defendants acted with scienter, knew that their representations were false, and intended that Plaintiffs rely upon the representations and omissions to induce them to invest their money with Defendants.

92.    As alleged herein, *inter alia*, Walsh: i) represented that he would invest the Gainesville Road Investment Funds in income producing real estate for the benefit of Plaintiffs, although he knew said representations to be false; ii) failed to advise Plaintiffs of the risks inherent in investing with him, including, but not limited to, the potential decline in the value of any real property purchased or fluctuations in income and expenses of the properties; iii) failed to advise Plaintiffs that the Gainesville Road Investment would not be liquid and that Plaintiffs could not obtain a return of principal upon demand; iv) failed to properly advise Plaintiffs of the growing risks of continued investment with Walsh and his affiliate entities, including Walsh's prior history with respect to investing in mobile home parks; v) failed to advise Plaintiffs of the true condition and value of the Gainesville Road Properties; and vi) failed to advise Plaintiffs that Defendants had no intention of putting their own funds into the Gainesville Road Investment.

93.    Plaintiffs relied upon Walsh's representations and omissions in making their investment in the Gainesville Road Investment, and have been damaged.

94.    In violation of Fla. Stat. § 517.07, Walsh offered to sell the subject security within Florida, which security was not registered pursuant to the provisions of § 517.011, *et seq*.

95.    Plaintiffs, in accordance with Fla. Stat. § 517.211(3), are entitled to recover the consideration paid for the security, *i.e.*, the Gainesville Road Investment Funds ($300,000.00), plus interest from the date of the investment, less any income received by Plaintiffs.

96.     Additionally, based upon Defendants' fraudulent conduct and concealment of facts in connection with the sale of the security, Plaintiffs are entitled to recover from Defendants payment of their attorneys' fees and costs in accordance with Fla. Stat. § 517.211(6).

97.     Plaintiffs tender their investments in the GRC Trust and the Gainesville Road Properties—the Gainesville Road Investment

## COUNT IV – VIOLATION OF FLORIDA BLUE SKY LAWS
### (as to the Plum Circle Investment)

98.     Plaintiffs re-allege and incorporate paragraphs 1 through 60 as if fully set forth herein.

99.     This is an action against Defendants for violations of the Florida Securities and Investor Protection Act ("FISPA"), Fla. Stat. §§ 517.011, *et seq*.

100.    Pursuant to Fla. Stat. § 517.301(1)(a), it is unlawful and a violation of FSIPA for a person, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of § 517.051 and including any security sold in a transaction exempted under the provisions of § 517.061, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

101.    It is also unlawful to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or

representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry. Fla. Stat. § 517.301(1)(c).

102. Pursuant to Fla. Stat. § 517.211(2), any person purchasing or selling a security in violation of § 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

103. A purchaser may recover the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of income received by the purchaser on the security or investment, in addition to an award of prevailing party attorneys' fees. *See* Fla. Stat. § 517.211(3).

104. Defendants employed a scheme to defraud Plaintiffs into making an investment in the PCC Trust and the Chipley Property—the Plum Circle Investment.

105. The acceptance of Plaintiffs' investment, *i.e.*, the Plum Circle Investment Funds, in exchange for a beneficial interest in title to notes, evidence of indebtedness, property, profits, or earnings is a "Security" as defined within the meaning and intent of Fla. Stat. § 517.021(21).

106. Pursuant to the terms offered by Walsh, individually and on behalf of his affiliate entities, Plaintiffs would "invest" funds with Walsh, for which Plaintiffs would receive a beneficial interest in real property plus a return on their investment from the income the property produced.

107. Walsh, individually and through Parks Management, purported to engage in the essential managerial effort and activities which would drive the success of the investment. Plaintiffs were only to provide the Plum Circle Investment Funds and share in the earnings and

profits generated by the income producing properties that were to be invested in by Walsh, leaving the management, control, and operation to Defendants.

108.    Walsh, in violation of §§ 517.211 and 517.301, knowingly and willfully, during the sale of a security, obtained the Plum Circle Investment Funds by means of untrue statements of a material fact. In addition, Walsh omitted material facts that were necessary under the circumstances to render said statements not misleading.

109.    Defendants engaged in transactions, practices, and a course of business that operated as a fraud on Plaintiffs.

110.    Defendants acted with scienter, knew that their representations were false, and intended that Plaintiffs rely upon the representations and omissions to induce them to invest their money with Defendants.

111.    As alleged herein, *inter alia*, Walsh i) represented that he would invest the Plum Circle Investment Funds in income producing real estate for the benefit of Plaintiffs, although he knew said representations to be false; ii) failed to advise Plaintiffs of the risks inherent in investing with him, including, but not limited to, the potential decline in the value of any real property purchased or fluctuations in income and expenses of the properties; iii) failed to advise Plaintiffs that the Plum Circle Investment would not be liquid and that Plaintiffs could not obtain a return of principal upon demand; iv) failed to properly advise Plaintiffs of the growing risks of continued investment with Walsh and his affiliate entities, including Walsh's prior history with respect to investing in mobile home parks; v) failed to advise Plaintiffs of the true condition and value of the Chipley Property; and vi) failed to advise Plaintiffs that Defendants had no intention of putting their own funds into the Plum Circle Investment.

112.    Plaintiffs relied upon Walsh's representations and omissions in making their investment in the Plum Circle Investment, and have been damaged.

113.    In violation of Fla. Stat. § 517.07, Walsh offered to sell the subject security within Florida, which security was not registered pursuant to the provisions of § 517.011, *et seq*.

114.    Plaintiffs, in accordance with Fla. Stat. § 517.211(3), are entitled to recover the consideration paid for the security, *i.e.*, the Plum Circle Investment Funds ($265,000.00), plus interest from the date of the investment, less any income received by Plaintiffs.

115.    Additionally, based upon Defendants' fraudulent conduct and concealment of facts in connection with the sale of the security, Plaintiffs are entitled to recover from Defendants payment of their attorneys' fees and costs in accordance with Fla. Stat. § 517.211(6).

116.    Plaintiffs tender their investments in the PCC Trust and the Chipley Property—the Plum Circle Investment.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (as to the GRC Trust)

117.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

118.    This is a cause of action against Walsh for breach of fiduciary duty.

119.    Walsh managed and/or controlled the GRC Trust at all times relevant to this action and was the Trustee pursuant to the GRC Trust documents.

120.    Walsh knew or had reason to know Plaintiffs placed their trust and confidence in him and relied on his representations and obligations to ensure proper protocol, procedures, and due care were followed in all transactions and actions of the GRC Trust.

121.    Walsh established a fiduciary duty with Plaintiffs, whether express or implied in law, based upon the special relationship and the specific factual circumstances described herein.

122.    Plaintiffs were justified in placing their trust and confidence in Walsh.

123.    Walsh owed duties to Plaintiffs of loyalty, prudent administration and control of the trust property, refraining from gross negligence or reckless conduct, self-dealing, and willful or intentional misconduct.

124.    Walsh was further required to discharge his duties consistently with the obligations of good faith and fair dealing.

125.    Walsh breached his fiduciary obligations to Plaintiffs, as described herein.

126.    Walsh's misconduct caused significant damage to Plaintiffs.

127.    Walsh's breaches amount to willful and intentional misconduct or, at the very least, gross negligence and reckless misconduct.

128.    Further, Walsh's misconduct caused the Gainesville Road Properties to fall into disrepair, lose income, have foreclosure proceedings commenced against them, and ultimately be forced into bankruptcy proceedings.

129.    Plaintiffs have been damaged as a direct and proximate result of Walsh's breaches of fiduciary duty.

## COUNT VI – CONSTRUCTIVE FRAUD
### (as to the Gainesville Road Investment)

130.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

131.    This is a cause of action against Defendants for constructive fraud relating to the Gainesville Road Investment.

132.    A duty to Plaintiffs under a confidential or fiduciary relationship has been abused.

133.    An unconscionable or improper advantage has been taken of Plaintiffs.

134.     As specifically described herein, a fraudulent scheme was perpetrated upon Plaintiffs, based upon knowingly false statements concerning material facts and concealment.

135.     Plaintiffs relied upon the knowingly false statements concerning material facts and concealment, were induced to provide their investments, and have been damaged.

136.     The fraudulent scheme perpetrated upon Plaintiffs was wrongful, and equitable interference is justified under these circumstances.

## COUNT VII – BREACH OF FIDUCIARY DUTY
### (as to the PCC Trust)

137.     Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

138.     This is a cause of action against Walsh for breach of fiduciary duty.

139.     Walsh managed and/or controlled the PCC Trust at all times relevant to this action and was the Trustee pursuant to the PCC Trust documents.

140.     Walsh knew or had reason to know Plaintiffs placed their trust and confidence in him and relied on his representations and obligations to ensure proper protocol, procedures, and due care were followed in all transactions and actions of the PCC Trust.

141.     Walsh established a fiduciary duty with Plaintiffs, whether express or implied in law, based upon the  special relationship and the specific factual circumstances described herein.

142.     Plaintiffs were justified in placing their trust and confidence in Walsh.

143.     Walsh owed duties to Plaintiffs of loyalty, prudent administration and control of the trust property, refraining from gross negligence or reckless conduct, self-dealing, and willful or intentional misconduct.

144.     Walsh was further required to discharge his duties consistently with the obligations of good faith and fair dealing.

145.   Walsh breached his fiduciary obligations to Plaintiffs, as described herein.

146.   Walsh's misconduct caused significant damage to Plaintiffs.

147.   Walsh's breaches amount to willful and intentional misconduct or, at the very least, gross negligence and reckless misconduct.

148.   Further, Walsh's misconduct caused the Chipley Property to fall into disrepair, lose income, have foreclosure proceedings commenced against it, and ultimately be forced into bankruptcy proceedings.

149.   Plaintiffs have been damaged as a direct and proximate result of Walsh's breaches of fiduciary duty.

## VIII – CONSTRUCTIVE FRAUD
### (as to the Plum Circle Investment)

150.   Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

151.   This is a cause of action against Defendants for constructive fraud relating to the Gainesville Road Investment.

152.   A duty to Plaintiffs under a confidential or fiduciary relationship has been abused.

153.   An unconscionable or improper advantage has been taken of Plaintiffs.

154.   As specifically described herein, a fraudulent scheme was perpetrated upon Plaintiffs, based upon knowingly false statements concerning material facts and concealment.

155.   Plaintiffs relied upon the knowingly false statements concerning material facts and concealment, were induced to provide their investments, and have been damaged.

156.   The fraudulent scheme perpetrated upon Plaintiffs was wrongful, and equitable interference is justified under these circumstances.

## COUNT IX – UNJUST ENRICHMENT
### (as to the Gainesville Road Investment)

157.   Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

158.   This is a cause of action against Defendants for unjust enrichment.

159.   By delivering the Gainesville Road Investment Funds to Defendants, Plaintiffs conferred a benefit on Defendants, each of whom has knowledge of the benefit conferred.

160.   Defendants voluntarily accepted and retained the benefits conferred by Plaintiffs.

161.   Because Plaintiffs provided substantial benefits to Defendants and Defendants provided no corresponding benefit to Plaintiffs because, *inter alia*, Defendants did not invest all of the Gainesville Road Investment Funds into the down payment or rehabilitation of the Gainesville Road Properties as required and instead kept some or all of the funds for Defendants or their affiliates; Defendants failed to improve the Gainesville Road Properties , instead allowing the properties to fall into disrepair; Defendants mismanaged the Gainesville Road Properties and misappropriated rents; Defendants improperly took a 10% management fee from the income of the property while claiming that the Gainesville Road Properties were otherwise operating at a loss; and Defendants allowed the Gainesville Road Properties to go into foreclosure and Defendants ultimately forced the GRC Trust into bankruptcy, the circumstances render the Defendants' retention of the benefits conferred inequitable unless Defendants return the monies to Plaintiffs.

## COUNT X – UNJUST ENRICHMENT
### (as to the Plum Circle Investment)

162.   Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

163.   This is a cause of action against Defendants for unjust enrichment.

164.     By delivering the Plum Circle Investment Funds to Defendants, Plaintiffs conferred a benefit on Defendants, each of whom has knowledge of the benefit conferred.

165.     Defendants voluntarily accepted and retained the benefits conferred by Plaintiffs.

166.     Because Plaintiffs provided substantial benefits to Defendants and Defendants provided no corresponding benefit to Plaintiffs because, *inter alia*, Defendants did not invest all of the Plum Circle Investment Funds into the down payment for the Chipley Property as required and instead kept some or all of the funds for Defendants or their affiliates; Defendants failed to improve the Chipley Property, instead allowing the property to fall into disrepair; Defendants mismanaged the Chipley Property and misappropriated rents; Defendants improperly took a 10% management fee from the income of the property while claiming that the Chipley Property was otherwise operating at a loss; and Defendants allowed the Chipley Property to go into foreclosure and Defendants ultimately forced the PCC Trust into bankruptcy, the circumstances render the Defendants' retention of the benefits conferred inequitable unless Defendants return the monies to Plaintiffs.

## COUNT XI – CONVERSION
### (as to the Gainesville Road Investment)

167.     Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

168.     This is a cause of action against Defendants for conversion.

169.     Defendants improper taking and retention of the Gainesville Road Investment Funds which belong to Plaintiffs gives rise to a claim for conversion. Defendants, without authorization, asserted dominion and control over the Gainesville Road Investment Funds.

170.     The Gainesville Road Investment Funds are specifically identifiable property of Plaintiffs and are or were the property of Plaintiffs and which were owned or payable to Plaintiffs.

171.    Defendants' conversion is inconsistent with Plaintiffs' rights and ownership of the Gainesville Road Investment Funds.

172.    Walsh solicited and advised Plaintiffs to invest in the Gainesville Road Investment. Upon trust and advice and based upon Walsh's solicitation and misrepresentations, Plaintiffs invested $300,000.00 (the Gainesville Road Investment Funds) into the GRC Trust for purposes of providing a down payment towards acquiring the Gainesville Road Properties. In return, Walsh promised income generation, profits, and refinancing that would result in a repayment of the initial investment after the properties were rehabilitated and exercising maximum use.

173.    Instead of using the Gainesville Road Investment Funds as solicited, promised, advised, and agreed upon, Walsh converted the Gainesville Road Investment Funds for his own benefit and use or that of his affiliated entities.

174.    The Gainesville Road Investment Funds were wrongfully and illegitimately used for the benefit of Defendants.

175.    Plaintiffs made a demand for the return of the Gainesville Road Investment Funds, but the funds have not been returned. Defendants have been confronted with the fact that they stole and converted Plaintiffs' property, but Defendants have failed to return any of the property to Plaintiffs and have ignored Plaintiffs' demands.

176.    As a direct and proximate result of Defendants' conversion of the Gainesville Road Investment Funds, Plaintiffs have been damaged.

## COUNT XII – CONVERSION
### (as to the Plum Circle Investment)

177.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

178.    This is a cause of action against Defendants for conversion.

179.    Defendants improper taking and retention of the Plum Circle Investment Funds which belong to Plaintiffs gives rise to a claim for conversion. Defendants, without authorization, asserted dominion and control over the Plum Circle Investment Funds.

180.    The Plum Circle Investment Funds are specifically identifiable property of Plaintiffs and are or were the property of Plaintiffs and which were owned or payable to Plaintiffs.

181.    Defendants' conversion is inconsistent with Plaintiffs' rights and ownership of the Plum Circle Investment Funds.

182.    Walsh solicited and advised Plaintiffs to invest in the Plum Circle Investment. Upon trust and advice and based upon Walsh's solicitation and misrepresentations, Plaintiffs invested $265,000.00 (the Plum Circle Investment Funds) into the PCC Trust for purposes of providing a down payment towards acquiring the Chipley Property. In return, Walsh promised income generation, profits, and refinancing that would result in a repayment of the initial investment after the properties were rehabilitated and exercising maximum use.

183.    Instead of using the Plum Circle Investment Funds as solicited, promised, advised, and agreed upon, Walsh converted the Plum Circle Investment Funds for his own benefit and use or that of his affiliated entities.

184.    The Plum Circle Investment Funds were wrongfully and illegitimately used for the benefit of Defendants.

185.    Plaintiffs made a demand for the return of the Plum Circle Investment Funds, but the funds have not been returned. Defendants have been confronted with the fact that they stole and converted Plaintiffs' property, but Defendants have failed to return any of the property to Plaintiffs and have ignored Plaintiffs' demands.

186.     As a direct and proximate result of Defendants' conversion of the Plum Circle Investment Funds, Plaintiffs have been damaged.

**COUNT XIII – CIVIL THEFT**
**(as to the Gainesville Road Investment)**

187.     Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

188.     This is a cause of action against Walsh for civil theft pursuant to Fla. Stat. § 772.11.

189.     Walsh unlawfully and knowingly obtained the Gainesville Road Investment Funds from Plaintiffs with the intent to temporarily or permanently deprive Plaintiffs of the right to that money and the benefit from that money and to appropriate that money to his own use, through the fraudulent means described herein.

190.     The acts of Walsh constitute violations of Fla. Stat. § 812.014, in that Walsh has stolen the principal sum of $300,000.00 from Plaintiffs through the fraudulent means described herein.

191.     Before filing this claim for civil theft, on June 12, 2020, Plaintiffs—through the Demand Letter—made written demand, by e-mail, U.S. First Class Mail, and Certified Mail Return Receipt Requested, on Walsh pursuant to Fla. Stat. § 772.11.

192.     To date, despite demand by Plaintiffs and Walsh's receipt of the Demand Letter, Walsh has failed to return the Gainesville Road Investment Funds to Plaintiffs and has never accounted to Plaintiffs for such funds. In fact, as of the filing of this Complaint, Walsh has never even responded to the Demand Letter. More than 30 days has passed since Walsh received the Demand Letter.

193.     As a direct and proximate cause of Walsh's unlawful actions, Plaintiffs were and continue to be deprived of their right to their property and the benefit therefrom.

194.    Plaintiffs have suffered damages in the minimum amount of $300,000.00, and, pursuant to Fla. Stat. § 772.11, Plaintiffs are entitled to treble damages in the minimum amount of $900,000.00.

## COUNT XIV – CIVIL THEFT
### (as to the Plum Circle Investment)

195.    Plaintiffs incorporate and reallege Paragraphs 1 through 60 as if fully restated herein.

196.    This is a cause of action against Walsh for civil theft pursuant to Fla. Stat. § 772.11.

197.    Walsh unlawfully and knowingly obtained the Plum Circle Investment Funds from Plaintiffs with the intent to temporarily or permanently deprive Plaintiffs of the right to that money and the benefit from that money and to appropriate that money to his own use, through the fraudulent means described herein.

198.    The acts of Walsh constitute violations of Fla. Stat. § 812.014, in that Walsh has stolen the principal sum of $265,000.00 from Plaintiffs through the fraudulent means described herein.

199.    Before filing this claim for civil theft, on June 12, 2020, Plaintiffs—through the Demand Letter—made written demand, by e-mail, U.S. First Class Mail, and Certified Mail Return Receipt Requested, on Walsh pursuant to Fla. Stat. § 772.11.

200.    To date, despite demand by Plaintiffs and Walsh's receipt of the Demand Letter, Walsh has failed to return the Plum Circle Investment Funds to Plaintiffs and has never accounted to Plaintiffs for such funds. In fact, as of the filing of this Complaint, Walsh has never even responded to the Demand Letter. More than 30 days has passed since Walsh received the Demand Letter.

201.    As a direct and proximate cause of Walsh's unlawful actions, Plaintiffs were and continue to be deprived of their right to their property and the benefit therefrom.

202.    Plaintiffs have suffered damages in the minimum amount of $265,000.00, and, pursuant to Fla. Stat. § 772.11, Plaintiffs are entitled to treble damages in the minimum amount of $795,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

a)  compensatory damages in an amount to be determined at trial;

b)  treble damages pursuant to Fla. Stat. § 772.11;

c)  interest pursuant to Fla. Stat. § 517.211(3);

d)  a full and complete accounting of any funds traceable to Plaintiffs, including the Gainesville Road Investment Funds and Plum Circle Investment Funds;

e)  rescission of Plaintiffs' investments;

f)  punitive damages;

g)  pre- and post-judgment interest and any other interest available under any applicable rule or statute;

h)  all costs of this action, including reasonable attorneys' fees and costs; and

i)  such other and further relief as this Court shall deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: December 22, 2020                Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
*Attorneys for Plaintiffs Joshua J. Craven and CRG
Properties, Inc.*
110 SE 6th Street, Suite 2600
Fort Lauderdale, Florida 33301
Tel.: 954-728-1280
Fax: 954-728-1282
Vincent.Alexander@lewisbrisbois.com
Ishmael.Green@lewisbrisbois.com

By: /s/ Vincent F. Alexander
        Vincent F. Alexander
        Fla. Bar No. 68114
        Ishmael A. Green
        Fla. Bar No. 109100

**IN THE CIRCUIT COURT OF THE**
**THIRTEENTH JUDICIAL CIRCUIT**
**IN AND FOR HILLSBOROUGH COUNTY,**
**FLORIDA - CIVIL DIVISION**

JOSHUA MANCE,

      Plaintiff,

                                    CASE NO.:

v.
                                      DIVISION:

URBAN BAY HOUSING FUND LLC,
URBAN BAY FINANCIAL LLC,
URBAN BAY TAMPA APTS LLC,
CALEB WALSH,

      Defendants.

_____/

## COMPLAINT FOR UNPAID WAGES

The Plaintiff, JOSHUA MANCE ("**Plaintiff**"), by and through his undersigned attorney, sues the above-named Defendants, URBAN BAY FINANCIAL LLC ("UB Financial"), URBAN BAY HOUSING FUND LLC ("UB Housing Fund"), URBAN BAY TAMPA APTS LLC ("UB Tampa Apts"), and CALEB WALSH ("Walsh") (collectively referred to as "**Defendants**"), and alleges;

## JURISDICTION, PARTIES, AND VENUE

1.     This is an action for damages greater than $50,000.00, exclusive of court costs, interest and attorney's fees.

2.     This is an action for unpaid wages and expenses.

3.     Plaintiff is an individual residing in Hillsborough County, Florida.

4.     Urban Bay purports to be a Florida limited liability company and has a principal place of business in Hillsborough County, Florida

5.      UB Housing Fund is a Florida limited liability company headquartered and has a principal place of business in Hillsborough County, Florida.

6.      UB Tampa Apts is a Florida limited liability company and has a principal place of business in Hillsborough County, Florida.

7.      Caleb Walsh is an individual residing in Hillsborough County, Florida.

8.      The venue is proper in Hillsborough County, Florida, as all of the Defendants reside and have their principal place of business in Hillsborough County, Florida.

## GENERAL ALLEGATIONS

9.      All conditions precedent to filing this action were previously performed or waived.

10.     Plaintiff has retained the undersigned attorneys and has obligated himself to pay reasonable attorney's fees and costs.

11.     Plaintiff requests a jury trial for all issues so triable.

## FACTS

12.     Plaintiff began his employment with JohnRuth Capital, Inc. ("JR Capital"), in January of 2018 as a "Regional Manager".

13.     JR Capital, a Florida for Profit Corporation, was, and is, owned and operated by Caleb Walsh ("Walsh").

14.     In November of 2019, Walsh formed UB Housing Fund and registered the LLC with the Florida Department of State.

15.     In April of 2021, Walsh formed UB Tampa Apts and registered the LLC with the Florida Department of State.

16.     Sometime after 2018, Walsh created UB Financial.

17.     UB Financial purports to be a Florida Limited Liability Company, however, it is

not registered with the Florida Department of State under that name.

18.    Walsh uses the name "Urban Bay Financial" as an umbrella entity to encompass the other named entity Defendants.

19.    Walsh is listed as the Manager for each of the entity Defendants registered with the Florida Department of State.

20.    Walsh's own LinkedIn page, which is linked on the UB Financial Website[1], states that he serves as the Director of "Urban Bay and multiple affiliate companies."

21.    Plaintiff was employed by Walsh, and all of his affiliated entities from January 29, 2018, until October 6, 2023.

22.    Plaintiff's paystubs list UB Housing Fund as the entity paying his wages.

23.    Actual checks received by Plaintiff for his payroll, and reimbursed expenses, are paid to the order of "Joshua P. Mance, re: Urban Bay Tampa Apts LLC."

24.    At all relevant times, Plaintiff was performing his job duties under the UB Financial name and considered his employment to be for UB Housing Fund, UB Financial and Walsh.

25.    Walsh dominated and controlled each entity Defendant to such an extent that each corporation's independent existence was in fact non-existent and Walsh is in fact an alter-ego of each named entity Defendant.

26.    In exchange for Plaintiff's services, Defendants agreed to pay Plaintiff a wage, and reimbursement for work-related expenses.

27.    On September 29, 2023, Plaintiff sent a Notice of Resignation to Walsh via email.

28.    Plaintiff's Notice of Resignation included a spreadsheet that detailed the outstanding payroll expense reimbursements due and owing to Plaintiff from January of 2023 to

---

[1] https://urbanbayfinancial.com/

the date of resignation.

29.    Defendants failed to pay Plaintiff all wages owed to Plaintiff, including reimbursement for expenses.

30.    Plaintiff served a formal Demand for Unpaid Wages to Walsh on November 8, 2023, through the undersigned counsel.

31.    The total amount of wages due and owing to Plaintiff is $52,123.52 for wages, and $12,537.29 for expenses, for a grand total of $64,660.81 due and owing to Plaintiff from Defendants.

32.    Despite demand, Defendants still failed to pay Plaintiff all wages and expenses owed.

33.    Plaintiff's unpaid wages and expenses constitute "wages" under Florida common law, as well as under Fla. Stat. § 448.08.

34.    During the statutory period, Plaintiff worked for Defendants, and Defendants agreed to pay Plaintiff for Plaintiff's services.

35.    Defendants failed to pay Plaintiff all "wages" owed to Plaintiff, including Plaintiff's work-related expenses.

36.    As a result of the foregoing, Plaintiff has suffered damages.

**WHEREFORE,** the Plaintiff prays for the following relief:

A.    A jury trial on all issues so triable;

B.    A ruling that all of the Urban Bay entity Defendants are alter-egos of each other and Walsh;

C.    All Defendants are held jointly and severally liable for unpaid wages and expenses as well as any additional damages due to Plaintiff;

D.    Judgment against all Defendants for an amount equal to Plaintiff's unpaid back wages and expenses, as well as any additional damages suffered by Plaintiff, together with post judgment interest;

E.    That Plaintiff be awarded all attorney's fees and court costs incurred, in accordance with Fla. Stat. § 448.08;

F.    That the Court grant such other and further relief as appears just, proper and equitable in the circumstances.

Respectfully submitted, this **11th day of December 2023**.


CRAIG E. ROTHBURD, P.A.

/s/ *Dylan J. Thatcher*

DYLAN J. THATCHER, ESQ.-FBN 1031532
CRAIG E. ROTHBURD, ESQ.-FBN: 0049182
320 W. Kennedy Blvd., #700
Tampa, Florida 33606
Telephone: (813) 251-8800
dylan@rothburdpa.com
craig@rothburdpa.com
maria@rothburdpa.com
*Counsel for Plaintiff*
CERPA File No.  7119

# EXHIBIT L



# Detail by Entity Name

Florida Limited Liability Company
URBAN BAY TAMPA APTS LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L21000159645 |
| **FEI/EIN Number** | 86-3494110 |
| **Date Filed** | 04/06/2021 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 04/29/2025 |
| **Event Effective Date** | 04/29/2025 |

**Principal Address**

7901 4TH ST N
STE 300
ST. PETERSBURG, FL 33702

**Mailing Address**

7901 4TH ST N
STE 300
ST. PETERSBURG, FL 33702

**Registered Agent Name & Address**

REGISTERED AGENTS INC.
7901 4TH ST N
STE 300
ST. PETERSBURG, FL 33702

Address Changed: 04/08/2023

**Authorized Person(s) Detail**

**Name & Address**

Title Manager

Walsh, Caleb
13194 us Hwy 301 s
374
Riverview, FL 33578

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2022 | 01/20/2022 |
| 2023 | 04/08/2023 |

**Document Images**

| | |
|---|---|
| 04/29/2025 -- VOLUNTARY DISSOLUTION | View image in PDF format |
| 04/08/2023 -- ANNUAL REPORT | View image in PDF format |
| 01/20/2022 -- ANNUAL REPORT | View image in PDF format |
| 04/06/2021 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

# EXHIBIT M

See below.

---

**From:** Joseph Hernandez <joseph@urbanbayfinancial.com>
**Sent:** Wednesday, April 19, 2023 12:36 PM
**To:** David Weinstein <dweinstein@fmm.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Caleb Walsh <hq@urbanbayfinancial.com>; Joshua Mance <josh@urbanbayfinancial.com>; Brittany Infield <brittany@urbanbayfinancial.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Joshua Mance <josh@urbanbayfinancial.com>
**Subject:** Cottonwood structure

Team,

Since the information provided on Monday's call, we've worked out further details in order to be able to fund the horizontal portion of the project as well as the vertical.

I'm reaching out to confirm that we still wish to move forward to funding, and to see if all necessary parties are available for another call tomorrow in order to expedite this process.

Before scheduling the call, I also want to make sure we understand that we are all on the same team here, all with a common goal. The call will consist strictly of technicalities to make sure all details of the project are confirmed, and we want to avoid any interrogation-styled interaction.

Urban Bay is still fully invested into this closing, and we want to assure that the borrowing team is on the same page.

Please confirm availability tomorrow for a follow-up call with credit and underwriting, and please see the description for a brief outline of the structure in which we're looking fund. As you can see below, the Horizontal and the Vertical will essentially be broken down into two different structures.


**Horizontal Construction Loan**
Loan Amount:        The lesser of:
$3,500,000
50% of the appraised 'at completion' value
50% of the projected total cost

    Loan Term:        12 months
    Interest Rate:        12% on drawn funds, 5% on undrawn funds, fixed
    Payments:        Interest-only monthly from interest reserve
    Prepayment:        50% of projected interest to be paid, no prepay thereafter
    Release:        Individual parcels released for 125% of par

**Vertical Construction Revolver**
Loan Amount:        The lesser of:
$5,189,000

60% of the appraised 'at completion' value
75% of the projected total cost

Loan Term:          12 months
Interest Rate:      11% on drawn funds, 0% on undrawn funds, fixed
Payments:           Interest-only monthly from interest reserve.  Loan will include 9 months
interest per unit.
Prepayment:         2% prepayment fee for first 6 months, no prepay thereafter
Revolver:           Financing costs to be paid by borrower in cash at closing
                    -Maximum of 18 units on the line at a time
                    -Minimum interest to be charged on $3,000,000 drawn, starting 150 days
from loan closing
Release:            Individual parcels released for 110% of par, $317,090


Please advise,



**Joseph Hernandez**
Urban Bay Financial

Commercial Loan Originator
Email: joseph@urbanbayfinancial.com
Office: 813.606.4630 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611
www.urbanbayfinancial.com

**From:** Caleb Walsh
**Sent:** Tuesday, April 11, 2023 12:12 PM
**To:** David Weinstein ; Brittany Infield ; Sol Gottlieb
**Cc:** Joshua Mance ; Joseph Hernandez
**Subject:** Re: Cottonwood

All, I think there was some form of a mixup as we need the borrower on the call to proceed.

We would like to reschedule this call when the borrower is back from Passover. This is all about the technical aspects of the project at this point and how to structure the proceeds at the funding table and the draw distributions, payoffs etc.

Per our former email,

Please assemble all details relating to the Horizontal work completed and to be completed on this project. We need specificty as this loan was originated based on the Vertical and the lack of information as to the Horizontal other than general math and brief descriptions is putting holding the file in place.

Our intention is to close this loan under what we understood is a "time of the essence closing" due to the maturity default condition of the loan with the foreberance agreement coming due at the end of this week. Please understand that this is the second registered delay that had nothing to do with Urban Bay Financial. The first delay being the Appraisal company receiving instructions from the borrower to hold on completeing the work as their was a competing offer from a different firm, obviously that has since been worked out but it cost us preacious time. Here we are again attempting to make the closing happen and not able to reach the borrower, our offices our open but we are at another standstill.

If the borrower is ready to speak on Friday the 14th please let us know the time we can setup the call for so that we can allow our team to work through the necessary information that is needed to properly paper this closing.

Many Thanks,



**Office of the Director, Caleb Walsh**

Urban Bay Financial

Email: hq@urbanbayfinancial.com

Office: 813.499.9712 | Fax: 813.499.9487

4868 W Gandy Blvd, Tampa, FL 33611

www.urbanbayfinancial.com

---

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Monday, April 10, 2023 6:00 PM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; Brittany Infield <brittany@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood

I understand.

He is observing Passover, and I have been unable to reach him via email or phone. I will send you all documentation related to the required horizontal work and will keep you posted as to the borrower's availability.

Get Outlook for Android

---

**From:** Caleb Walsh <hq@urbanbayfinancial.com>
**Sent:** Monday, April 10, 2023 2:49:26 PM
**To:** David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood

David,

Nothing is with a different company, we are trying to nail down the closing statement and associated loan documents with our credit team and it became clear there is $1.6m worth of horizontal work that needs to be completed, and although we have thoroughly underwritten the vertical portion of this loan, it became apparent in the 11th hour that there is no document that thoroughly outlines specifics completed on the horizontal work and what is left to be done. Considering this would need to be completed before our vertical work is completed, it's hard to shape the closing with this uncertainty.

This is the reason for the call and the reason we need to have the direct borrower, the person performing the project to answer the questions.



**Office of the Director, Caleb Walsh**

Urban Bay Financial

Email: hq@urbanbayfinancial.com

Office: 813.499.9712 | Fax: 813.499.9487

4868 W Gandy Blvd, Tampa, FL 33611

www.urbanbayfinancial.com

---

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Monday, April 10, 2023 2:41 PM
**To:** Brittany Infield <brittany@urbanbayfinancial.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood

Brittany,

You just informed me that borrower needs to be on the call a few hours ago. I have not been able to reach the borrower. We have already had multiple calls with the borrower. I do not understand why we need to do this again otherwise delay the call. Can you please explain what is going on and why we are having a call with someone at a different company?

It seems that this is being brokered.

I really would like transparency here.

The biggest issue, as you know, is closing date must be on or before April 14th. You already committed to closing by March 31st and have collected $165,000 in fees toward that end.

Please confirm we will be closing on or before April 14th. At this point we have been going circles submitting the same information over and over again.

Get Outlook for Android

---

**From:** Brittany Infield <brittany@urbanbayfinancial.com>
**Sent:** Monday, April 10, 2023 2:13:05 PM
**To:** David Weinstein <dweinstein@fmm.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood

David,

We need to know that everyone including the borrower will be available to be on the call. If the borrower is unable to be on the call, please advise and we will reschedule. Please let me know today.

Thank you,



**Brittany Infield**
Urban Bay Financial

Executive Assistant to Caleb Walsh
Email: brittany@urbanbayfinancial.com
Office: 813.499.9712 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611
www.urbanbayfinancial.com

---

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Monday, April 10, 2023 2:09 PM
**To:** Brittany Infield <brittany@urbanbayfinancial.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood

I will ask him and let you know.

Get Outlook for Android

**From:** Brittany Infield <brittany@urbanbayfinancial.com>
**Sent:** Monday, April 10, 2023 11:32:02 AM
**To:** David Weinstein <dweinstein@fmm.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
David,
Will the borrower be available as well? Please advise.
Thank you,



**Brittany Infield**
Urban Bay Financial

Executive Assistant to Caleb Walsh
Email: brittany@urbanbayfinancial.com
Office: 813.499.9712 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611
www.urbanbayfinancial.com

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Monday, April 10, 2023 8:43 AM
**To:** Brittany Infield <brittany@urbanbayfinancial.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
I am available 4/11 at 12pm est.
Get Outlook for Android

**From:** Brittany Infield <brittany@urbanbayfinancial.com>
**Sent:** Monday, April 10, 2023 8:11:00 AM
**To:** David Weinstein <dweinstein@fmm.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
Hello,
Please advise if any of the below times will work to have a call with credit:
Today 4/10/23 @ 1pm, 3:30pm, 4pm
4/11/23 @ 12pm, 12:30pm, 1pm, 3:30pm, 4pm
This call with credit is to help us better understand what has been done and what needs to be done with the actual horizontal work.
Thank you,



**Brittany Infield**
Urban Bay Financial

Executive Assistant to Caleb Walsh
Email: brittany@urbanbayfinancial.com
Office: 813.499.9712 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611
www.urbanbayfinancial.com

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Saturday, April 8, 2023 9:48 PM
**To:** Brittany Infield <brittany@urbanbayfinancial.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>

**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood

Brittany,

I must say I am shocked by these questions. This was all discussed on our initial communication and at least an additional 10 times by phone. I have never seen anything like this in my career. Here are the answers again.

Is the borrower done with the horizontal work? No

Are the lots split yet, or is it all one parcel? It is all one parcel until water is in, at which point it becomes subdivided.

Please confirm the vertical budget for the first 30 homes. Confirmed

Get Outlook for Android

---

**From:** Brittany Infield <brittany@urbanbayfinancial.com>
**Sent:** Thursday, April 6, 2023 3:47:19 PM
**To:** David Weinstein <dweinstein@fmm.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood

Hi David,

I need answers on the below:
Is the borrower done with the horizontal work?
Are the lots split yet, or is it all one parcel?
Please confirm the vertical budget for the first 30 homes
Please get us answers to these questions as soon as you can.
Thank you,

**Brittany Infield**
Urban Bay Financial

Executive Assistant to Caleb Walsh
Email: brittany@urbanbayfinancial.com
Office: 813.499.9712 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611
www.urbanbayfinancial.com

---

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Wednesday, April 5, 2023 1:22 PM
**To:** Brittany Infield <brittany@urbanbayfinancial.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood

Ok.
I will work on. Most likely not able to get that until Monday.
Can you send me a complete list of items needed rather than sending one at a time?
Get Outlook for Android

---

**From:** Brittany Infield <brittany@urbanbayfinancial.com>
**Sent:** Wednesday, April 5, 2023 1:08:48 PM
**To:** David Weinstein <dweinstein@fmm.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood

David,

We need to have a copy of the borrower experience. We have their REO, but we need specifically a track record of experience from the most recent three years. Please provide.
Thank you,



**Brittany Infield**
Urban Bay Financial

Executive Assistant to Caleb Walsh
Email: brittany@urbanbayfinancial.com
Office: 813.499.9712 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611
www.urbanbayfinancial.com

---

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Wednesday, April 5, 2023 12:31 PM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood

Why is it taking a week to schedule a zoom call? We discussed this last Thursday and have been waiting for scheduling. We have a hard-close date on the 14th and this next week is a holiday.

Get Outlook for Android

---

**From:** Caleb Walsh <hq@urbanbayfinancial.com>
**Sent:** Wednesday, April 5, 2023 10:43:56 AM
**To:** David Weinstein <dweinstein@fmm.com>; Sol Gottlieb <sgottlieb@fmcapital.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood

Urban has not gone dark. Brittany please find out when credit can hold the aforementioned zoom meeting with sponsor.

**Sent:** Monday, April 3, 2023 9:38:59 AM
**To:** Sol Gottlieb <sgottlieb@fmcapital.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood

Sol you and i have multiple messages exchanged on Friday / Thursday and more, please review the thread.

I'm setting up a zoom call with you and credit to finanlize the details i outlined on the "Budget per House".

Many Thanks,



**Office of the Director, Caleb Walsh**

Urban Bay Financial

Email: hq@urbanbayfinancial.com

Office: 813.499.9712 | Fax: 813.499.9487

4868 W Gandy Blvd, Tampa, FL 33611

www.urbanbayfinancial.com



**Office of the Director, Caleb Walsh**

Urban Bay Financial

Email: hq@urbanbayfinancial.com

Office: 813.499.9712 | Fax: 813.499.9487

4868 W Gandy Blvd, Tampa, FL 33611

www.urbanbayfinancial.com

---

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Wednesday, April 5, 2023 10:39 AM
**To:** Sol Gottlieb <sgottlieb@fmcapital.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
Caleb,
We need to know what is happening, we are going days with Urban dark on us.
We have not made any progress since last week.
Urban committed to closing by end of March, and pressured our client into submitting a very large deposit asap to that effect.
We are now past your commitment date and we are not hearing from your team.
This is unacceptable.
Get Outlook for Android

---

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>
**Sent:** Tuesday, April 4, 2023 3:59:32 PM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
Is there any reason why there was no response to my email below? We are heading into Passover during which time we will have very limited time to work on this file. Can we get a response ASAP?
This is not fair to us and our client.
Thank you.
Sol Gottlieb

---

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>
**Sent:** Monday, April 3, 2023 9:42 AM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
Thank you. And sorry if I missed the response to my questions on Thursday. Can you please forward me that email? Might have been blocked by new filter our IT Dept installed.
Thank you
Sol Gottlieb

Sol Gottlieb

FM Capital

56 Congers Road

New City, NY 10956

Cell: 845-263-7402

Email: sgottlieb@fmcapital.com

---

**From:** Caleb Walsh <hq@urbanbayfinancial.com>
**Sent:** Monday, April 3, 2023 9:38:59 AM

**To:** Sol Gottlieb <sgottlieb@fmcapital.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
Sol you and i have multiple messages exchanged on Friday / Thursday and more, please review the thread.
I'm setting up a zoom call with you and credit to finanlize the details i outlined on the "Budget per House".
Many Thanks,



### Office of the Director, Caleb Walsh

Urban Bay Financial

Email: hq@urbanbayfinancial.com

Office: 813.499.9712 | Fax: 813.499.9487

4868 W Gandy Blvd, Tampa, FL 33611

www.urbanbayfinancial.com

---

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>
**Sent:** Monday, April 3, 2023 9:00 AM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
Good morning, Caleb and team. Is there any reason we have not heard anything from urban last week? Why is everything like pulling teeth? Is there anything we can do to help your underwriting team wrap this up?
Please advise
Thank you
Sol Gottlieb

Sol Gottlieb

FM Capital

56 Congers Road

New City, NY 10956

Cell: 845-263-7402

Email: sgottlieb@fmcapital.com

---

**From:** Sol Gottlieb
**Sent:** Friday, March 31, 2023 12:47:05 PM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
Guys, another day flying by quickly. Can we get something already?
Thank you.
Sol Gottlieb

---

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>
**Sent:** Friday, March 31, 2023 10:06 AM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
Where are we on loan docs? If you can just tell us on the initial funding, we can then confirm with the borrower and get the docs in order

Sol Gottlieb

FM Capital

56 Congers Road

New City, NY 10956

Cell: 845-263-7402

Email: sgottlieb@fmcapital.com

**From:** Caleb Walsh <hq@urbanbayfinancial.com>
**Sent:** Friday, March 31, 2023 9:54:50 AM
**To:** Sol Gottlieb <sgottlieb@fmcapital.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
I have the updates I will give you a rough draft of estimated hud amounts this morning shortly.



**Office of the Director, Caleb Walsh**

Urban Bay Financial

Email: hq@urbanbayfinancial.com

Office: 813.499.9712 | Fax: 813.499.9487

4868 W Gandy Blvd, Tampa, FL 33611

www.urbanbayfinancial.com

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>
**Sent:** Friday, March 31, 2023 9:53 AM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
Calec and team, good morning. When can we expect an answer to the below questions?
I don't understand why this isn't being dealt with the utmost urgency. Please advise asap.
Thank you
Sol Gottlieb

Sol Gottlieb

FM Capital

56 Congers Road

New City, NY 10956

Cell: 845-263-7402

Email: sgottlieb@fmcapital.com

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>
**Sent:** Thursday, March 30, 2023 6:38:47 PM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
Caleb, can you please advise so that we can wrap this up? Thank you

Sol Gottlieb

FM Capital

56 Congers Road

New City, NY 10956

Cell: 845-263-7402

Email: sgottlieb@fmcapital.com

**From:** Sol Gottlieb
**Sent:** Thursday, March 30, 2023 5:40:21 PM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield
<brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
In addition to the below which I think looks fine, but client still needs to confirm how much will be funded day 1 for the loan payoff and
initial soft cost related to the water fee and electric deposit? And what would be the final horizontal loan balance at the time when the
vertical loan will be drawn upon for the first time?
Thank you

**From:** Sol Gottlieb
**Sent:** Thursday, March 30, 2023 5:19 PM
**To:** Caleb Walsh <hq@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield
<brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
Thanks Caleb, can you send in excel for easier review?
Thank you

**From:** Caleb Walsh <hq@urbanbayfinancial.com>
**Sent:** Thursday, March 30, 2023 5:05 PM
**To:** David Weinstein <dweinstein@fmm.com>; Sol Gottlieb <sgottlieb@fmcapital.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
David / Sol and team,
Thank you for your patience as I worked with my credit team to get this outlined enough to a point where we can start drafting
documents.
**Based on credits review of the appraisal, here are their comments on how we will setup the loan docs:**
1. We are going to look at each vertical unit individually.
2. When a unit's foundation is poured, half the loan dollars are disbursed.
   a. ~$27,603 is disbursed from the vertical revolver to pay down the horizontal construction loan at 125% of par.
   b. $250 is disbursed to Lender for fund control (we do fund control in-house).
   c. ~$23,782 is disbursed to our servicing company for interest reserve. This assumes 9 months for construction, sale and
      closing.
   d. ~$92,748 is wired into the borrower's bank account.
3. When a unit's roof is complete (or some other milestone that we agree on), the second half of the loan dollars are disbursed.
   a. $250 is disbursed to Lender for fund control.
   b. ~$143,882 is wired to the borrower's bank account.
4. When a unit closes we require paydown at 110% of par, ~$317,090.
Advantages:
1. Borrower manages their cash flow much easier.
2. Less equity required up front (they keep it).
3. On every unit closing they get their equity for that unit back AND the profit for that unit.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Land Equity / Lot | | $ 18,927 | $ 18,927 | $ - | | $ - | |
| Land Paydown (125% of par) | | $ 27,603 | $ - | $ - | | $ 27,603 | |
| Vertical Costs | | $ 289,031 | $ - | $ 67,103 | | $ 221,928 | |
| Contingency | 5% | $ 14,452 | $ - | $ - | | $ 14,452 | |
| Interest Reserve | | $ 23,782 | $ - | $ - | | $ 23,782 | |
| Fund Control | | $ 500 | $ - | $ - | | $ 500 | |
| Loan Closing Costs | | $ 10,142 | $ 10,142 | $ - | | $ - | |
| Closing & Financing Costs | | $ - | $ - | $ - | | $ - | |
| **Total Costs** | | **$ 384,436** | **$ 29,069** | **$ 67,103** | | **$ 288,264** | |
| Percentage of Costs | | 100.0% | 7.6% | 17.5% | | 75.0% | |
| Loan to Value - As Complete | | $ 521,519 | | | | 55.3% | |

### Disbursed once Milestone #1 is complete

| | | |
|---|---|---|
| Land Loan Paydown: | $ | 27,603 |
| Fund Control: | $ | 250 |
| Interest Reserve (dsbrsd to Loan Servicer): | $ | 23,782 |
| Hard & Soft Costs (disbursed to Borrower): | $ | 92,498 |
| **Total:** | **$** | **144,132** |

### Disbursed once Milestone #2 is complete

| | | |
|---|---|---|
| Fund Control: | $ | 250 |
| Hard & Soft Costs (disbursed to Borrower): | $ | 143,882 |
| **Total:** | **$** | **144,132** |

| Interest Reserve Calculation | | | Miscellaneous Terms | | |
|---|---|---|---|---|---|
| Loan Amount | $ | 288,263 | Prepayment Fee (months) | | 2% for 6 mnths |
| Loan Term (Months) | | 12 | Late Charge (10 days) | | 10% |
| Interest Rate | | 11.00% | Monthly Payments (I/O) | $ | 2,642 |
| | | | Release Price (110% of par) | $ | 317,090 |
| Interest Reserve Months | | 9 | Exit Fee | | 1.00% |
| Total Interest Reserve | **$** | **23,782** | | | |

Let me know the questions any questions on this, we should be able to have everything set to proceed and beat the deadline!
Many Thanks,

**Office of the Director, Caleb Walsh**



Urban Bay Financial

Email: hq@urbanbayfinancial.com

Office: 813.499.9712 | Fax: 813.499.9487

4868 W Gandy Blvd, Tampa, FL 33611

www.urbanbayfinancial.com

---

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Thursday, March 30, 2023 2:42 PM
**To:** Sol Gottlieb <sgottlieb@fmcapital.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Brittany Infield <brittany@urbanbayfinancial.com>

**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>

**Subject:** Re: Cottonwood

Caleb,

Can we please discuss timing on this?

**Apply Now**

--

**David Weinstein**

Senior Loan Officer | NMLS # 2073478

56 Congers Rd.

New City, NY 10956

Mobile: 646-496-5169

dweinstein@fmm.com

https://www.fmm.com







The greatest compliment I can receive is a recommendation to your friends, loved ones or co-workers.

Thank you for your trust and continued business.

**FM Home Loans, LLC | NMLS ID: 2212**

This e-mail, along with any attachments, is considered confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>

**Sent:** Thursday, March 30, 2023 12:46 PM

**To:** David Weinstein <dweinstein@fmm.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Brittany Infield <brittany@urbanbayfinancial.com>

**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>

**Subject:** RE: Cottonwood

Guys, any update on this file? It's the 30th! Please advise ASAP.

Thank you

**From:** Sol Gottlieb

**Sent:** Wednesday, March 29, 2023 5:09 PM

**To:** David Weinstein <dweinstein@fmm.com>; Caleb Walsh <hq@urbanbayfinancial.com>; Brittany Infield <brittany@urbanbayfinancial.com>

**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>

**Subject:** RE: Cottonwood

Hi Caleb, anything yet?

Thank you

**From:** David Weinstein <dweinstein@fmm.com>

**Sent:** Wednesday, March 29, 2023 1:57 PM

**To:** Caleb Walsh <hq@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>; Brittany Infield <brittany@urbanbayfinancial.com>

**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>

**Subject:** Re: Cottonwood

Ok. Thank you.

**Apply Now**

--

**David Weinstein**

Senior Loan Officer | NMLS # 2073478

56 Congers Rd.

New City, NY 10956

Mobile: 646-496-5169

dweinstein@fmm.com

https://www.fmm.com





Survey

The greatest compliment I can receive is a recommendation to your friends, loved ones or co-workers.
Thank you for your trust and continued business.

**FM Home Loans, LLC | NMLS ID: 2212**

This e-mail, along with any attachments, is considered confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**From:** Caleb Walsh <hq@urbanbayfinancial.com>
**Sent:** Wednesday, March 29, 2023 1:40 PM
**To:** Sol Gottlieb <sgottlieb@fmcapital.com>; David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
I gave my credit guys a day, I'll see if I can get a response this afternoon.



**Office of the Director, Caleb Walsh**

Urban Bay Financial

Email: hq@urbanbayfinancial.com

Office: 813.499.9712 | Fax: 813.499.9487

4868 W Gandy Blvd, Tampa, FL 33611

www.urbanbayfinancial.com

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>
**Sent:** Wednesday, March 29, 2023 1:32 PM
**To:** David Weinstein <dweinstein@fmm.com>; Brittany Infield <brittany@urbanbayfinancial.com>
**Cc:** Caleb Walsh <hq@urbanbayfinancial.com>; Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
Is there an update on this file yet?

Sol Gottlieb

FM Capital

56 Congers Road

New City, NY 10956

Cell: 845-263-7402

Email: sgottlieb@fmcapital.com

**From:** David Weinstein <dweinstein@fmm.com>
**Sent:** Tuesday, March 28, 2023 6:03:26 PM
**To:** Brittany Infield <brittany@urbanbayfinancial.com>; Sol Gottlieb <sgottlieb@fmcapital.com>
**Cc:** Caleb Walsh <hq@urbanbayfinancial.com>; Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** Re: Cottonwood
Thanks.
How long does the review generally take?
What are next steps?

**Apply Now**

--

**David Weinstein**

Senior Loan Officer | NMLS # 2073478

56 Congers Rd.

New City, NY 10956

Mobile: 646-496-5169

dweinstein@fmm.com

https://www.fmm.com





 SocialSurvey

The greatest compliment I can receive is a recommendation to your friends, loved ones or co workers.
Thank you for your trust and continued business.

**FM Home Loans, LLC | NMLS ID: 2212**

This e-mail, along with any attachments, is considered confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**From:** Brittany Infield <brittany@urbanbayfinancial.com>
**Sent:** Tuesday, March 28, 2023 4:32 PM
**To:** Sol Gottlieb <sgottlieb@fmcapital.com>; David Weinstein <dweinstein@fmm.com>
**Cc:** Caleb Walsh <hq@urbanbayfinancial.com>; Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
Hi Sol,
I sent a follow up to our back office regarding the review of the appraisal and will advise of any update.
Thank you,



**Brittany Infield**
Urban Bay Financial

Executive Assistant to Caleb Walsh
Email: brittany@urbanbayfinancial.com
Office: 813.499.9712 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611

[www.urbanbayfinancial.com](www.urbanbayfinancial.com)

**From:** Sol Gottlieb <[sgottlieb@fmcapital.com](mailto:sgottlieb@fmcapital.com)>
**Sent:** Tuesday, March 28, 2023 4:23 PM
**To:** Brittany Infield <[brittany@urbanbayfinancial.com](mailto:brittany@urbanbayfinancial.com)>, David Weinstein <[dweinstein@fmm.com](mailto:dweinstein@fmm.com)>
**Cc:** Caleb Walsh <[hq@urbanbayfinancial.com](mailto:hq@urbanbayfinancial.com)>; Joshua Mance <[josh@urbanbayfinancial.com](mailto:josh@urbanbayfinancial.com)>; Joseph Hernandez <[joseph@urbanbayfinancial.com](mailto:joseph@urbanbayfinancial.com)>
**Subject:** RE: Cottonwood
Following up on this – please advise as soon as possible.
Thank you

**From:** Sol Gottlieb <[sgottlieb@fmcapital.com](mailto:sgottlieb@fmcapital.com)>
**Sent:** Tuesday, March 28, 2023 11:14 AM
**To:** Brittany Infield <[brittany@urbanbayfinancial.com](mailto:brittany@urbanbayfinancial.com)>, David Weinstein <[dweinstein@fmm.com](mailto:dweinstein@fmm.com)>
**Cc:** Caleb Walsh <[hq@urbanbayfinancial.com](mailto:hq@urbanbayfinancial.com)>; Joshua Mance <[josh@urbanbayfinancial.com](mailto:josh@urbanbayfinancial.com)>; Joseph Hernandez <[joseph@urbanbayfinancial.com](mailto:joseph@urbanbayfinancial.com)>
**Subject:** Re: Cottonwood
Good morning, any updates you can share?
Thank you
Sol Gottlieb

Sol Gottlieb

FM Capital

56 Congers Road

New City, NY 10956

Cell: [845-263-7402](tel:845-263-7402)

Email: [sgottlieb@fmcapital.com](mailto:sgottlieb@fmcapital.com)

**From:** Sol Gottlieb
**Sent:** Monday, March 27, 2023 3:46:05 PM
**To:** Brittany Infield <[brittany@urbanbayfinancial.com](mailto:brittany@urbanbayfinancial.com)>, David Weinstein <[dweinstein@fmm.com](mailto:dweinstein@fmm.com)>
**Cc:** Caleb Walsh <[hq@urbanbayfinancial.com](mailto:hq@urbanbayfinancial.com)>; Joshua Mance <[josh@urbanbayfinancial.com](mailto:josh@urbanbayfinancial.com)>; Joseph Hernandez <[joseph@urbanbayfinancial.com](mailto:joseph@urbanbayfinancial.com)>
**Subject:** RE: Cottonwood
The payoff is dated for Feb 28th but I am told it's the same payoff amount. I will get you an updated one but lets not hold up anything – thank you!

**From:** Sol Gottlieb
**Sent:** Monday, March 27, 2023 3:45 PM
**To:** Brittany Infield <[brittany@urbanbayfinancial.com](mailto:brittany@urbanbayfinancial.com)>, David Weinstein <[dweinstein@fmm.com](mailto:dweinstein@fmm.com)>
**Cc:** Caleb Walsh <[hq@urbanbayfinancial.com](mailto:hq@urbanbayfinancial.com)>; Joshua Mance <[josh@urbanbayfinancial.com](mailto:josh@urbanbayfinancial.com)>; Joseph Hernandez <[joseph@urbanbayfinancial.com](mailto:joseph@urbanbayfinancial.com)>
**Subject:** RE: Cottonwood
Great! See attached proof of funds and payoff letters.
Please let us know when we can expect loan docs
Thank you!
Sol Gottlieb

**From:** Brittany Infield [brittany@urbanbayfinancial.com](mailto:brittany@urbanbayfinancial.com)
**Sent:** Monday, March 27, 2023 3:29 PM
**To:** Sol Gottlieb [sgottlieb@fmcapital.com](mailto:sgottlieb@fmcapital.com); David Weinstein [dweinstein@fmm.com](mailto:dweinstein@fmm.com)
**Cc:** Caleb Walsh [hq@urbanbayfinancial.com](mailto:hq@urbanbayfinancial.com); Joshua Mance [josh@urbanbayfinancial.com](mailto:josh@urbanbayfinancial.com); Joseph Hernandez [joseph@urbanbayfinancial.com](mailto:joseph@urbanbayfinancial.com)
**Subject:** RE: Cottonwood
Hello,
We received the appraisal this afternoon. Our back office is reviewing and I will once I have any update.
Thank you,



**Brittany Infield**
Urban Bay Financial

Executive Assistant to Caleb Walsh
Email: brittany@urbanbayfinancial.com
Office: 813.499.9712 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611
www.urbanbayfinancial.com

---

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>
**Sent:** Monday, March 27, 2023 3:26 PM
**To:** Brittany Infield <brittany@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>
**Cc:** Caleb Walsh <hq@urbanbayfinancial.com>; Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
Hi Brittany, has the appraisal been provided yet?
Thank you

---

**From:** Brittany Infield <brittany@urbanbayfinancial.com>
**Sent:** Friday, March 24, 2023 9:50 AM
**To:** Sol Gottlieb <sgottlieb@fmcapital.com>; David Weinstein <dweinstein@fmm.com>
**Cc:** Caleb Walsh <hq@urbanbayfinancial.com>; Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
Good morning,
If that is the case, I would be able to get the appraisal which I am not able to do. We are now almost 2 weeks behind waiting on the appraisal which is causing a delay on a loan that we originally wanted to fund quickly. The appraisal assignment has also already been paid for and yet to be assigned. We cannot move forward without the updated appraisal in hand for review.
Thank you,



**Brittany Infield**
Urban Bay Financial

Executive Assistant to Caleb Walsh
Email: brittany@urbanbayfinancial.com
Office: 813.499.9712 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611
www.urbanbayfinancial.com

---

**From:** Sol Gottlieb <sgottlieb@fmcapital.com>
**Sent:** Thursday, March 23, 2023 5:47 PM
**To:** Brittany Infield <brittany@urbanbayfinancial.com>; David Weinstein <dweinstein@fmm.com>
**Cc:** Caleb Walsh <hq@urbanbayfinancial.com>; Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>
**Subject:** RE: Cottonwood
Hi,
We just tried calling you and got voicemail. There seems to be a miscommunication. The borrower and us are fully committed to close with Urban Bay. Please DO NOT pause the loan. We have a real deadline to meet, and we have confidence with you.
Please call me to discuss this further.
Thank you,
Sol Gottlieb

---

**From:** Brittany Infield <brittany@urbanbayfinancial.com>
**Sent:** Thursday, March 23, 2023 4:39 PM
**To:** Sol Gottlieb <sgottlieb@fmcapital.com>; David Weinstein <dweinstein@fmm.com>

**Cc:** Caleb Walsh <hq@urbanbayfinancial.com>; Joshua Mance <josh@urbanbayfinancial.com>; Joseph Hernandez <joseph@urbanbayfinancial.com>

**Subject:** Cottonwood

Hi Team,

We have been pounding the pavement attempting to complete the underwriting file as we know time is of the essence on this file. Two weeks ago, we paid for the BBG appraisal to be updated and assigned to our firm Urban Bay Financial. While waiting for the appraisal, our underwriting team worked through property taxes, project reserve escrow, we updated the DSCR due to rate increases, worked on the property tax escrow, and anticipated moving our capital into escrow pending the appraisal being returned along with a cost analysis report. We worked with a fund partner in Casa Grande to give us local comps to confirm a $520k target resell price was obtainable; we have been editing a preliminary Hud statement and to our alarm found out today from our contact John Wyatt at BBG that they cannot assign / update the appraisal to us because the borrower may assign to a different lender that they are working with on this same file. We have been calling BBG multiple times a day and informed you of the fact that we were doing this as it is a necessary component of our closing of the file, only to find out the borrowing team was working against us. This is a complete violation of our commitment agreement, and we are forced to pause the file as it seems the borrower has gone in a different direction, completely wasting the time of our staff and resources.

Thank you,



**Brittany Infield**
Urban Bay Financial

Executive Assistant to Caleb Walsh
Email: brittany@urbanbayfinancial.com
Office: 813.499.9712 | Fax: 813.499.9487
4868 W Gandy Blvd, Tampa, FL 33611
www.urbanbayfinancial.com

This e-mail, along with any attachments, is considered confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**FM Home Loans, LLC | NMLS ID: 2212**

This e-mail, along with any attachments, is considered confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**FM Home Loans, LLC | NMLS ID: 2212**

This e-mail, along with any attachments, is considered confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**FM Home Loans, LLC | NMLS ID: 2212**

This e-mail, along with any attachments, is considered confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**FM Home Loans, LLC | NMLS ID: 2212**

This e-mail, along with any attachments, is considered confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

# EXHIBIT N

**FILED**
**Apr 30, 2025**
**Secretary of State**

# ARTICLES OF DISSOLUTION

Pursuant to section 605.0707, Florida Statutes, this Florida limited liability company submits the following Articles of Dissolution:

The name of the limited liability company as currently filed with the Florida Department of State:

URBAN BAY HOUSING FUND LLC

The document number of the limited liability company: L19000293153

The file date of the articles of organization: November 27, 2019

The effective date of the dissolution if not effective on the date of filing: April 30, 2025

A description of occurance that resulted in the limited liability company's dissolution:

BUSINESS CLOSED.

The name and address of the person appointed to wind up the company's activities and affairs:

CALEB WALSH
13194 US HWY 301 S #374
RIVERVIEW, FL  33578      US

I/we submit this document and affirm that the facts stated herein are true.  I/we am/are aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in section 817.155, Florida Statutes.

Signature:   CALEB WALSH

Electronic Signature of authorized person

# EXHIBIT O

**FILED**
**Apr 29, 2025**
**Secretary of State**

# ARTICLES OF DISSOLUTION

Pursuant to section 605.0707, Florida Statutes, this Florida limited liability company submits the following Articles of Dissolution:

The name of the limited liability company as currently filed with the Florida Department of State:

URBAN BAY TAMPA APTS LLC

The document number of the limited liability company: L21000159645

The file date of the articles of organization: April 6, 2021

The effective date of the dissolution if not effective on the date of filing: April 29, 2025

A description of occurance that resulted in the limited liability company's dissolution:

BUSINESS CLOSED.

The name and address of the person appointed to wind up the company's activities and affairs:

CALEB WALSH
13194 US HWY 301 S #374
RIVERVIEW, FL  33578     US

I/we submit this document and affirm that the facts stated herein are true.  I/we am/are aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in section 817.155, Florida Statutes.

Signature:  CALEB WALSH
_____
Electronic Signature of authorized person